UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| THOMAS OSTROWSKI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:18-cv-00423-TLS |
| | ) | |
| LAKE COUNTY, INDIANA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

# DEFENDANTS' EXHIBIT B – EXCERPTS OF THOMAS OSTROWSKI DEPOSITION TRANSCRIPT
## (with deposition exhibits)

Kenneth J. Yerkes
Bart Karwath
Jackie S. Gessner
**BARNES & THORNBURG LLP**
11 South Meridian Street
Indianapolis, Indiana  46204
Telephone:     (317) 236-1313
Facsimile:     (317) 231-7433
E-mail:     ken.yerkes@btlaw.com
         bart.karwath@btlaw.com
         jackie.gessner@btlaw.com

*Counsel for Defendants*

Page 1

1              UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF INDIANA
2                   HAMMOND DIVISION
3

     THOMAS OSTROWSKI,                )
4                                     )
                  Plaintiff,          )
5                                     )
        vs.                           )   Cause No.:
6                                     )   2:18-cv-00423-JVB-JEM
     LAKE COUNTY, INDIANA, the        )
7    LAKE COUNTY SHERIFF, in his      )
     official capacity, the LAKE      )
8    COUNTY TREASURER, in her         )
     capacity as Trustee of the       )
9    Pension Plan of the Lake         )
     County Sheriff, and the          )
10   PENSION COMMITTEE of the         )
     Pension Plan of the Lake         )
11   County Sheriff,                  )
                                      )
12            Defendants.             )
     - - - - - - - - - - - - - - -    )
13
14     The Video Deposition of THOMAS JOSEPH OSTROWSKI
15            Date:  Friday, December 13, 2019
16            Time:  9:54 a.m.
17            Place: Barnes & Thornburg LLP
                     700 1st Source Bank Center
18                   100 North Michigan
                     South Bend, Indiana 46601
19
              Called as a witness by the Defendants
20            in accordance with the Federal Rules of
              Civil Procedure for the Northern District
21            of Indiana, pursuant to Notice
22   Before Michelle Soffa, Court Reporter
     Notary Public, La Porte County, Indiana
23
24
25

Page 2

```
1    APPEARANCES:

2

3            MR.                                    ROSE
             ACLU of Indiana
4            1031 East Washington Street
             Indianapolis, Indiana 46202
5            grose@aclu-in.org

6        on behalf of the Plaintiff;

7        MS. JACKIE GESSNER
         MR. BART A. KARWATH
8            Barnes & Thornburg LLP
             11 South Meridian
9            Indianapolis, Indiana 46204
             jgessner@btlaw.com
10           bkarwath@btlaw.com

11       on behalf of the Defendants;

12

13

14

15

16

17

18           ALSO PRESENT:  Laura Switalski, CLVS

19

20

21

22

23

24

25
```

Page 3

1                    I   N   D   E   X
2              THE VIDEO DEPOSITION OF
               THOMAS JOSEPH OSTROWSKI
3
4    DIRECT EXAMINATION
5       By Ms. Gessner......................... Page   7
6    DIRECT EXAMINATION (Continued)
7       By Mr. Karwath......................... Page 119
8    DIRECT EXAMINATION (Continued)
9       By Ms. Gessner......................... Page 169
10   CROSS-EXAMINATION
11      By Mr. Rose............................ Page 207
12

                       E X H I B I T S
13                                              MARKED
14   Exhibit  1............................... Page   6
        (Responses to Discovery Requests)
15

     Exhibit  5............................... Page   6
16      (Complaint)
17   Exhibit  6............................... Page   6
        (Settlement and Release Agreement)
18

     Exhibit  8............................... Page   6
19      (Police Benefit Plan)
20   Exhibit  9............................... Page   6
        (Police Retirement Plan)
21

     Exhibit 10............................... Page   6
22      (Dilts & Associates Letter, July 15, 2003)
23   Exhibit 11............................... Page   6
        (Application for Pension Benefits)
24

     Exhibit 12............................... Page   6
25      (Working Togaher (sic) To Make the Pension
         System Fair Document)

Page 4

1           E X H I B I T S  (Continued)

2                                           MARKED

3     Exhibit 13............................. Page    6
       (Regular Meeting Minutes, County Council
4       10/11/16)

5     Exhibit 14............................. Page    6
       (Regular Meeting Minutes, County Council,
6       7/11/17)

7     Exhibit 15............................. Page    6
       (Regular Meeting Minutes, County Council,
8       11/14/17)

9     Exhibit 16............................. Page    6
       (Job Application)

10

      Exhibit 17............................. Page    6
11     (Indiana Worker's Compensation Injury Report)

12    Exhibit 18............................. Page    6
       (Letter from Dr. Gropper, 7/25/2002)

13

      Exhibit 19............................. Page    6
14     (Functional/Activity/Work Status Form)

15    Exhibit 20............................. Page    6
       (Letter from Dennis Heaps, 5/22/2003)

16

      Exhibit 21............................. Page    6
17     (Letter from Otho Lyles, 7/2/2003)

18    Exhibit 25............................. Page    6
       (Progress Note, 1/7/2003)

19

      Exhibit 27............................. Page    6
20     (Letter from Thomas Ostrowski, 1/21/2003)

21    Exhibit 30............................. Page    6
       (Charge of Discrimination)

22

      Exhibit 31............................. Page    6
23     (Letter from David Tite, 9/27/2018)

24    Exhibit 33............................. Page    6
       (Amended Complaint)

25

Page 5

1                E X H I B I T S (Continued)
2                                              MARKED
3      Exhibit 44.............................. Page    6
         (Petition for Ad Hoc Payment)
4
       Exhibit 46.............................. Page    6
5        (Dilts & Associates Letter, 7/15/2003)
6      Exhibit 47.............................. Page    6
         (Dilts & Associates Letter, 7/9/2003)
7
       Exhibit 48.............................. Page    6
8        (Review of Disability Benefits)
9      Exhibit 49.............................. Page    6
         (Dilts & Associates Letter, 5/25/2017)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 6

1    (All exhibits marked prior to deposition.)

2                THE VIDEOGRAPHER:  Good morning.

3        We're now on the record at 9:54 a.m.

4        Today's date is December 13th, 2019.

5        This is the videotaped deposition of

6        Thomas Ostrowski versus -- in the case of

7        Thomas Ostrowski, Plaintiff, versus Lake

8        County, Indiana, the Lake County Sheriff,

9        et al., United States District Court,

10       Northern District of Indiana, Hammond

11       Division.  We're located at the offices

12       of Barnes and Thornburg in South Bend,

13       Indiana.

14            Will the attorneys present please

15       introduce themselves, who they represent

16       and will the court reporter please swear

17       in the deponent.

18            MS. GESSNER:  Jackie Gessner and

19       Bart Karwath with Barnes and Thornburg

20       for Defendants.

21            MR. ROSE:  Gavin Rose with the ACLU

22       of Indiana for the plaintiff.

23

24

25

Page 7

1          THOMAS JOSEPH OSTROWSKI,

2          called as a witness by the Defendants,

3          having been first duly sworn, was examined

4          and testified as follows:

5                    DIRECT EXAMINATION

6  BY MS. GESSNER:

7  Q    Good morning, Mr. Ostrowski.

8  A    Good morning.

9  Q    We just briefly met but for the record I'll repeat.

10      I'm an attorney with Barnes and Thornburg and I

11      represent the defendants, all of them that have

12      been identified in this matter.  And for the sake

13      of brevity just for today, I will say "defendants"

14      to mean all of those entities that are named, so

15      Lake County, Lake County Sheriff, Lake County

16      Pension Committee as well as the Lake County

17      Treasurer.

18 A    Yes, ma'am.

19 Q    Okay.  So the deposition today is designed for us

20      to ask questions of you to understand your

21      knowledge about the facts related to your claims.

22           And have you ever been deposed before?

23 A    Yes, ma'am.

24 Q    In what type of setting, in another legal matter, a

25      case?

Page 12

1    Q    Any hearing impairments that would inhibit your
2         ability to hear my questions today?
3    A    No, ma'am.
4    Q    I'm also gonna be handing you some documents today.
5         I'll ask you to review them and identify whether or
6         not you recognize them and I'll be asking you
7         questions about them as well.
8              So I'm gonna hand you the first one which has
9         been marked Exhibit 1, gonna be doing some reaching
10        today.  Maybe Gavin will help me out.
11                        MR. ROSE:  Hand it to me, I'll be
12                   the middle man.
13   BY MS. GESSNER:
14   Q    If you can just take a look at Exhibit 1 and you
15        don't need to read it in full, I'm not gonna ask
16        you about everything in it right now.
17             But if you can take a brief look and tell me
18        do you recognize this document?
19   A    This is the document that my attorney, Mr. Rose,
20        prepared, yes.
21   Q    And do you recognize this to be your responses to
22        the discovery requests that were submitted to you
23        in this case?
24   A    Response and ob -- and objections, yes, ma'am.
25   Q    To the discovery requests submitted to you.

Page 13

1     Correct?

2   A   Yes, ma'am.

3   Q   And did you assist Mr. Rose in preparing these

4       responses and objections?

5   A   Yes, ma'am.

6   Q   And if you could flip to Page 20 for me, of Exhibit

7       1?

8   A   (Witness complies.)

9   Q   Do you see the verification on Page 20?

10  A   Yes, ma'am.

11  Q   And is that your signature on the verification?

12  A   Yes, ma'am.

13  Q   And did you understand by signing that verification

14      that you were verifying under the penalties of

15      perjury that the answers were true and accurate to

16      the best of your knowledge, at least as far as the

17      interrogatories that are preceding the

18      verification?

19  A   Yes, on 8/19/19, yes, ma'am.

20  Q   And with respect to those interrogatories are there

21      any answers you're aware of that were incomplete or

22      that you did not answer truthfully?

23  A   Not that I'm aware of, no, ma'am.

24  Q   Are there any answers that you're aware of that you

25      need to change?

Page 36

```
 1   A   Yes, ma'am.
 2   Q   And it follows, "Prior to both this case and my
 3       earlier federal case, for instance, I filed a
 4       complaint with the U.S. Equal Employment
 5       Opportunity Commission."
 6           Do you see that sentence?
 7   A   Yes, ma'am.
 8   Q   I just want to ask you about those particular
 9       complaints, as you call them.  Your reference to
10       "Prior to both this case and my earlier federal
11       case," what earlier federal case are you referring
12       to there?
13   A   I filed a complaint with the EEOC when I was at
14       Lake County as a dispatcher.
15   Q   So was that the approximately 2016 federal lawsuit
16       that you filed against the Lake County entities?
17   A   Yes, ma'am.
18   Q   So your reference here is to a complaint, as you
19       call it, or a charge with the EEOC in both that
20       particular lawsuit and the one that we are talking
21       about today?
22   A   Yes, ma'am.
23   Q   Okay.  Were there any other EEOC charges that you
24       filed --
25   A   No, ma'am.
```

Page 38

1    Q   So -- and I'm not saying to have you identify any

2        and all, you know, causes.

3            But are you aware whether disability was

4        something you raised in that particular complaint

5        in 2016 or earlier?

6    A   I don't -- I don't have it in front of me so I

7        don't know what I put into the body of the

8        complaint, so.

9    Q   I'm gonna hand you what's been marked Exhibit 5 and

10       no cause for concern that the numbers are not in,

11       necessarily, numerical order.  Do you recognize --

12                   MR. ROSE:  Jackie, let me butt in

13                   real quick.  I'm gonna give you as much

14                   leeway as I possibly can.  As you are

15                   aware and as the witness is aware, there

16                   are certain things that have -- in a

17                   separate case that I don't think he's

18                   allowed to talk about and I know that

19                   you're aware of that.  So do I have your

20                   word that we're not going to encroach

21                   upon those?  Because I don't -- because

22                   of whatever agreement he has reached I do

23                   not have a full understanding of what

24                   those issues are.

25                   MS. GESSNER:  So I will say we'll --

Page 41

```
 1              confidential --
 2                   MR. ROSE:  This is a
 3              publically-filed document.
 4                   MS. GESSNER:  Of the transcript
 5              today?
 6                   MR. KARWATH:  No, I think he is
 7              talking about the -- the EEOC document
 8              public, so -- is that right?
 9                   MR. ROSE:  No.  I -- I -- obviously,
10              you can ask about the -- this is the
11              complaint, I assume.  Obviously you can
12              ask about that, that's a publically-filed
13              document.
14   BY MS. GESSNER:
15   Q   Well, we'll move forward and if there is further
16       questions we can handle them at that time.
17           Mr. Ostrowski, do you recognize Exhibit 5 to
18       be the complaint that you filed in 2016 against the
19       Lake County Board of Commissioners and other county
20       entities?
21   A   Yes, ma'am.
22   Q   And earlier I was asking you about in terms of the
23       type of protected status in which you were
24       identifying as the reasons for your alleged
25       discrimination.
```

Page 42

1          Do you recall having identified a disability

2      as one of the basis in which you believed to have

3      been discriminated against in that action?

4   A  According to the documents in front of me, I

5      checked Americans with Disability Act of 1990, as

6      codified, 42 U.S.C. 12112 to 12117.  And in my

7      statement of claim I put in re -- requested

8      reasonable accommodations due to known medical

9      condition.

10  Q  Okay.  And if you could flip to the page marked

11     "144" for me, which is Page 5 of the complaint.

12          Do you see Section D on Page 5?

13  A  D as in dog?

14  Q  Yes.

15  A  Yes, ma'am.

16  Q  And do you see there, which section, do you read,

17     Defendants discriminated against me based on my and

18     then it indicates to check all that apply.  And

19     you've checked "disability or perceived

20     disability."  Correct?

21  A  Yes, ma'am.

22  Q  Okay.  You completed this complaint; is that right?

23  A  Yes, ma'am.

24  Q  And on the first page there it has the file date,

25     the stamping of when this complaint was filed.

Page 43

```
 1        Correct?
 2    A   Yes, ma'am.
 3    Q   That's marked May 12, 2016.  Correct?
 4    A   Yes, ma'am.
 5    Q   Okay.  And so as of the time in 2016 you had
 6        pursued a legal action under the ADA irrespective
 7        of who it was against, you pursued a legal action
 8        under the Americans with Disabilities Act at that
 9        time?
10    A   Yes, ma'am.
11    Q   And the EEOC charge we were talking about that
12        preceded this particular lawsuit, that would have
13        had to have been filed prior to May of 2016.
14        Correct?
15    A   Yes, ma'am.
16    Q   Did you speak with any attorneys with respect to
17        that charge that you filed which precipitated this
18        lawsuit?
19            And I'll clarify.  When I say "charge," do you
20        understand I'm talking about an EEOC complaint or
21        filing?
22    A   Yes.
23    Q   Okay.
24    A   I think the only attorney that I talked to, I had a
25        discussion with the Lake County Council's attorney
```

Page 44

```
 1        about issues that were going on at the 911 center.
 2        And I was describing problems there and that's the
 3        only attorney that I'm -- I can recall having a
 4        conversation with about -- about this.
 5   Q    Okay.  Is that an attorney for the Lake County
 6        Council?
 7   A    Yes.
 8   Q    Okay.  Any attorneys that you'd inquired who had --
 9        either have advice to you or to represent you with
10        respect to either the charge or this lawsuit?
11   A    Not that I can recall.
12   Q    And any reason you didn't seek any legal advice or
13        counsel with respect to this matter?
14   A    To this matter?  No, I don't remember why I didn't
15        call around or anything like that.  I just went
16        online and seen that the -- the documents were
17        self-filling.
18   Q    So you represented yourself throughout this matter?
19   A    Until the very end and then I retained an attorney
20        at the very end.
21   Q    Who did you retain at the very end?
22   A    I don't remember his name but that's the gentleman
23        that wrote up the confidential agreement that I
24        have.  He -- he wrote it up and submitted it to the
25        county and the county then -- to the county's
```

Page 45

1    attorneys.

2  Q  So the confidential agreement that you referenced

3     is that the confidential settlement agreement that

4     resolved this legal matter?

5  A  Yes, ma'am.

6  Q  And there was an attorney who represented you with

7     respect to the creation of that document and the

8     signing off on that document?

9  A  Yes, ma'am.

10 Q  Do you recall that attorney's name?

11 A  No, ma'am.

12 Q  Did you pay that attorney any fees?

13 A  Yes, ma'am.

14 Q  Do you recall how much?

15 A  No, ma'am.

16 Q  Was it less than $5,000?

17 A  Yes, ma'am.

18 Q  Less than $1,000?

19 A  I don't remember if it was less than a thousand or

20    around a thousand, I'm not sure.

21 Q  Is that the only time you've ever interacted or

22    engaged with that attorney?  In terms of the --

23 A  Rephrase, please.

24 Q  Sure.  Any way in which you would be able to recall

25    that attorney's name?  Are there any other

Page 48

```
 1          Do you recall when you applied to the Lake
 2     County Sheriff's Department for employment?
 3   A  Late -- well, I would say late '80 -- well, late
 4     '89.  Is that right?  Late '89, something like
 5     that, I believe.  'Cause I -- I was -- I put in for
 6     employment as a correctional officer.
 7   Q  So not too long after you returned from military
 8     service?
 9   A  I got out of military service, I worked with my
10     brother for a little bit and then I put in for a
11     job as a correction officer, I took the test and so
12     forth and then I was hired there.  And I was also
13     hired as a part-time bailiff in the Gary City Court
14     system around the same time, too.
15   Q  Do you recall about how long you were a correction
16     officer?
17   A  Until I became a police officer.
18   Q  You worked as a bailiff as well part time
19     throughout the time you were a correction officer?
20   A  I worked as a bailiff for about three years.
21   Q  Gonna hand you what's been marked as Exhibit 16.
22   A  One, 5, 16.
23   Q  Do you recognize Exhibit 16?
24   A  No.  But it's an application.  I don't remember
25     this but --
```

Page 49

1   Q   Blast from the past?  Does it appear to be your
2       handwriting on the first page of 16?
3   A   Yes, ma'am.
4   Q   And does it appear to be your signature at the
5       bottom?
6   A   Yes, ma'am.
7   Q   So while I understand this was a long time ago, any
8       reason to dispute that this was an application you
9       filled out for the patrol officer position?
10  A   No, ma'am.
11  Q   So the date there on the bottom, just what I want
12      to draw your attention to, June 12th, 1995, does
13      that sound like the correct year or time frame that
14      you applied for the police officer position?
15  A   This was the second time that I applied to be a
16      police officer.
17  Q   So you applied initially and were not accepted?
18  A   Correct.
19  Q   Do you recall about what year that was?
20  A   No, ma'am.
21  Q   Do you know the reason why at that first
22      application you did not receive a position?
23  A   You needed to score a 70 on the test and I was
24      informed that I scored a 69.9, which meant that I
25      was not politically correct.

Page 53

1       sheriff's department, were you a patrol officer at

2       that time?

3   A   Yes, ma'am.

4   Q   I'm gonna hand you Exhibit 16.

5   A   I have 16.

6   Q   I'm sorry, 17.

7   A   That's okay.

8   Q   Thank you.

9   A   No, no it's...

10  Q   Do you recognize Exhibit 17?

11  A   Yes, ma'am.

12  Q   And do you recognize this to be an injury report

13      form filled out with respect to an injury that you

14      incurred as a employee of the sheriff's department?

15  A   Yes, ma'am.

16  Q   And do you see that this is dated in the bottom

17      portion of the form, 5/16/96?

18              MR. ROSE:  Seventeen, I think.

19              MS. GESSNER:  On the furthest left

20          of the page, the date of IMJ --

21              MR. ROSE:  Oh, I'm sorry, you're

22          right, I'm sorry, I was looking at the

23          bottom one.

24  BY MS. GESSNER:

25  Q   Do you understand that to be day of injury?

Page 54

1    A    Yes, ma'am.

2    Q    And that reads 5/16/96.  Correct?

3    A    Yes, ma'am.

4    Q    Was that the date of the injury that this form is

5         referencing?

6    A    Yes, ma'am.

7    Q    And as far as you can recall did you complete this

8         form?

9    A    This is my handwriting.

10   Q    Any reason to dispute that you -- you filled out

11        this form?

12   A    No, ma'am.

13   Q    I want to ask you about the injury that's

14        referenced here as you see in the box marked "Type

15        Of Injury," it reads "Injury to lower back."

16        Correct?

17   A    Yes, ma'am.

18   Q    Can you tell me about that incident?

19   A    I was down at the police academy we were going

20        through what they call EVOC training, which is the

21        driving course.  There was a student driver in the

22        front driving.  There was an instructor sitting

23        next to him.  I was in the back seat with another

24        student.  As we were going through -- and we were

25        in a old police car, which had the part of the seat

Page 55

1    belt that came out of the seat but not the part

2    that came across to connect it.  And as you go

3    through EVOC training, you have to make sudden

4    turns and twists and so forth.  And what happened

5    was -- is the instructor told the student to -- to

6    make a turn or whatever.  I slid across the back

7    seat and took the part of the seatbelt that comes

8    out of the seat into my lower back.

9         Didn't think anything of it.  Later on that

10   evening I started to have back pain.  In the

11   morning I couldn't move, they had to pick me up and

12   carry me and put me in the back of a squad car and

13   rush me to the hospital.

14   Q   And at the time -- I'm just trying to envision and

15       kind of understand, were these metal parts, the

16       actual piece that you're referring to, the metal

17       part of the seatbelt?

18   A   Yes, ma'am.  It's the part that comes out where you

19       would click the button to release the seatbelt

20       attachment but that's -- that's the part that was

21       there, the other part wasn't.

22   Q   There just was no shoulder belt?

23   A   Correct, no shoulder or lap strap.

24   Q   And the -- when the belt actually hit your back,

25       the piece of the belt, did that cause any breaking

Page 60

1   Q    So once you graduated was there any point in time

2        at which you had to take a leave absence or medical

3        leave before you officially started normal duty

4        with the sheriff's department?

5   A    Not that I recall.

6   Q    Okay.  So as best you can recall you were released

7        to full duty at the time you graduated from the

8        academy?

9   A    I don't know if I, after this, went -- if the

10       department sent me to another -- sent me to a

11       doctor to be cleared to -- to full duty or not.  So

12       I don't -- I don't want to say that I was released

13       to go to full duty 'cause I don't have anything

14       that says, here, you're -- you're back on full

15       duty, everything's okay, you're fine to go, so.

16  Q    Would you say within at least six months of

17       graduating from the academy you were released to

18       full duty to start work at the sheriff's

19       department?

20  A    When I left the police academy and I went to patrol

21       there was -- I did everything that my field

22       training officers wanted me to do, so that's --

23       that's what I did.

24  Q    Okay.  What was the status of your back condition

25       in those first few years following your graduation

Page 61

1      from the academy?

2   A   Can you rephrase what -- can you explain to me what

3      you mean by "condition," please?

4   Q   Well, with respect to this injury to your back was

5      there a diagnosed medical condition that followed?

6   A   I -- I do not believe so until -- I don't know how

7      many years it was and then my back started to give

8      out, my back started to give out.  And I don't know

9      if it was due to the gun belt, you know, you have

10     all that weight around your gun belt, that was

11     putting additional stress onto my lower back or,

12     you know, if that was the reason.  But it -- it --

13     my back started to go out and eventually I had to

14     seek treatment for it.  And I seen a neurosurgeon,

15     Dr. Gropper.

16  Q   Did you experience any back pain prior to going to

17     seek treatment from a neurosurgeon?

18  A   Between the time of this period and the time I seen

19     Dr. Gropper, yes.

20  Q   Okay.  As far as you're aware did you have any

21     diagnosed back conditions during that period of

22     time?

23  A   Diagnosed meaning did -- did a doctor say this is

24     what you have?  No, not that I can recall.

25  Q   At least as far as that period, you were, to the

Page 62

1      best extent you could, performing full duties, no

2      restrictions?

3  A   Until -- yes, I would say yes.

4  Q   Just trying to get an understanding of the

5      timeline.  Gonna hand you Exhibit 18.

6          Do you recognize Exhibit 18?

7  A   No.  I know it's Dr. Gropp -- I know that's Dr.

8      Gropper but I -- I don't -- I don't know if they

9      sent this.  This went to the merit board so I'm

10     assuming that the merit board contacted my doctor

11     and wanted to know about my situation.

12 Q   Okay.  So you have not seen this letter, as best

13     you can recall, before today?

14 A   Correct, best I can recall today, no.

15 Q   And so if we can just take a look at it, it appears

16     to be a one-page letter addressed from a Mitchell

17     Gropper, M.D.  Correct?

18 A   That's my neurosurgeon, yes, ma'am.

19 Q   And so this letter is dated July 25th, 2002, and

20     you mentioned it's addressed to an individual from

21     the Lake County Sheriff's Department.  Correct?

22 A   Yes, ma'am.

23 Q   And as you see, given it's dated 2002, Mr. Gropper

24     indicates that he has been under -- you have been

25     under his care for back/disc problems for the past

Page 63

1        two years.

2            Do you see that sentence?

3    A    Yes, ma'am.

4    Q    And so presumably 2001 or thereabouts until 2002

5        sometime Mr. Gropper was treating you for

6        conditions or problems related to your back?

7    A    Dr. Gropper, yes, ma'am.

8    Q    And your treatment, at least as far as you

9        understand, was related to the injuries we just

10       discussed at the police academy?

11   A    That's what Dr. Gropper states, yes, ma'am.

12   Q    Okay.  And did you dispute his opinion with respect

13       to the cause of the back problems?

14   A    I don't dispute them but this is the first time I'm

15       seeing this letter so I don't have any reason to

16       dispute them.

17   Q    Is it your understanding that Dr. Gropper believed

18       your back condition to be related to the injury we

19       just discussed?

20   A    That's what he states, ma'am, yes.

21   Q    Your understanding today based --

22   A    Yes, yes, my understanding today based upon the

23       letter that you handed me is that Dr. Gropper

24       believed that my back problems are related to the

25       vehicle accident with the Indiana Police Academy.

Page 82

```
 1        know, he didn't explain to me on the MRI or CT or

 2        x-rays that he did and so forth and maybe after

 3        discussion with the department, I don't know.

 4   Q    Before the revision did you feel like you were able

 5        to perform the job duties of a patrolman?

 6   A    No.  Because I was still having back pain.

 7   Q    And after the revision did you feel that you were

 8        able to perform the job duties of a patrolman?

 9   A    We never had the -- the revision.  We had just had

10        the one surgery and then Dr. Gropper died so we --

11        we never went --

12   Q    The revision did not occur?

13   A    Correct.

14   Q    And subsequent to this period of time at the time

15        at which you felt that you were unable to continue

16        as a patrolman, have you subsequently had a change

17        in that opinion?

18   A    Opinion if I can go back to work?

19   Q    Correct.

20   A    No, ma'am.

21   Q    Sitting here today, are you able to perform the

22        job duties of a patrolman?

23   A    No, ma'am, not of a patrol -- of a patrolman, no,

24        ma'am.

25   Q    And since 2003 have you had any ability to perform
```

Page 83

```
 1        those job duties?

 2   A    No, ma'am, because I -- my back is never -- has

 3        never fused.

 4   Q    Gonna hand you -- one more quick question.  If you

 5        can flip to the last page of Exhibit 25, which is

 6        marked Page 281, do you see that this appears to be

 7        another Functional/Activity/Work Status Form,

 8        similar to the one we reviewed earlier?

 9   A    Yes, ma'am.

10   Q    And this one is dated April 2nd of 2003.  Correct?

11   A    Yes, ma'am.

12   Q    And this is marking a no work restriction and the

13        length of the restriction is listed as permanent.

14        Correct?

15   A    Yes, ma'am.

16   Q    Any reason to dispute, at least as of this date,

17        you were under a permanent no work restriction?

18   A    All I can -- all I can -- well, I didn't write

19        this.  I -- it looks like the same person, maybe

20        Dr. Gropper sent it in -- sent it in.  So I don't

21        know if this -- if this was mailed to the

22        department or not.  But he felt that at -- on 4/3

23        of 2003 that it was no work and it was permanent.

24        His -- his opinion was length of restrictions was

25        permanent.
```

Page 86

1      to that specific job to enable you to work as a

2      patrolman?

3   A  No, ma'am.

4   Q  Do you believe that there would be anything today

5      that could have been changed to the patrolman

6      position that would enable you to perform the job

7      today?

8   A  If the department wanted to keep me on, I -- I

9      believe that they could have offered me the -- like

10     the desk sergeant position to sit there and type up

11     reports and not go on patrol.  If they thought

12     my -- my skills were needed there.  I worked in the

13     radio room as the IDACS coordinator, which means I

14     didn't have to carry a gun, I worked with civilians

15     who were dispatching at the time.  If they wanted

16     to keep me they could have offered me that

17     position.  So that's -- I mean, to be on patrol

18     outside -- work in the streets so forth, at this

19     time, no I could not -- I could not have done it.

20  Q  Okay.  I'm gonna hand you what's been marked

21     Exhibit 27.

22         Do you recognize Exhibit 27?

23  A  This is a letter that I sent to Mr. Ted Nowakowski,

24     president of the Lake County Sheriff's Merit Board.

25  Q  And did you draft this letter?

Page 87

1    A    Yes, it's my signature on it, yes.

2    Q    Anyone help you draft this letter?

3    A    No, ma'am.

4    Q    And this is a letter referencing your July surgery.

5         Correct?

6    A    Yes, ma'am, 2002, yes.

7    Q    And it's dated January 2003; is that right?

8    A    Twenty-one, January, 2003.

9    Q    Uh-huh.

10   A    Yes, ma'am.

11   Q    Was this letter for the purpose of formally

12        applying for your disability benefits under the

13        disability benefit plan?

14   A    Yes -- yes, ma'am, it says, "I here by (sic) apply

15        for my disability pension."

16   Q    So as of January 2003 you believed that you were

17        disabled and unable to perform the patrolman

18        duties?

19   A    I believe that I had to follow the rules set by --

20        the rules and regulation under Section 5.07.02,

21        Sick Leave-Major Er -- Illness, Subsection F, I had

22        to follow those rules and that's why I applied for

23        it.

24   Q    Did you believe you were disabled at this time you

25        wrote this letter?

Page 93

```
 1         merit board asked questions and then made their
 2         decision.
 3     Q   Fair enough.  Let me hand you Exhibit 21, maybe
 4         this will help us clear up this miscommunication.
 5             Do you recognize Exhibit 21 to be a letter
 6         from the police merit board to the Disability
 7         Determination Bureau?
 8     A   Yes, ma'am.
 9     Q   Okay.  And this is with respect to you.  Correct?
10     A   Yes, ma'am.
11     Q   And this identifies that "The above captioned
12         employee," referring to Thomas Ostrowski, "was
13         approved as eligible and granted the disability
14         benefit as outlined in the Lake County Police
15         Pension and Disability Plan."  Correct?
16     A   That's what it says, yes, ma'am.
17     Q   All right.  And so any reason to dispute that as of
18         this time there had been a determination to grant
19         your application for disability benefits under the
20         benefit plan?
21     A   No, ma'am.
22     Q   I asked you earlier about your present ability to
23         perform the job duties of a patrol officer and you
24         indicated that at present you're unable to perform
25         the job duties of a patrol officer.  Correct?
```

Page 97

1   A   Yes, ma'am.

2   Q   Are you aware whether there'd be any positions that

3       you could work in as a full-time employee today?

4   A   Where, ma'am?

5   Q   Is there any form of work that you believe that

6       you're able to do full time today?

7   A   Not -- not at this time.

8   Q   Do you still have Exhibit 1 in front of you, the

9       thick one?

10  A   Yes, ma'am.

11  Q   If you could turn to Page 9 for me, interrogatory

12      number seven?

13  A   The very bottom one?

14  Q   Yes, it starts on nine and goes to 10 and 11.

15          Do you recall that this question asked you

16      about any income from -- from any kind, money or

17      benefits that you had received after you had

18      separated employment with the sheriff's department?

19  A   Yes, ma'am.

20  Q   And you identified at one point in time you had

21      been employed by the Lake County E-911.  Correct?

22  A   Yes, ma'am.

23  Q   You had estimated on Page 11 that that was from

24      2014 through 2015; is that right?

25  A   Yes, ma'am.

Page 98

1    Q    What made you decide -- excuse me, what made you

2         decide to apply for the E-911 job?

3    A    I needed -- I needed a increase in my income to be

4         able to afford me to stay in my house and to be

5         able to pay my bills.  The money that I had been

6         make -- that I was making was insufficient and the

7         options that I have -- since 2004 starting with

8         Sheriff Dominguez I have been trying to get a

9         cost-of-living increase or any -- or other benefits

10        for disabled officers and widows and orphans.  And

11        I have started in 2004 with him.

12             He sent a letter to the auditors -- actuary,

13        sorry, to the actuaries explaining, you know, what

14        we were trying to do and they came back with a --

15        with the Indiana law that says this is how you can

16        do it and then from 2004 until Sheriff Dominguez

17        left, we kept working on this issue to try to get

18        the disabled officers and the widows and orphans an

19        increase in their -- in their pay.

20             But we kept coming up against people on the

21        pension committee and on the merit board who had a

22        definite dislike for disabled officers and widows

23        and orphans and fought him all the way on trying to

24        help these -- those individuals.

25    Q    So, you know, as you described this period of time

Page 99

1      it's, what, 15 years of which you have been trying

2      to work to get this cost-of-living increase for

3      disabled officers, you know, beginning with the

4      letter to Sheriff Dominguez, what actions were you

5      taking as you say you were trying to, since 2004,

6      get this increase?  What were the actions you were

7      implementing?

8   A   I -- my letter to Sheriff Dominguez and the -- like

9      I said, the actuaries came back with a -- with

10     their determination how we could do this.  We kept

11     petitioning -- Sheriff Dominguez kept petitioning

12     the merit board and the pension committee to -- to

13     look into this.  Because the officers -- the

14     officers on disability never received anything and

15     the widows and orphans never received an increase

16     either.  And he -- Sheriff Dominguez thought that

17     was -- was killing morale.  And it was something

18     that as a former state trooper he didn't see a

19     reason why these individuals weren't getting it

20     when other people with -- within the pension plan

21     were getting it.

22        So we started off there, I -- I've written

23     letters to the merit board, I have written letters

24     to the pension committee, I have written letters to

25     the Lake County Council, I have gone in front of

1    the Lake County Council for years and at the end of

2    the meetings before they -- they have a public --

3    public portion where you could stand up and ask a

4    question of the Lake County Council and I explained

5    to the Lake County Council look, you know, you

6    guys -- there is two options here that the Lake

7    County Council has.

8         There is the option of changing the pension

9    because Lake County Council as the fiscal body has

10   the final say on the pension, they could ask the --

11   they could ask the sheriff, hey, look, why are you

12   doing this and why aren't you doing that.  Or the

13   county council can, under state statute, which

14   their attorney mentioned at a meeting that, yes,

15   they have the authority, the county council has the

16   authority to grant us a -- a cost-of-living

17   increase and/or an ad hoc increase for the disabled

18   officers.  But there was nothing that the county

19   council could do through the statute for -- for the

20   widows and orphans, that would have to change the

21   pension for that.

22        So I also worked -- talked to the FOP and

23   the -- and the police union to try to get some

24   assistance for the officers and nothing ever came

25   about.  I even had a meeting with the last sheriff,

1    Sheriff Martinez.  During that meeting, he had the

2    chief in there with him and the chief told me --

3    told us in the meeting, the -- Sheriff Martinez,

4    myself and the chief that the sheriff is not

5    against you -- the disabled officers getting a

6    cost-of-living increase as long the county pays for

7    it.  And I said, "Okay, Chief," I said, "Thank you

8    very much, I appreciate it."

9        I sent the sheriff a followup letter a couple

10   days after the -- the meeting thanking him for his

11   time about the cost-of-living increase and the

12   possibility of an ad hoc payment.  And I thought

13   the sheriff was on board with this.

14       And then I was put on the official agenda of

15   the Lake County Council.  At the beginning of the

16   council meeting, councilman Ted Bilski, who was the

17   president of the council said, I do not know how

18   this gentleman got on the agenda but from now on

19   any member of the public that wants to be put on --

20   onto the agenda must get the approval of three

21   council members before we put anybody on -- on the

22   agenda but we have to go ahead with this 'cause

23   he's on the agenda.

24       I stood up, I made my pitch again and then for

25   some reason the FO -- the president of the FOP and

1     the president of the union were there, they came

2     walking in with the sheriff and the chief, the

3     president of the FOP asked the county council not

4     to get involved in this issue.  And the president

5     of the FOP was also the president of the Northwest

6     Indiana Federation of Labor so he had, behind him,

7     a lot of votes and the county council -- and the

8     county council decided not to vote on helping the

9     disabled officers.  The head of the FOP, the head

10    of the union, the chief and the sheriff all walked

11    out together and I stood there looking like an

12    idiot because I thought I had the sheriff's backing

13    on this issue finally.

14  Q   How -- as you described kind of all the, you know,

15    different courses over a long period of time, years

16    over which all the things you have just described

17    occurred --

18  A   Yes, ma'am.

19  Q   -- how much time would you say, you know, on a

20    weekly basis you were devoting to these efforts?

21  A   I wrote my letter to Sheriff Dominguez and then I

22    just -- I waited until Sheriff Dominguez got back

23    to me and said, Tom, this is what -- this is what I

24    found out, this is what's going on.  You know, it

25    could have been a week, a month, two months, I

Page 113

1      this person along with the bill.  Medication, I

2      have to submit the original thing from Walgreens on

3      the front it says, you know, 10 bucks, 20 bucks or

4      whatever, I have to submit the originals for that.

5   Q  And has that been the case for as long as you're

6      aware of of submitting medical reimbursement and

7      that being the process by which you go about doing

8      it?

9   A  Yes.  They -- they just changed the persons who --

10     who were overseeing it.

11  Q  When do you recall the earliest that you went to

12     the county council with this issue for obtaining a

13     cost-of-living increase for disabled officers?

14  A  I don't know if it was when Will Smith was the

15     county councilman or Jerome Prince was the county

16     councilman.  It was when -- it's one of those two.

17  Q  And as best as you can recall, was this 10 years

18     ago?  Longer?

19  A  I don't know because Jerome Prince is now gonna be

20     the mayor of Gary and Will Smith was indicted by

21     the feds and convicted so I don't know when.

22  Q  So you mentioned at the beginning there being a

23     2004 letter?

24  A  Yes, ma'am.

25  Q  That you drafted that related to this issue.

1        Correct?  In part to this issue?

2    A   Yes, ma'am.  Sheriff Dominguez sent out a letter

3        saying that he was going to be trying -- he was

4        going to be working on getting the widows and

5        orphans a cost-of-living increase because they were

6        the smallest group and he wanted everybody's

7        support on this issue.

8            I sent the pension committee a letter stating

9        that, you know, I'm in full support of that and --

10       and asking the pension committee to also look into

11       automatically give the disabled officers the same

12       cost-of-living increase that they are considering

13       for the widows and orphans.

14   Q   So beginning as early as 2004 you were

15       communicating or sending communications to the

16       pension committee and the merit board --

17   A   Yes, ma'am.

18   Q   About your support for that effort?

19   A   And the sheriff, yes, ma'am.

20   Q   And the sheriff.

21           And would it have been at least around the

22       similar time or not that long after that you had

23       went to the county council to also present this

24       same issue?

25   A   I don't know because I was hoping that the pension

1    the politicians.

2        So if -- so if the county councilmen were able

3    to work this without having to embarrass the -- the

4    politicians then it's always better because once

5    you embarrass somebody, they get made at you and,

6    you know, you're not gonna get -- no matter what.

7  Q  Uh-huh.  So did you have those conversations with

8    individual council members where they said, hang

9    on, don't go and submit before the council yet,

10    let's get you some information?

11  A  Yeah, Will Smith and Jerome Prince.

12  Q  Okay.  And as best you can recall what is the

13    approximate years you had those conversations?

14  A  I don't remember, ma'am.

15  Q  Would it have been prior to 2010?

16  A  I don't remember, I'm sorry.

17  Q  Would it have been within the last five years?

18  A  Within the last five years?  Maybe with Will Smith

19    because he was the last councilman to leave.

20    'Cause he -- like I said, he got indicted and he

21    left and then Councilman Washington, I believe,

22    took over his spot on the county council.

23  Q  Okay.  So you believe it would be true then to say

24    at whatever point in time Will Smith's spot on the

25    council was turned over to Councilman Washington

Page 118

1      that at least that time or earlier you had this

2      conversation with Will Smith?

3   A  Yes.

4   Q  All right.  Jerome Prince, do you recall what time

5      period you've spoken with him about this issue?

6   A  It's just when he was on the county council.

7      Because he left the county council and became

8      the -- he ran for Lake County Assessor, which he is

9      at this time and then after January 1st he becomes

10     the Mayor of the City of Gary.

11  Q  Okay.  So at some point in time during Jerome

12     Prince's council election and -- and sitting on the

13     council was a period of time in which you'd agree

14     it must have been then that you had spoken with him

15     about this issue?

16  A  The begin -- yes.  That -- that time and probably

17     up to two years ago.

18  Q  That you've spoken with Jerome Prince?

19  A  Yeah.  'Cause he would be walking through the

20     hallways and I'd say, hey, Jerome, how's it going?

21         He'd say, hey, Tom, how's it going?

22         I said, well, you know, you know, still having

23     those issues with the county council, you know, not

24     wanting to -- he'd say, just hang in there,

25     Brother, you know, you're doing the right thing,

Page 120

1        Exhibit 8 and ask you if you recognize that

2        document?

3    A   Yes, sir, I've seen this document before.

4    Q   And it's marked the "Lake County Police Benefit

5        Plan" and this is the version that's effective July

6        1, 2013, on Page -- on the first page of Exhibit 8

7        it says "Reinstatement Effective July 1, 2013."

8            Do you see that?

9    Q   And is this the -- the benefit plan that provides

10       the disability benefit that you receive that is the

11       subject of this lawsuit?

12   A   No.  Because I believe what -- if you look on

13       Page -- it says "5 of 11" so it' s DEF1 00258.  It

14       says, Section 1A.  Disability for Participants

15       hired before December 1st, 2004.  I would fall

16       under -- if this is the same document that I had in

17       2003 if it wasn't changed, then it's the same.  But

18       I don't -- then the -- then the next page it says,

19       Section 1B.  Disability for Participants hired on

20       after December 1st, 2004.  So since I was hired

21       before that date.

22   Q   So as -- but as you pointed out, Section 1A says

23       that this is the disability for participants hired

24       before December 1, 2004.

25           You were hired before December 1, 2004.

Page 121

1          Correct?

2     A    Yes.  So the only -- only qu -- question I would

3          have about the document is I don't know how this

4          relates to the one I had in 2001, if there was

5          changes made.  Because in 2013 I think they -- I

6          don't know if I got a copy of that from the FOP or

7          if somebody mailed me a copy of it.

8     Q    Well, other than that concern this provides -- this

9          document discusses a disability benefit, you are

10         receiving a disability benefit and -- and is it

11         your testimony that the benefit you're receiving is

12         under the version of the plan that was in place in

13         2003 when you began receiving the benefit?

14    A    Yes, sir.

15    Q    So the Lake County Police Benefit Plan is the

16         benefit plan that provides the benefit you're

17         receiving?

18    A    My -- myself, officers who are receiving a monthly

19         check and the widows and orphans.

20    Q    So I -- the reason I want to make that clear is --

21         and I'll give you another exhibit, which is marked

22         as Exhibit 9 through your attorney here.  This

23         document, Exhibit 9, is marked "Lake County Police

24         Retirement Plan."

25              And is it correct that the Exhibit 9 reflects

Page 122

```
1        the -- what I'll call maybe the regular retirement
2        or the -- the retirement benefit that officers who
3        are not disabled but otherwise meet the criteria of
4        years of service and -- and age, that's the plan,
5        Exhibit 9, that provides their retirement benefit?
6                    MR. ROSE:  I'm -- Bart, I'm gonna
7                    let him answer all these questions.  I'm
8                    just gonna state for the record the
9                    documents speak for themselves and,
10                   obviously, they are what they are.  But
11                   to the extent that he knows, that's fine.
12    BY MR. KARWATH:
13    Q    No, I'm just trying to make sure -- and if you
14         don't know, say you don't know.  But I -- my
15         purpose for asking you these questions is that I
16         want to ask you about some -- some aspects of both
17         of these documents.
18              But before I do that I want to make sure I
19         know what your understanding is so I don't go --
20         just jump into it without, you know, understanding
21         what you know about these documents.
22    A    The second document you handed me I have never
23         seen, I've never seen before.  But I will -- but on
24         Page DEF 00270, Article VII, Sever -- is that
25         Severance and Disability Benefits, it does mar --
```

Page 123

```
 1        mark that so I would -- you mentioned one had
 2        disability and one didn't but they both.
 3    Q   Fair enough.  Thank you for mentioning that.  And
 4        so one of the things I understand about this case
 5        is that you are saying in your lawsuit that the
 6        defendants should be required to provide a COLA to
 7        you and the other folks who have a disability
 8        benefit; is that correct?
 9    A   I -- I believe it's that the disabled officers
10        should receive the same benefits that everybody
11        else within the benefit plan is receiving, a
12        cost-of-living increase.  They provide a
13        cost-of-living increase to the widows and orphans,
14        they provide it to the officers taking a monthly
15        check and they do not provide it to the disabled
16        officers.
17    Q   When you say the officers who -- who get a monthly
18        check, what do you mean by that?
19    A   When you retire from the sheriff's department after
20        20 years you have two options.  First option is
21        that you can take a lump sum payment.  That would
22        come out of the money that is in -- that is in the
23        retirement plan.
24    Q   Exhibit 9?
25    A   Yes, Exhibit 9.  Or an officer can decide, look, I
```

Page 127

1      Mr. Dilts, if I remember correctly, the officers

2      who take a monthly check and the widows and

3      orphans.  And I know they get it because of a

4      letter that the Lake County Pension Committee sent

5      out and -- 2017, 2018.  And that's the first I

6      learned that the widows and orphans were getting

7      it.

8   Q  So the -- the difference is -- is the COLA for the

9      other folks but not for you and the people who are

10     getting the disability benefit?

11  A  Yes, sir.

12  Q  Let's look at Exhibit 8, which is the current

13     version of the benefit plan.  And I think other

14     than your concern about whether or not this has the

15     same terms that were in place because of this

16     reference to 2004 and -- and you began receiving a

17     benefit in 2003, other than that I think your

18     testimony was this is the plan that you're getting

19     the benefit under just, obviously, whatever was in

20     place in 2003 is the caveat; is that correct?

21  A  Yes, sir, that I --

22  Q  Okay.  Okay.  So what -- if I understand it, if you

23     look at Page -- it's marked DEF1 258 and up at the

24     top it says "Article III Benefits."  And it says --

25     also it says Page 5 of 11, if you'll go down to the

Page 128

1    one, two, three, four, fifth paragraph, it says, If

2    the disability was incurred in the line of duty the

3    disability benefit of such eligible Employee under

4    this Plan shall be a monthly benefit based on the

5    provisions of the Retirement Plan computed as of

6    the last date such employee was included on the

7    payroll of the employer and based on his salary in

8    effect as of such date and it shall be assumed that

9    the Participant had completed 32 years of Credited

10   Service.

11       Do you see that?

12   A   Yes.

13   Q   Do you understand -- or is it the case that that --

14   that that paragraph would describe the benefit that

15   you're receiving, that -- that your disability was

16   incurred in the line of duty; is that correct?

17   A   Yes, sir.

18   Q   And -- and that when you -- it was determined that

19   you were disabled and eligible for the disability

20   benefit that you were given or it was assumed that

21   you had completed 32 years of credited service?  Do

22   you know whether or not that's true?

23   A   I don't know because I -- like I said, they don't

24   sit down with you and --

25   Q   And walk you through it?

Page 132

```
 1        doesn't cover it.  So this is -- they are missing

 2        that.

 3   Q    Well, let me go back and ask you a few questions

 4        about that, I want to make sure I understand it.

 5             You say that in order for the medical expense

 6        to be reimbursed, one, it's got to be related to

 7        your disabling condition.  So if you, you know,

 8        burned your hand on the stove or something like

 9        that and went and got treatment in the emergency

10        room, because that -- unless you could make some

11        connection between that and your injury to your

12        back, that wouldn't be eligible for reimbursement;

13        is that correct?

14   A    You would think so but at one time for like a week

15        the policy was was anything covered underneath the

16        plan -- underneath the Lake County insurance they

17        do it.  But then they realized, wait a minute, no,

18        we -- we screwed up, we need to rephrase it and put

19        in -- and change this to it's only -- only for

20        the -- those things covered under your disability.

21   Q    So as it's applied currently and your understanding

22        of it is, it would have to be related to your back

23        and -- and the disabling condition for which you

24        got the disability benefit, it couldn't be for

25        unrelated medical treatment even if it was covered
```

Page 133

1      under the insurance plan or by Medicaid?

2   A  Yes, sir.

3   Q  And when you say that it has to be covered by

4      insurance or Medicaid, let me make sure I

5      understand what you're saying there is that -- so

6      let's say you have medical expenses relating to

7      your back injury and I'm assuming your testimony is

8      that your insurance would pay some portion of that

9      and you would have a copay or some additional

10      out-of-pocket expense and that's what you can get

11      reimbursed?

12   A  What -- if it relates to my -- my disability what I

13      do is I submit it to the county and the county

14      insurance, whatever portion the county insurance

15      doesn't pay that I have to pay, then I can -- I can

16      submit it to the -- to the pension committee for

17      reimbursement of -- of that.

18   Q  Okay.  That's all I wanted to get clarified.  It is

19      the same with the Medicaid that they don't pay --

20      if they don't pay a hundred percent of it and you

21      have got 20 percent left or some copay or something

22      that's out-of-pocket, you can submit the bill and

23      get reimbursed the stuff that you had to pay out of

24      your own pocket?

25   A  As long as it relates to my -- my back and so

Page 134

```
 1        forth, yes, sir.
 2   Q    All right.  Now is that a benefit, do you know,
 3        that is exclusive to people on the disability
 4        benefit or is that a benefit that normal retirees
 5        also have?
 6   A    Since I've never seen this, I can't tell you.
 7   Q    Okay.  But would it -- would it -- it seems to me
 8        that if I'm a normal retiree and I'm not a dis --
 9        disability benefit recipient and if one of the
10        terms is the medical expense has to relate to my
11        disability, normal retirees wouldn't have a, quote,
12        disability on which they're getting a -- a pension.
13        Right?  Does that make sense?
14   A    One more time, please, I'm sorry.
15   Q    So because you have a disability --
16   A    Yes, sir.
17   Q    -- and that qualifies you to get a disability
18        pension, you have this benefit under your plan that
19        allows you to get reimbursed for medical -- for
20        certain medical expenses relating to your
21        disability.  Correct?
22   A    Yes, sir.
23   Q    But one would not a expect a normal retiree to have
24        that sort of benefit because they don't have a
25        disabling condition that forced them to be unable
```

Page 135

```
1         to work.  Correct?
2    A    Right.  What they -- they don't get the
3         reimbursement benefit.  What they get is after 25
4         years of service to the county their insurance is
5         paid for.  Where the disabled officers, no matter
6         how much time of service you have, you have to pay
7         for your own insurance.
8    Q    So there are differences between what benefits you
9         get as a retired -- what I'm gonna call a normal
10        retired or regular retired versus the disability
11        benefit that are -- that are not related to the
12        COLA?
13   A    Yes, sir.
14   Q    If you'll look at Page -- Page 259 of the bottom
15        it's also marked Page 6 of 11, the very next page,
16        there is the -- the third paragraph down begins,
17        "The disability pension benefit payable under this
18        Plan is in addition to the disability retirement
19        benefit, if any, provided to the Participant under
20        the Lake County Police Retirement Plan."
21             Do you see that?  It's right here
22        (indicating).
23   A    Above Section 1B?
24   Q    Yes.  It's the paragraph immediately above 1B.
25   A    Okay, yes, sir.
```

Page 136

1  Q   So it says, "The disability pension benefit payable

2      under this Plan is in addition to the disability

3      retirement benefit, if any, provided to the

4      Participant under the Lake County Police Retirement

5      Plan."  Do you see that?

6  A   Yes, sir.

7  Q   Did you get any money or any benefit from the Lake

8      County Police Retirement Plan?

9  A   I don't know where the money came from.  What I

10     received was a check for -- from the -- from Dilts

11     and Associates of the money that I put in.

12 Q   Okay.  So your contributions got refunded to you?

13 A   Yes.

14 Q   And if you look at Page 261, which is also labeled

15     Page 8 of 11 up at the top it says "Section 2.

16     Options."  Do you see that?

17 A   Yes, sir.

18 Q   It says, In lieu of the monthly form of benefit

19     payment payable for Participant's life specified in

20     Section 1A and 1B, the Participant may elect upon

21     written notice to the Merit Board at any time prior

22     to the commencement of his daily disabil -- or his

23     disability benefit to receive the Actuarial

24     Equivalent of the disability benefit under one of

25     the following options.  Then it has two options

Page 137

1       provided.

2             Do you recall whether when you went on your

3       disability benefit if you were given the option to

4       get it every month like you have been receiving it

5       for life or to get the actuarial equivalent under

6       one of -- under some option under the plan?  Was

7       that an option that was -- was that afforded to

8       you?

9    A  No, sir.

10   Q  So you weren't given the ability to -- to take it

11      in any form other than a monthly benefit for the

12      rest of your life?

13   A  Yes, sir.

14   Q  Was there a -- an insurance -- a life insurance

15      benefit that -- that you had through -- through the

16      count that -- that you received payments from in

17      light of your disability benefit status?

18   A  There -- there was a life insurance policy which

19      you had the option of either taking $250 a month

20      for five years and then the policy would drop down

21      to 10,000.  And then at age 70 I believe the policy

22      drops down to $5,000 in case you die.  Then

23      after -- I think once you get 80 it's -- it's

24      worthless.

25   Q  And those were a benefit that you had the right

Page 138

```
 1        to -- to receive because you were on disability
 2        status.   Correct?
 3   A    Well, every officer has -- the county pays for it,
 4        the $25 life insurance policy --
 5   Q    Right.
 6   A    -- everybody but you become disabled, right, you
 7        have to submit -- well, the county would submit, I
 8        would assume, paperwork to the insurer and then the
 9        insurer would make a determination underneath their
10        guidelines if you're disabled or not if it -- if
11        your disability falls underneath their guidelines
12        to pay you.
13   Q    But that right to get those -- to apply for and get
14        those, what I'll call early life insurance
15        payments, that's something that's only provided for
16        the people like yourself who get the disability
17        benefits, that's not something the normal retirees
18        get?
19   A    I don't know.  Because I don't -- 'cause we don't
20        see the life insurance policies.  So I don't know
21        if there's other provisions within that life
22        insurance policy.  I was just told by either
23        Mr. Dilts or somebody on -- in -- in the staff
24        services that this is something you can look at, if
25        you don't want to do it, don't -- you don't have to
```

Page 139

1      do it.  But if you do, it's up to you.

2    Q   But it certainly was a benefit you -- you had the

3        right to -- to request and -- and did you receive

4        those benefits?

5    A   Yes, sir.  It's in my interrogatory.

6    Q   I understand that with respect to Exhibit 9 you say

7        you have not seen that document before; is that

8        correct, that's your testimony?

9    A   Yes, sir.  I don't -- I do not believe I have ever

10       seen this before.

11           Can I say one thing?

12   Q   Sure.

13                   THE DEPONENT:  That name?  You

14               wanted the name of the FOP president.

15                   MR. ROSE:  Tomko.

16                   THE DEPONENT:  Tomko.

17                   MS. GESSNER:  Thank you.

18                   THE DEPONENT:  You're welcome.

19                   MR. ROSE:  He told you it would come

20               to him when he wasn't thinking about it,

21               over lunch.

22   BY MR. KARWATH:

23   Q   Do you know whether everybody who receives a -- a

24       monthly retirement benefit under the regular

25       retirement plan, do they -- does everyone get a

Page 140

```
1        COLA or is it only some of the folks who receive a
2        monthly retirement benefit under the retirement
3        plan that receive a COLA?
4    A   Well, based -- based upon the letter that the
5        pension committee sent out I would assume that
6        it's -- if you're receiving a -- a monthly check
7        then they're getting a COLA.
8    Q   Do you know whether or not there is any years of
9        service requirement in order to -- to -- to receive
10       a COLA under the -- under the normal retirement
11       plan?
12   A   I don't know, sir.
13   Q   So if I were to ask you whether it's true that only
14       retirees who attain 20 years of service and reach
15       age 55 are -- are -- are the folks who receive --
16       who are eligible to receive a COLA, is that
17       something you would know or not know whether that's
18       true?
19   A   No, I wouldn't know.  But I -- I do know that
20       underneath the county ordinance that the county
21       council can give a cost-of-living to individuals
22       who are over 55 years old if you're disabled or
23       just a regular county employee.  The county council
24       can do that on their own separate from the
25       retirement plan, benefit plan and so forth.
```

Page 141

```
 1    Q    Are you receiving Social Security Disability
 2         benefits?
 3    A    Yes.
 4    Q    How much, if you know, do you receive per month in
 5         Social Security Disability?
 6    A    Can I refer back to --
 7    Q    Sure, absolutely.
 8                        MR. ROSE:   It's in the
 9              interrogatories.
10    A    According to this it's at $1,814 according to the
11         interrogatory.
12  BY MR. KARWATH:
13    Q    That's a little over $20,000 a year?
14    A    If you say so.
15    Q    Twelve times 1800?  I mean, you re -- you receive
16         the benefit, I would -- do you have any reason to
17         disagree that --
18    A    No, sir.
19    Q    -- more than $20,000?
20    A    No.
21    Q    Okay.  And that's in addition to the disability
22         benefit you get under the plan from Lake County.
23         Correct?
24    A    Yes, sir.
25    Q    There is no offsetting or reducing one of the
```

Page 142

1    benefits because you receive the other one?

2  A   No.  Because Social Security Disability has never

3      been considered an income vehicle by the pension

4      plan.

5  Q   When you say "the pension plan," you're talking

6      about the plan under which you're getting your

7      disability benefit?

8  A   The benefit plan, yes, sir.

9  Q   Okay.  Do you get a COLA with the Social Security

10     benefits, are those increased for a cost-of-living?

11 A   Whenever the federal government --

12 Q   So yes?

13 A   Yes, sir, yes, whenever the federal government

14     decides to.

15 Q   I'm gonna hand you what's been be marked Exhibit

16     10.  Have you seen that document before?

17 A   Yes, sir.  This is what they -- like I said they --

18     they just send you a -- a letter in the mail

19     telling you to sign the paperwork and then they

20     send you the check.

21 Q   Okay.  And so you received this around July 15,

22     2003, the date -- that date that's on there?  It's

23     on the very top of the first page, it's dated

24     July 15, 2003?

25 A   Yeah.  I'm just looking at the date of the check.

Page 143

```
 1        The check's dated July 11th, 2003, so sometime

 2        after that I would assume.

 3    Q   It says that -- the letter here, Exhibit 10, says

 4        that they are enclosing a original check 087563 in

 5        the amount doll -- $9,791.84 and that's for the

 6        refund of the nontaxable portion of the employee

 7        contributions.

 8            Is that -- that's part of the money that you

 9        were refunded for your contributions to the -- to

10        the retirement plan, is that -- that you testified

11        about earlier?

12    A   Yes, sir.

13    Q   Then it -- you also get a check for $752.98 for --

14        also for refund of the taxable portion of the

15        employee contributions, is that correct?

16    A   That's what it says, sir, yes.

17    Q   Any reason to doubt that that's what those checks

18        were for?

19    A   No, sir.

20    Q   Any reason to doubt that you were actually provided

21        that money?

22    A   No, sir my signature's on the form.

23    Q   So when you received these checks, what did you do

24        with the money?

25    A   Probably paid off debt.
```

Page 147

1    Q    And in this instance were you reimbursed?

2    A    Yes.  After I had to go and get a copy of my check

3         and -- because at that time Mr. Dilts and I had a

4         discussion about well, what do you do if people pay

5         their bills online.  And he said well, we'll have

6         to bring that up to the pension board sometime

7         because some people don't write checks.

8    Q    So you were reimbursed these expenses, that's your

9         testimony?

10   A    Yes, sir.

11   Q    Okay.  I want to make sure I understood.

12                   MR. KARWATH:  Can I have 48?  Did

13            you already give it to me?

14   BY MR. KARWATH:

15   Q    I'm gonna hand you what's been marked as Exhibit

16        48.  So this document says "Thomas Ostrowski Review

17        of Disability Benefits."

18            Is this a document you have seen before?

19   A    Yes, sir.

20   Q    Okay.  And it goes down the page, it says "Date of

21        Birth."  Is that your correct date of birth, at the

22        top there?

23   A    Yes, sir, yes, sir.

24   Q    And date of hire, is that what you believe to be

25        your date of hire?

Page 148

1    A    As a police officer.

2    Q    Okay.  It says, "Worked 6 years," is that your

3         understanding of how long you worked as a police

4         officer?

5    A    I believe it was a little bit longer, but.

6    Q    How much longer?

7    A    Seven, eight months maybe.

8    Q    So at least within a year?

9    A    Yes, sir.

10   Q    Date of disability, May 22nd, 2003, is that

11        consistent with your understanding of the date of

12        your disability?

13   A    I have to look at the letter from the -- May 22nd

14        2003, yes, sir, that's what they have.

15   Q    Okay.  And at the time that you -- of your date of

16        disability were you age 54?

17   A    No.

18   Q    Okay.  How old were you?  Forty?

19   A    Somewhere in my 40's.

20   Q    This document may not -- may have been created when

21        you were -- were 54, not at the time of your -- of

22        becoming disabled.  It says, "Average Salary:

23        (Best 3 years)" and it has a month of -- or an

24        amount of $3047.67.

25            Is that your understanding of what your

1       average monthly salary was for the best three years

2       of -- of compensation you received?

3  A  That probably has all my overtime -- all my

4       overtime with it.

5  Q  Okay.  So -- so with the overtime the best -- the

6       average of your best three years, you have no

7       reason to dispute that the 3,047 -- $3047.67 is

8       correct?

9  A  Yes, sir.

10  Q  And then says, "Benefit Calculation based on 25

11      Years of Service:  Equal 60%."  And it says

12      "$1,828.61."

13         Is that an accurate reflection of the amount

14      that you get per month?

15  A  I think that's what was in the interrogatories.

16  Q  And then plus $20 and then it says "Monthly

17      Disability Payment: $1,848.61."

18         So does this document explain how your -- your

19      disability payment, your monthly disability payment

20      was calculated?

21  A  I believe this -- this document was created --

22      because it has age 54 on it.

23  Q  Right.

24  A  Is when I notified the department that I was trying

25      to go back to work.  And what they were using this

Page 150

 1    document to do was to cut my pension by over

 2    $10,000 because they felt that I was making too

 3    much money.  And the only time I seen this

 4    document, Mr. Dilts and Associates sent -- every so

 5    many years they sent out a form that you have to

 6    fill out, it says are you still disabled, are you

 7    working?  And I put down, yes, I am working.  And

 8    then attached to that I put down if my -- I don't

 9    know if I attached a letter to it or if I wrote it

10    on the form that if my disability benefits were

11    going to be affected in any way that I would like

12    to go to the -- the pension committee or the merit

13    board to have a discussion before they cut my

14    pension.

15         And what happened was is that I received a

16    letter from the sheriff's department telling me

17    that I -- that they were going to allow me to come

18    to the merit board meeting.  I showed up at the

19    merit board meeting and everybody there had a

20    package created by Dilts and Associates and this

21    was one of the documents in it, which they never

22    sent me.  So I went in there blind.  Everybody

23    in -- the merit board members had it, the sheriff

24    had it, the chief had it, the FOP had it, the union

25    had it.  Everybody had a thick document like this

Page 151

```
 1          about all this.  And Mr. Dilts was there and they

 2          said, well, we can throw this out because

 3          Mr. Ostrowski is no longer working so this no

 4          longer means anything.

 5   Q      Okay.  But as far as your understanding as you sit

 6          here today, is this an accurate recitation of how

 7          the monthly disability payment was calculated, 60

 8          percent of the average of your best three years of

 9          salary plus $20, is that -- or do you disagree with

10          this calculation?

11   A      I -- it's -- that's the dollar amount I'm getting,

12          so.

13   Q      Okay.

14   A      So.

15   Q      But as far as how it got -- how they got that

16          number, you don't know?

17   A      Correct.

18                    MR. KARWATH:  Why don't we take a

19               break at this point so they can change

20               the tape.

21                    THE VIDEOGRAPHER:  Off the record at

22               2:27.

23               (A short break was held.)

24                    THE VIDEOGRAPHER:  We're now back on

25               the record at 2:31.  Please continue.
```

Page 152

```
 1   BY MR. KARWATH:
 2   Q   Mr. Ostrowski, we're back on the record, just want
 3       to confirm you understand you're still under oath.
 4       Correct?
 5   A   Yes, sir.
 6   Q   Gonna hand you what's been marked as Exhibit 11.
 7       This document is titled "Application For Pension
 8       Benefits."
 9           And is that your signature on the document?
10   A   Yes, sir.
11   Q   And it appears to be dated July 8th, 2003?
12   A   Yes, sir.
13   Q   This document indicates that your first monthly
14       payment -- if you look in that box that says
15       "Reason For Payment," says "Date of First Monthly
16       Payment June 1, 2003."
17           Do you see that?  Kind of about a fourth of
18       the way down --
19   A   Yes, sir.
20   Q   Okay.  Is that your understanding, is that correct
21       about the time you began to receive your first
22       monthly payment under the disability plan?
23   A   Yes, sir.
24   Q   Okay.  And it references "Form Of Payment" and
25       then it references the monthly income payment of
```

Page 153

```
 1       $1848.61 and then it also says, "Cash Refund of
 2       Employee Contributions."
 3            Do you see that?
 4   A   Yes, sir.
 5   Q   And that box or that letter "b" and there is an "X"
 6       by that.  Correct?
 7   A   Yes, sir.
 8   Q   Is that the mechanism through which you elected to
 9       get a cash refund of your employee contributions of
10       $10,733.07?
11   A   The two checks, yes, sir.
12   Q   Okay.  And one of the options down below that is
13       "d.  Direct rollover of $10,733.07 to Another
14       Employer's Plan or an Individual Retirement Account
15       or Annuity."
16            Do you see that?
17   A   Yes, sir.
18   Q   You elected to take a cash refund and did not elect
19       to -- to take a direct rollover into an IRA?
20   A   Yes, sir.
21   Q   I think you testified that you don't recall exactly
22       what you might have done with the $10,733.07 but
23       you think you used it for living expenses or to pay
24       off debt; is that correct?
25   A   Yes, sir, I believe so, yes.
```

Page 154

```
 1   Q   Do you know whether the people who qualify for the
 2       regular retirement get a cash -- the option to have
 3       a cash refund of all their -- all their employee
 4       contributions that they had made into the
 5       retirement plan?
 6   A   I don't know if they do but I believe that the
 7       spouse of a deceased officer is -- is given that --
 8       beyond -- you know, as part of -- then they get a
 9       monthly check after that.
10   Q   My question for somebody who's -- who was an
11       officer who worked 20 years, hits the age to get
12       the retirement benefit, they start getting their
13       retirement benefit, they didn't also get all the
14       money that they contributed into it back in a lump
15       sum like you did for your disability benefit?
16   A   I don't know because that would be --
17   Q   You don't know the answer to that?
18   A   Yes, sir.
19   Q   You would agree, though, wouldn't you, that if you
20       hadn't used that 10,700 and some dollars to pay
21       expenses or pay off debt you could have invested
22       it, including in an IRA?
23   A   I don't -- well, I would -- what I would have done
24       is that if I wouldn't have used it for that, I
25       would have consulted with my tax -- with H&R Block
```

Page 155

```
 1        who does my taxes to find out what's my best -- my
 2        best option with it.
 3   Q    And at least as far as on that exhibit, one of the
 4        options that you could have elected was to roll it
 5        over into an IRA.  Correct?
 6   A    Yes, if -- yes.
 7   Q    Gonna hand you what's been marked as Exhibit 46.
 8        This is also a letter directed to you, references a
 9        check for $3477.22 and it says that's for your
10        June 2003 and July 2003 monthly payment; is that
11        correct?
12   A    Yes, sir.
13   Q    And then it references a withholding, do you see
14        that?
15   A    Yes, sir.
16   Q    Do you know what's your understanding of the issue
17        about the withholding, if you have one?
18   A    I have no idea.
19   Q    Do you recall whether or not there was a tax
20        withholding?
21   A    I -- I -- I don't know if there is a -- another
22        document that says hold -- withhold my taxes or --
23        or what.
24   Q    Do you pay taxes on the monthly benefit that you
25        receive from the disability plan?
```

Page 156

1    A    No.

2    Q    Gonna hand you what's been marked as Exhibit 47.

3         Do you recognize this letter or have you seen it

4         before?

5    A    Yes.

6    Q    This is a letter enclosing paperwork and

7         referencing your disability benefit.  Correct?

8    A    Yes, sir.

9    Q    And it says Under the terms of the plan -- of this

10        plan Mr. Ostrowski is eligible to receive a monthly

11        income of $1,848.61 with the first payment

12        commencing June 1, 2003 to cease upon recovery or

13        death, plus Disability Medical Expense

14        Reimbursement as approved by the Merit Board.

15        Mr. Ostrowski has elected to have federal income

16        taxes withheld from his annuity payments - filing

17        status married - Allowances Claimed.

18             Do you see that?

19   A    Yes, sir.

20   Q    Does that refresh your recollection about whether

21        or not you elected to have any withholding of your

22        monthly disability benefit?

23   A    At the time that I -- at the -- the first couple

24        years they were taking taxes out.  And what

25        happened was is that H&R Block did some research

Page 158

```
 1          that -- we went to -- my wife had a young lady from
 2          H&R Block who was a tax expert.  And we would drive
 3          from Lake County to Porter County for her to do our
 4          taxes.
 5     Q    And do they still do your taxes?
 6     A    H&R Block does, yes, sir.
 7     Q    When did you first know that the disability benefit
 8          that you received did not have a COLA but that
 9          there was a COLA for some of the regular retirement
10          benefit recipients?
11     A    I don't know because I -- it -- it -- this really
12          didn't hit me until the pension committee sent out
13          that letter saying that some -- some -- somebody
14          inquired about cost-of-living for the off -- for
15          disabled officers, the same ones we give to the
16          officers getting a monthly check and the widows and
17          orphans.  And that's when it -- when I received
18          that letter from the pension committee, that's when
19          it's like well, okay.
20     Q    So prior to receiving that letter you weren't aware
21          that other folks did receive a COLA?
22     A    I -- I've never -- I don't believe I've ever seen a
23          document that -- that stated that.  It may have
24          been common knowledge around the department or
25          whatever.  But I never got to that point in my
```

Page 159

1          career where, you know, I had the option.

2     Q    You knew you weren't getting a COLA.  Correct?

3     A    Yes.

4     Q    Okay.  That -- you've known that from the beginning

5          of you receiving the disability benefit?

6     A    My checks never changed, so.

7     Q    All right.  Did you ever ask anybody with Lake

8          County or any of the defendants why the retire --

9          why the disability benefit recipients such as

10         yourself don't get a COLA when other recipients of

11         retirement benefits do get a COLA?

12    A    In 2004 my first letter to the pension committee I

13         asked them to consider it because they were working

14         on with that.  Like I said, Sheriff Dominguez told

15         me that they were -- he was, you know, having a

16         real problem, even -- you know, trying to get the

17         widows and orphans a -- a cost-of-living increase

18         the one letter from Sheriff Dominguez said

19         something about there was $20 million in the

20         disability funds, so he didn't understand why the

21         pension administrator and other people were trying

22         to change the pension to cut off -- to cap our

23         medical expenses.  The only person -- and the

24         pension committee I wrote letters to, you get no

25         response back.  I have wrote letters to the merit

1 board, you get no response back, even acknowledging

2 that you sent them a letter.  The county council,

3 you know, I'm standing there for -- I think since

4 maybe -- when I went to the council meetings itself

5 and started questioning this, I think that was for

6 a couple years and they kept telling me well, it's

7 up to the sheriff, it's up to the sheriff.  You

8 know, if the sheriff wants to do this, we'll --

9 we'll do this.

10   I believe the sheriff's -- I'm sorry, I

11 believe that the county council's attorneys even

12 stated during a session that, yeah, we can -- you

13 know, we can give this to you and so forth but it's

14 up the sheriff and the merit board to -- you know,

15 to ask for it.  And then when the chief presented a

16 actuary study on -- on the cost and what it would

17 be for the disabled officers and we went over this

18 in our -- I went over this with -- in my meeting

19 with the Sheriff Martinez and -- and the chief and

20 they said that it was three -- that three percent

21 would cost it $247,000.

22   And I said, well, wait a minute, I said,

23 that's -- that's not what they're saying.  I said

24 they're saying that three percent of total payroll,

25 meaning everybody in the department would cost

Page 161

```
1        $247,000 for a three percent raise.  Because there

2        are officers that are making $800 a month.  So

3        there is no way that 16 officers would ever -- at

4        three percent would ever equal a yearly increase to

5        the budget of $247 000.

6             And it was explained to me that the actuaries

7        had to do total payroll, they could not subdivide

8        the cost.  So they didn't break it down as like

9        right now what are they paying the officers who are

10       getting a monthly check, how much is -- how much of

11       that $247,000 is theirs, the widows and orphans,

12       how much of that $247,000 is already built into

13       that and then the extra to make up for the disabled

14       officers, how much that was.  They couldn't -- they

15       couldn't do it.

16   Q   Let me make sure I understand your testimony.  So

17       I'm gonna summarize what I think I heard you say,

18       tell me if that's -- if that's not correct.  So to

19       the extent you raised this issue, people looked

20       into it, there was an actuarial study done to

21       address it.  And that actuarial study said it was

22       gonna cost a lot of money.

23            Is that -- is that a fair statement of what

24       you just said, am I -- or am I misunderstanding

25       your testimony?
```

Page 162

```
 1   A   No.  It -- it -- it -- the dollar that they said,
 2       the $247,000, they never defined how that was
 3       broken down.  If -- let's say 180,000 of it is
 4       already built in for the officers getting a monthly
 5       check.  And the widows and orphans, let's say,
 6       another $50,000.  So the actual cost to give the
 7       disabled officers would actually be let's say
 8       $6,000.  See what I'm saying?
 9   Q   I'm not sure I understand it.  I guess before I get
10       to that part of your test -- I want to make sure --
11       my question is, you know, did anyone ever give you
12       a reason for not providing the COLA?  And it
13       sounded to me like your -- your -- your testimony
14       was that they had an actuary who said it was gonna
15       be too expensive or that it was gonna cost a lot of
16       money.  Whether or not you agree with that or --
17       or -- but was that the -- is that the gist of what
18       your testimony was, that you testified about how
19       they had an actuary come in doing some sort of
20       study and -- and there was a large dollar figure
21       you think that maybe they got -- they did the math
22       wrong or something or they didn't look at it the
23       right way.
24            But to the extent after that actuarial
25       analysis was done and you didn't get -- they didn't
```

Page 163

```
 1        give a COLA to you and the other people getting a
 2        disability benefit, is it your testimony that it
 3        was because of the analysis done by the actuary, is
 4        that --
 5    A   No.  Because what happened was is that after the
 6        actuary study was done at the county council
 7        meeting, Councilman Strong asked the chief, did you
 8        put this dollar amount into your budget so we know
 9        that we have to appropriate it?  And the chief said
10        no.  The chief never submitted what the actuary
11        said to the county council for the county council
12        to even consider giving us -- giving the disabled
13        officers a cost-of-living increase.  And that
14        was -- that was the chief's decision not to submit
15        it in the budget.
16    Q   So if -- then if I'm to understand your testimony,
17        you've never been given a -- a reason for why
18        you -- you don't -- that you weren't given the
19        COLA?
20    A   Nobody has ever sat down with me and said, Tom,
21        this -- this is the reason why, nobody from the
22        pension committee, the merit board, the sheriff, or
23        the Lake County Council.
24    Q   Earlier today you testified about some
25        conversations you had with folks including the --
```

Page 164

```
 1        you mentioned that they were with the FOP or were
 2        part of the FOP.
 3            The FOP is -- what's that an acronym for?
 4   A    Fraternal Order of Police.
 5   Q    And is that the union that represents the officers
 6        in their collective bargaining?
 7   A    There is union -- there is the union and then
 8        there's the FOP.  It's two separate organizations
 9        and they both repre -- they both represent the --
10        the police officers.
11   Q    What's the name of the union that represents the
12        police officers?
13   A    IUPA, International Union of Police Organizations
14        and it has a number behind it, whatever -- whatever
15        union number --
16   Q    Local number --
17   A    Yeah, Local, I don't know what it is, I'm sorry.
18   Q    So is the FOP involved in collective bargaining
19        with the -- with the county?
20   A    The FOP and the union, they pick -- they -- it's
21        the FOP president, the union president, they pick
22        two people and then they sit down with the county
23        to -- to discuss issues.
24   Q    Okay.  So if there is a -- a -- ongoing
25        negotiations about how -- how much to pay active
```

Page 165

```
 1        duty police officers, that's something that's gonna
 2        involve the FOP and the union?
 3   A    Yes.
 4   Q    And so that the FOP and the union, do they
 5        represent retired and disabled -- and/or disabled
 6        police officers such as yourself?
 7   A    The FOP does.  But once you retire you can be a
 8        union member but you have no voting rights.
 9   Q    You had given testimony about the FOP didn't want
10        you to be bringing up the COLA issue and I think
11        your testimony, correct me if I'm wrong, was that
12        then there wouldn't be money for -- for them; is
13        that?
14   A    No.
15   Q    Okay.  I must have misunderstood.
16   A    That's okay.  Sheriff Dominguez sent out the letter
17        saying that he was shocked that the FOP, Mr. Dan
18        Murchek, who was the union -- union president and
19        Mr. Mitch Keene, who was the FOP secretary came to
20        him and asked him not to get involved or push the
21        COLA for the widows and orphans and the off -- and
22        the police -- and the disabled officers because
23        they felt that it would hurt their negotiating
24        issues.  And Sheriff Dominguez put in his letter
25        that he was shocked that these individuals would
```

Page 166

```
 1          come to him with -- with an idea that -- you know,

 2          to stop him from helping the disabled -- I'm sorry,

 3          to help -- to stop him from helping the widows and

 4          orphans who lost their husbands and fathers.

 5     Q    So the -- the people who -- in that part of your

 6          testimony that you were just discussing again that

 7          were -- were not interested in supporting a COLA,

 8          they were the FOP people and/or the union people?

 9     A    Both of them yes, sir.

10     Q    Both of them, okay.

11              But they weren't -- those -- the FOP and the

12          union, they're not the county or the defendants in

13          this case.  Correct?

14     A    No.

15                    MR. KARWATH:  Why don't we take a

16               real quick break.  And I think I'll pass

17               it back to Jackie then.

18                    THE VIDEOGRAPHER:  Off the record at

19               2:54.

20              (A short break was held.)

21                    THE VIDEOGRAPHER:  We're now back on

22               the record at 3:13.  Please continue.

23                    MR. ROSE:  This is Gavin Rose

24               speaking for the plaintiff.  During the

25               break we have been handed a number of
```

Page 167

 1            documents by Ms. Gessner and asked to

 2            agree to the authenticity of them or that

 3            they are what they purport to be.

 4            Exhibits 12 and 44, we agree to be

 5            authentic and my understanding is that

 6            they were documents prepared by

 7            Mr. Ostrowski for the Lake County

 8            Council.

 9                 Exhibits 30, 31 and 6 we agree are

10            authentic and are what they purport to

11            be.  Exhibits 15, 14 and 13 are all

12            meetings from various Lake County Council

13            meetings.  We have no reason to believe

14            that they are not authentic.  My client

15            simply took them off the Lake County

16            Council's web page.  To the extent that

17            they have not messed up there, that --

18            that is what they are.  And I think

19            that's all that we were handed.  Does

20            that make sense?

21                 MS. GESSNER:  That does, thank you.

22            And that is all that you were handed

23            during the break.

24                 Mr. Ostrowski, no objection to the

25            authenticity of those documents

Page 168

1                  identified by Mr. Rose?

2                     THE DEPONENT:  No, ma'am.

3                     MS. GESSNER:  You agree with his

4               description and his statement as to their

5               authen -- authenticity?

6                     THE DEPONENT:  Yes, ma'am.

7    BY MR. KARWATH:

8    Q   Mr. Ostrowski, again, coming back from a break I

9        always ask, you understand you're still under oath?

10   A   Yes, sir.

11   Q   Earlier we were talking about H&R Block and

12       disability benefits that you received and whether

13       or not those are taxed or not.  And your testimony

14       was that H&R Block said, we messed up, they're not

15       taxable, you don't pay tax on them now and to the

16       extent any tax was previously paid in, you got that

17       all refunded; is that correct?

18   A   Yes, sir.

19   Q   When it comes time to a regular retirement benefit,

20       do you have any understanding about whether or not

21       people who receive a benefit under the -- what I'm

22       calling the regular retirement benefit, do you know

23       whether or not that -- those payments, those

24       monthly payments are taxable?

25   A   I don't know.

Page 169

1    Q    You don't.

2                    MR. KARWATH:   Okay, thanks.

3              DIRECT EXAMINATION (Continued)

4    BY MS. GESSNER:

5    Q    Just a few quick things, Mr. Ostrowski.  We were

6         talking about the FOP president and earlier you

7         couldn't remember the name of that person and you

8         subsequently remembered that it was Jim Tomko.

9         Correct?

10   A    Yes, ma'am.

11   Q    When we were talking about that person making a

12        comment or speaking, you were referring to Jim

13        Tomko?

14   A    Jim Tomko is the FOP president that told me that we

15        are not gonna get any -- any of his fucking money,

16        yep -- that portion of it, yes.

17   Q    That part was that person?

18   A    Yes, ma'am.

19   Q    And do you recall sitting here today around what

20        time that happened, what year the comment was made?

21   A    It was -- no.  It happened in a FOP meeting I don't

22        know if the -- if the FOP secretary was taking

23        notes or not, no, ma'am.

24   Q    Okay.  We also talked about a Will Smith, former

25        county council member, do you recall speaking about

Page 170

1          Will Smith --
2     A    Yes --
3     Q    -- earlier today?
4     A    Yes, ma'am.
5     Q    And you mentioned that you must have spoken to him
6          about the disability COLA during the time that he
7          was in -- sitting as active tenure on the council.
8          Correct?
9     A    Yes, ma'am.
10    Q    And so if I told you that he resigned from the Lake
11         County Council in December 2007, any reason to
12         dispute your conversations with him about the
13         disability COLA took place prior to that date?
14    A    No, ma'am.  Because after he resigned I think I
15         talked to him one other time and that was, I
16         believe, before his sentencing hearing at the
17         federal court.
18    Q    And would that have been fairly soon after he
19         resigned from the county council?
20    A    I -- I believe once he was convicted that he had to
21         resign and then you have sentencing, whatever the
22         guidelines are for that.
23    Q    Okay.  And we also talked about Jerome Prince
24         earlier today, a former Lake County Council member?
25    A    Yes, ma'am.

Page 171

```
 1   Q   And you mentioned similar conversations about the
 2       same topic with Jerome Prince while he was an
 3       active council member?
 4   A   Yes, ma'am.
 5   Q   And if he was on the council until 2014, would it
 6       be true to say that your conversations with him
 7       about that subject happened prior to 2014 or
 8       thereabouts?
 9   A   There and after.  Because, like I said, I would --
10       when I would go out to the county he would be
11       walking down the hallway or whatever and he went to
12       school with my sister and Jerome would say, hey
13       Tom, how's it going?
14            I'd say, hey, Jerome, you know,
15       everything's -- he'd say what's going on?
16            I'd say, well, I'm going back up -- you know,
17       the county council and he would -- you know, we
18       would have a short discussion.
19   Q   Okay.  And his knowledge of what you were talking
20       about, the fact that you were going to the county
21       council to seek the COLA for disability benefits,
22       his knowledge of that would have been during
23       conversations prior to 2014?
24   A   And after.
25   Q   But as well as prior to?
```

Page 174

1              Obviously, for the record, he is not an
2              attorney and whatever claims will be
3              flushed out during briefings but you can
4              ask him what his understanding is.
5      BY MS. GESSNER:
6      Q   To the extent you understand your claims that you
7          have brought forth in this lawsuit, do you
8          understand whether or not you are alleging any
9          violation of the Americans with Disabilities Act?
10     A   I believe it's states the refusal to provide
11         disabled retirees with any cost-of-living increases
12         in their petition -- in their pension payments,
13         while providing such increases to non-disabled
14         retirees and surviving spouses violates Title I of
15         the Americans with Disability Act as well as
16         Section 504 of the Rehabilitation Act.
17     Q   And I appreciate your recitation there.
18             What's your understanding of what your claim
19         is with respect to specifically the Americans with
20         Disabilities Act?
21     A   That everyone -- everyone no matter of their
22         disability must be treated equally.
23     Q   So is it your contention that it's a violation of
24         the act not to provide the same treatment to the
25         disability retirees and the non-disabled retirees?

Page 175

1    A    One more time, please.

2    Q    Is it your contention that if -- it's illegal or a

3         violation of this law not to provide the same

4         treatment to the disabled retirees as to

5         non-disabled retirees?

6                       MR. ROSE:  I'll object to the extent

7                  you're asking about a legal contention.

8                  But if he has an opinion, he can answer.

9    A    My -- my opinion on this is is that when it comes

10        to benefits that are given to -- that the

11        council -- that the pension committee and the merit

12        board and the county has decided to provide to some

13        individuals within -- within the ben -- benefit

14        pension plan then those benefits should be provided

15        to everybody within the pension benefit plan, no

16        matter if you're disabled or not.

17   BY MS. GESSNER:

18   Q    And is it specifically the action of the failure to

19        provide a cost-of-living increase that you believe

20        to be some violation of the Americans with

21        Disabilities Act?

22   A    Yes.

23   Q    Is there any other action that you believe to be a

24        violation of that law?

25   A    Since I don't know the complete law and so forth, I

Page 181

```
 1        by the Lake County Council attorney didn't we go --
 2        we were discussing the cost-of-living allowance for
 3        the disabled officers.  And I believe Mr. -- the
 4        county council attorney said something to
 5        Mr. Blanchard who at one time was on the county
 6        council but is now a member of the Lake County
 7        Commissioners staff, he asked him, didn't we
 8        discuss this years ago about COLA and so forth for
 9        the disabled officers.  And I believe Mr. Blanchard
10        said something to the effect of, yeah, we did but
11        it got nowhere really quick.
12   Q    And what about that statement do you believe to
13        imply some form of discrimination?
14   A    Because every time you -- you bring up the question
15        of a cost-of-living for the disabled officers,
16        it -- it's shut down very quickly where most people
17        would say well, let's have a conversation about
18        this.  Unless you have a prejudice against somebody
19        then it's like -- if you do then you shut it down
20        quickly.  If you don't, normal people would be able
21        to sit down and have a conversation.
22   Q    Okay.  And is that -- that understanding -- that
23        you have, your understanding of the reasoning why
24        someone would respond in that way, is that based on
25        your assumption that that's what's going on in
```

Page 182

```
 1        their minds or did you -- did you ever learn
 2        anything about why it was at that time that the
 3        discussion shut down, as you say?
 4   A    No, nobody -- nobody gave me a -- a definite answer
 5        saying, well, Tom, it was shut down because of this
 6        or money, politics, we just don't like disabled
 7        people, you know, nobody would ever come out to say
 8        it.  But people who are prejudice usually don't
 9        come out and say that they're prejudice.
10   Q    So no one that you know of has -- you know, with
11        respect to any of these discussions or your efforts
12        to talk to individuals about this issue, no one's
13        ever said to you specifically well, there's a bias
14        or prejudice, that's why we're not going to?
15   A    No -- no, ma'am, you just said -- some people
16        don't -- won't even talk to you.
17   Q    And I know you -- we talked about this a little bit
18        earlier when you were speaking with Bart but when
19        it relates to the failure to provide a COLA for the
20        disability retirees, who were the groups that you
21        believe are being treated better -- better than you
22        when it comes to those who are not disabled?
23                   MR. ROSE:  Objection to the extent
24             it asks for a legal conclusion but you
25             can answer.
```

Page 183

```
 1    A    Like I said, I believe that if -- if we -- if I am
 2         in a defined plan, the benefit plan that if out of
 3         the three parties who are in the defined benefit
 4         plan, one is the officers who -- who determined to
 5         take a monthly check, the others are the widows and
 6         orphans of -- of fallen officers then the disabled
 7         officers should receive the -- the same benefit
 8         that -- a cost-of-living increase that they
 9         receive.
10   BY MS. GESSNER:
11   Q    And so the groups you identified there as
12        individuals that you allege receive some form of
13        better treatment would be the officers who receive
14        a monthly check under the normal retirement plan
15        and the widows and orphans?
16   A    Yes.  Because -- because they -- they receive
17        something more than we do, not just financially but
18        also -- well, you could say financially, too, but
19        the insurance, too.  Where they're -- if they have
20        been on the department for over 25 years and -- 25
21        years of credit is what I should say because you
22        can buy into the police officer's pension plan.  So
23        you have -- you may have been on the department 20
24        years but you can purchase an extra five years by
25        don't -- by buying into it, money and so forth.
```

Page 184

1          But -- so that's what they look at.

2              So if the county -- if the sheriff says that

3          you've been on the department 25 years, then the

4          county will pick up your -- your insurance costs,

5          what you pay.  Whereas the disabled officers, like

6          myself, I pay -- out of my check I pay $200 a month

7          for my health insurance.

8     Q    And does that benefit, the benefit of having your

9          insurance fully covered, does that only apply to

10         those who do this buy-in of additional time that

11         you described, as far as you understand?

12    A    As far as I understand anybody -- anybody in the

13         county who has worked for the county for 25 years

14         or longer -- this is the county health insurance

15         we're talking about -- get their insurance picked

16         up after 25 years.

17    Q    Are there any other reasons that you have to

18         believe that that failure to provide a COLA to the

19         disabled retirees is a form of discrimination other

20         than what we have already discussed?

21    A    I would say yes because when you look at -- when

22         you look at the amount of money that you're getting

23         on your pension plan and it's supposed to be a

24         reasonable amount and when the pension committee or

25         the merit board or the sheriff or the county

Page 185

1    council have never submit -- have never asked

2    officers to submit to like a financial survey, so

3    you can -- you can just come out and say, Bart, I

4    think a reasonable amount for you is X number of

5    dollars and that's what it is. Well, it may not

6    be.

7         And it's easy -- and when you're talking about

8    people who cannot work you have to look at what

9    that -- what that money means to them because

10   that's -- that's their livelihood. And when you're

11   telling these people that, yeah, you know, you were

12   on the department, we decided to put you on this

13   disability and that if you want to go out to work

14   you can do that if you can but we're also going to

15   cut your -- your pension plan.

16        And what happens is is when you have people

17   who have -- were willing to sacrifice themselves

18   for their fellow citizens and when you tell these

19   officers, look, we don't care, we're giving you

20   this dollar amount and that's it, we don't care,

21   the -- the trauma of that -- that not just you

22   receive but you have to look at the officers who

23   are still working. What -- what do they see when

24   that happens? Are they really going to put

25   themselves on the -- on the -- on the line when

Page 186

1      they know that if they get hurt on dut -- on duty

2      the sheriff can say, look, I'm putting you on a

3      disability that's it.

4          And so now you're looking at officers second

5      guessing themselves about maybe getting hurt or not

6      and then what happens to the civilians then.  If

7      you're a -- you're your at home, your significant

8      other starts assaulting you and -- now we're

9      talking about county officers now so we're talking

10     about the nearest backup may be 20 or 30 minutes

11     away.  Is that officer gonna rush into that house

12     and fight off the aggressor?  Or is he gonna sit

13     back and wait until his backups show up and then go

14     in in force so that none of them get hurt.  So

15     that's -- you know, when you're talking about

16     discrimination, you know -- you know, the -- the

17     issue is very large in my opinion, but.

18  Q  So a couple things that I just kind of want to

19     understand that I make sure I understand what it is

20     you're saying.  You mentioned that, you know,

21     you've not been asked to do a financial survey, and

22     correct me if I'm wrong but I think you mean to

23     explain what it is your cost of living to you

24     individually might be?

25  A  Right.  Because --

1    Q    Your bills, things -- expenditures, your budget,

2         things like that?

3    A    Right.  Because every two years you get a -- you

4         get a form that says are you working and are you

5         disabled and that's it.  So what's the mechanism of

6         trying to get a reasonable amount, a cost-of-living

7         increase.  Well, my option was write to the pension

8         committee, write to the merit board, write -- go to

9         the county council, you know, those -- those were

10        my options that I had because, you know, the FOP

11        and the union already shut down any type of

12        assistance to give to the -- you know, to try to

13        talk to the Lake County Council about it, they

14        can't negotiate benefits, the union and FOP can't

15        negotiate benefits but they can at least put some

16        pressure on the politicians saying, look, our guys

17        are hurt, the State of Indiana says if a city

18        police officer or a town police officer gets hurt,

19        they automatically get the full pay of a patrolman

20        for the rest of their life if they have a

21        67 percent or higher disability rating and they

22        automatically get all increases.  So what are --

23        what are -- what are you telling our guys?  You

24        know, if you're not willing to sit down and try to

25        help our guys, why -- how are we going to get the

Page 188

1      best of the best to come to the county instead

2      going to the city or a town.

3  Q   And so as part of your contention about what's

4      reasonable, you're describing, you know, when it

5      comes to what actually your amount of your

6      disability benefit is, are you saying that in terms

7      of the comparison between other types of plans,

8      what they provide, that it is not reasonable if it

9      does not provide the same types of benefits by the

10     same calculation as other plans that other

11     government entities might use?

12 A   I would say I would -- I would leave that to the

13     dis -- decision of a judge to make the decision on

14     what -- after looking at our -- after looking at

15     the Lake County Sheriff's Plan and what the city

16     and town's officers get and so forth and what

17     reasonable is.

18         I don't -- I know officers on my department

19     who make more money than I do on disability.  And I

20     know -- like I said, the city and town police

21     officers make -- you know, if you're a St. John

22     police officer and you got a 67 percent or higher

23     disability, you get $70,000 a year plus inter --

24     plus increases, you know so, you know, like I

25     said --

Page 189

1    Q    I understand that you're saying, you know, that's

2         up to the judge ultimately but what I'm asking you

3         today and what I have to understand from you is

4         what do you deem to be unreasonable?

5              So what I'm saying to you in my question is do

6         you think that it makes it unreasonable if the

7         amount is not calculated in the same way for

8         different types of plans by different types of

9         government entities?

10   A    I don't know.  Because you have -- you have to

11        include benefits -- other benefits like insurance

12        and so forth.  I don't know what the cities and

13        towns, how they handle their insurance benefits

14        like that.  So what I -- all I would say is that I

15        don't think that I am getting a -- a reasonable

16        amount of money -- reasonable amount of money from

17        the county and that -- and that's based upon the

18        information that the county has of what they pay

19        me.

20             I know that the -- I've never received

21        anything from the pension committee asking me how

22        much I pay for my -- my health insurance.  I don't

23        know how -- I don't know if there is anything

24        within the pension committee's policies or

25        procedures that tells them they should be doing

Page 190

```
 1        something like, you know, reviewing the status of
 2        what the officers are being paid and so forth, I
 3        don't know because we don't get to go to the
 4        pension meetings and I don't know what their
 5        policies and procedures are, so --
 6   Q    So I understand all that, you know -- do you need a
 7        break?
 8   A    No, no, no 'cause he has to get home.
 9   Q    And, you know, understanding that there are other
10        entities involved sort of making these
11        determinations what the amount is but what I -- I
12        guess I want to understand and here's what I
13        believe you said is, you know, your amount is based
14        on info that the county has of what they pay.
15        Explain that to me in terms of how that determines
16        whether or not you receive a reasonable amount?
17   A    I believe it's -- it's -- it's not what the county
18        has, it's what's county doesn't have is that if
19        you're talking about a -- what is a reasonable
20        amount?  Okay, I live in Northwest Indiana.  What
21        is our cost-of-living in Northwest Indiana?  Okay.
22        What is -- what is the officer's insurance
23        payments, how much does he or she have to pay a
24        month, you know, for determination, not just how
25        much -- not just how many years the officer was on
```

Page 191

```
 1        the department because you -- you have to look at
 2        the fact that the officers don't make the -- the
 3        determination to go on a disability pension.  It's
 4        the department that makes the determination to put
 5        the officer on a disability pension or offer him or
 6        her a job.  So you have -- you have to look at that
 7        also.
 8             And -- and the department knows because this
 9        is -- the pension plan is run by officers and
10        retired officers and so forth, they understand that
11        the amount of money that you lose by going on a
12        disability pension by this -- by this.  Okay?  They
13        know you're not working those other jobs, you can't
14        do that.  They know, you know, the loss of income.
15        They know that you have to put -- for your medical
16        bills you have to put everything up front, you
17        know, and hopefully get reimbursed for it, you
18        know, if it's something that they -- they cover,
19        you know, so.
20    Q   Okay.  And so I think I -- I understand what you're
21        saying in terms of an amount, you know, if that is
22        not considering that individual's cost of living,
23        their actual healthcare costs in terms of the true
24        cost to them living in the area they're living, if
25        it's not considering those items, it's your
```

Page 192

```
 1        contention or testimony that that would not be a
 2        reasonable amount for a disability benefit?
 3   A    I -- I believe that would be a part of it, yes.
 4   Q    Any -- are there any other parts that -- that would
 5        play into whether or not the amount is
 6        unreasonable?
 7   A    I -- I would say that the county -- the county
 8        should look at the last person that retired, how
 9        much are they paying that -- that person?  And if
10        they're paying that person, let's say, $40,000, why
11        is that reasonable for that person to receive
12        $40,000 a year and an officer to receive $800 --
13        $800 a month, so 8000 -- 9600, $9600 a year when
14        they live in the same county, they're under the
15        same pension plan, they were put on the pension
16        plan by -- by the merit board and the county.  How
17        do you -- how do you determine that this person's
18        life is worth paying him 40,000 and this person's
19        life is worth paying $9600?
20   Q    And earlier, as you described, you weren't sure
21        exactly of the way that your disability pen --
22        payment was calculated.  Correct?
23   A    Yes, ma'am.
24   Q    Okay.  So with respect to others -- other
25        individuals and whatever their amounts might be,
```

Page 193

| | | |
|---|---|---|
| 1 | | you similarly would not have personal knowledge as |
| 2 | | to how that amount was computed? |
| 3 | A | Was computed, no. |
| 4 | Q | Can I have you look at paragraph 35 of Exhibit 33? |
| 5 | | Should be the same page, Page 8. |
| 6 | | And as described in this paragraph it explains |
| 7 | | that the refusal to provide disability retirees |
| 8 | | with a cost-of-living increase in their payments |
| 9 | | while providing such increases to other retirees |
| 10 | | violates the Equal Protection Clause of the |
| 11 | | Fourteenth Amendment. |
| 12 | | And I've abbreviated it somewhat, but the |
| 13 | | extent that that's how you understand that |
| 14 | | paragraph? |
| 15 | A | Yes, ma'am. |
| 16 | Q | Okay.  Do you understand as well that in this |
| 17 | | lawsuit you're bringing a claim of a Equal |
| 18 | | Protection Clause violation? |
| 19 | A | Yes, ma'am. |
| 20 | Q | And as explained here, is it, again, the same |
| 21 | | action that we were just talking about with respect |
| 22 | | to the Americans with Disabilities Act, the failure |
| 23 | | to provide a cost-of-living increase, is that same |
| 24 | | action the action you're alleging also violates the |
| 25 | | Equal Protection Clause? |

Page 194

```
 1              MR. ROSE:  Same objection as before
 2         but he can certainly testify as to his
 3         understanding.
 4    A    Yes.
 5    BY MS. GESSNER:
 6    Q    Do you believe that that violates the U.S.
 7         Constitution?
 8    A    Do I believe what violates the Con --
 9    Q    What we just described, failure to provide a COLA
10         to disabled retirees in this instance?
11    A    If it's equal protection then equal means equal,
12         yes.
13    Q    So is it your contention that that is a violation
14         of the Equal Protection Clause because those
15         payments are not equal for all individuals
16         receiving a benefit?
17    A    It's -- it's a violation because other members
18         within the same plan are not being treated the
19         same.
20    Q    So with respect to this particular action, the
21         failure to provide a COLA, is it your contention
22         that all individuals, if any of them receive a COLA
23         that all should receive a COLA?
24    A    Within the benefit plan, yes, ma'am.
25    Q    And is that as well if an individual under the
```

Page 195

```
 1          retirement plan is receiving a COLA, that an

 2          individual under the benefit plan must receive one

 3          as well?

 4    A     It's two separate plans, so you're treated

 5          differently between the two plans.

 6    Q     They're two separate plans, there's not the same

 7          treatment provided to beneficiaries under both?

 8    A     Yes.  My -- as far as I understand because I have

 9          never gone through this Lake County Police

10          Retirement Plan, Exhibit Number 9, so I don't know

11          if they're exactly the same, you know what I mean,

12          if everybody's being treated exactly the same or

13          not.

14    Q     And other than that particular action, the -- the

15          failure to provide the COLA to disabled retirees,

16          is there anything else that you deem to be a

17          violation of the Equal Protection Clause?

18    A     I'm not an expert on the Equal Protection Clause so

19          I don't -- I don't -- there may be there, I don't

20          know.

21    Q     Is there any other action taken by the county or

22          any of the defendants that you deem to violate the

23          law in any way?

24    A     It's Lake County, I'm sorry, I'm sorry, no, I'm

25          sorry, I apologize --
```

Page 199

1           none of this is remotely admissible

2           'cause you're asking him what -- what the

3           law is and the complaint speaks for

4           itself.  But so -- so go ahead and ask

5           but --

6               MR. KARWATH:  Just ask him what he's

7           complaining about.

8    BY MS. GESSNER:

9    Q   What are the actions by any of the defendants that

10       you are bringing some sort of claim in this

11       lawsuit?

12   A   You're asking me why I'm bringing the claim because

13       of the inactions of the complaint -- of the

14       defendants?  Is that the question or am I

15       misunderstanding what you're asking?

16   Q   I'll rephrase it.  What specific actions by any of

17       the defendants are you complaining about in this

18       lawsuit?

19   A   One, cost-of-living that is given everybody else

20       within the de -- within the benefit plan that is

21       not given to the disabled officers.  Two,

22       reasonable amount of a -- of a disability pension,

23       that other officers are receiving more money

24       than -- than I am on their disability pension,

25       which -- failure to provide my equal -- equal

Page 200

1        protection because if they're getting it and

2        it's -- it's the benefit plan then I should also be

3        getting it, parts of the benefit, I should be

4        getting it also, refusal to provide the -- the

5        disabled employees with cost-of-living in their

6        pension payments, which they can but they just

7        don't want to.

8   Q    Okay.  Anything else?

9   A    No, ma'am.

10  Q    What are you hoping to accomplish through this

11       lawsuit?

12  A    That my fellow officers who are disabled will be

13       able to live on an income that will allow them to

14       not have to go to food banks or have to worry about

15       if they can pay their heating bills or electrical

16       bills, that my fellow officers will be treated with

17       the respect that is due them because of the

18       sacrifices that they made -- that they have made to

19       the county and to -- to the department, that my --

20       the younger officers who are coming onto the

21       department will realize that they are going to be

22       respected in case something happens to them.

23       Because it's mostly the younger officers who get

24       hurt because they're the ones in patrol.

25            A 18-year officer is sitting in some civil

# DEPOSITION EXHIBIT 1
# TO THOMAS OSTROWSKI DEPOSITION

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

THOMAS OSTROWSKI,                        )
                                         )
            Plaintiff,                   )
                                         )
    v.                                   )
                                         )
LAKE COUNTY, INDIANA; the                )
LAKE COUNTY SHERIFF, in his              )   No. 2:18-cv-00423-JVB-JEM
official capacity; the LAKE COUNTY       )
TREASURER, in her capacity as            )
Trustee of the Pension Plan of the       )
Lake County Sheriff; and the             )
PENSION COMMITTEE of the                 )
Pension Plan of the Lake County          )
Sheriff,                                 )
                                         )
            Defendants.                  )

## PLAINTIFF'S RESPONSES AND OBJECTIONS TO DEFENDANTS' FIRST DISCOVERY REQUESTS TO PLAINTIFF

**COMES NOW** Plaintiff, by his counsel, and provides his Responses and Objections to Defendants' First Discovery Requests to Plaintiff:

## INTRODUCTION AND GENERAL OBJECTIONS

1.      The plaintiff **OBJECTS** to all requests and definitions to the extent that they impose obligations beyond those imposed by the Federal Rules of Civil Procedure.

2.      The plaintiff **OBJECTS** to all requests for documents insofar as they do not, by their terms, exclude documents that are protected by the attorney-client privilege.  The plaintiff states that no documents have been withheld as protected by the attorney-client privilege other than direct communications between the plaintiff and an attorney (or legal organization) pertaining to legal advice and/or current or future litigation.

1

EXHIBIT
1

3.     The plaintiff **OBJECTS** to the definition of "you" and "your," which the defendants have defined to include not only the plaintiff but also "any of his designated representatives, agents, or counsel." Given this definition, Interrogatory No. 1, for instance, seeks the social security number, date and place of birth, and other personal information pertaining not only to the plaintiff but also to his counsel (and any other representatives). This definition is clearly overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant evidence.

4.     The plaintiff is responding to the defendants' discovery requests on the basis of information currently known to him and in a good faith effort to respond to requests that are not objected to. In the event that additional information responsive to these requests is subsequently recalled or obtained by the plaintiff, these responses will be supplemented as necessary. By producing his discovery responses, either in the form of documents or in the form of answers to propounded interrogatories, the plaintiff is not conceding that any of the produced information is discoverable or admissible.

5.     On August 8, 2019, the parties filed their proposed Stipulated Protective Order. As of August 15, 2019, that protective order has not yet been entered by the Court. Counsel for the parties have communicated and have agreed that documents may be produced and designated as confidential as if the protective order has been entered and that such documents will be treated confidentially pursuant to the terms of the protective order. These discovery responses are being provided with that understanding.

6.     Several documents produced by the plaintiff in response to the propounded discovery requests contain the plaintiff's home address and/or his telephone number. Although the plaintiff understands that this information is discoverable, he requests that his personal contact information be redacted from any public filing.

2

## ANSWERS AND OBJECTIONS TO INTERROGATORIES

For his Answers and Objections to Interrogatories, the plaintiff hereby states as follows:

**INTERROGATORY NO. 1:**   Please state your full name and provide your date and place of birth, your present address, telephone number, and the names of all persons with whom you reside at such address, including their relationship to you, if any.

**ANSWER:**   My name is Thomas Joseph Ostrowski.  I was born in Gary, Indiana, and I currently reside at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, ▮▮▮▮.   My daughter, Stephanie Ostrowski, resides part of the time with me and part of the time with her mother.  As I was previously employed by the Lake County Sheriff's Department, my date of birth is known to the defendants and is not reproduced here in order to ensure that this document need not be maintained confidentially.

The plaintiff **OBJECTS** to the request that he provide his telephone number, as that request is not reasonably calculated to lead to the discovery of relevant evidence.  The plaintiff may be contacted in care of his attorney.

**INTERROGATORY NO. 2:**   Please identify all persons, including any current or former employees or representatives of Defendants, having knowledge relevant to your claims, including but not limited to any person whom you or your agent has interviewed, communicated with or contacted in relation to/concerning this action or the facts and allegations underlying this action.  With respect to each such employee, former employee, or any other individual, please include the following:

(a)   whether the individual is a current or former employee or representative of Defendants;

(b)   whether and when you communicated with the individual concerning this action;

(c)   whether the individual gave any written statements; and

(d)   a summary of each person's knowledge of Plaintiff's claims.

3

**ANSWER:**     The plaintiff **OBJECTS** to this request as overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant evidence.  The request seeks the identification of "all persons . . . having knowledge relevant to [the plaintiff's] claims" and includes anyone with whom the plaintiff has communicated "concerning this action or the facts and allegations underlying this action."  The scope of this request is virtually boundless.  For instance, the plaintiff has alleged that he is a Lake County resident, that he is a former employee of the Lake County Sheriff's Department, that he is disabled, and that he receives a pension as a result of his disability.  The request would thus require the identification of every person with whom the plaintiff has shared his address, of every person aware of his past employment with the Lake County Sheriff's Department, of every person with any information concerning his disability (including not only medical providers but persons who have observed him), and of every person aware that he receives a pension.  The plaintiff has also made several allegations concerning the defendants' practices and/or policies regarding pension benefits.  The request would thus also require the identification of every person aware of these practices and/or policies.

**INTERROGATORY NO. 3:**     Have you given any written or oral statements and/or interviews to anyone concerning this case?  If so, please state:

      (a)      the date of each;

      (b)      the location of each;

      (c)      who was present at each;

      (d)      whether the statement was oral, written, and/or recorded;

      (e)      the person who currently has possession of any such statement; and

      (f)      a summary of the content of the statement/interview.

**ANSWER:**   The plaintiff **OBJECTS** to this request insofar as it is overbroad, unduly burdensome, vague, and not reasonably calculated to lead to the discovery of relevant evidence. Interpreted literally, the request seeks information concerning every casual conversation in which the plaintiff has even mentioned his filing of this lawsuit (or, potentially, every casual conversation in which the plaintiff has even mentioned any of his allegations giving rise to this case). The plaintiff further **OBJECTS** to this request insofar as, by its terms, it appears to include statements or interviews given to attorneys for the purpose of securing legal advice or representation, and these communications are of course protected by attorney-client privilege. Notwithstanding and without waiving these objections, the plaintiff states as follows:

Shortly after this case was initiated, I spoke briefly over the telephone with a reporter from the Times of Northwest Indiana. I do not recall the name of the reporter, and I do not believe that any other persons were present. I did not take any notes during this conversation; if the reporter did, I assume that those notes have either been destroyed or are in possession of the Times of Northwest Indiana. I do not recall specifically what was said, although I assume that I gave a short synopsis of the lawsuit from my perspective and that I described my belief that I am entitled to cost of living increases in my pension payments. I do not believe that I spoke with any other reporters concerning this lawsuit.

**INTERROGATORY NO. 4:**   Please identify each employer (including self-employment) for whom you have worked in the past five years and for each state:

  (a)    the name and address of each employer;

  (b)    all positions worked;

  (c)    all supervisors to whom you reported;

  (d)    whether you were ever disciplined, and if so, the nature of such discipline;

(e)     the dates of your employment; and

(f)     whether your separation was voluntary or involuntary, if applicable.

**ANSWER:**     I worked for Lake County E-911 from 2014 through 2015.  The address of that employer is 2293 N. Main Street in Crown Point, Indiana.  My position was as a Call Taker.  I do not remember the names of the supervisor(s) to whom I reported.  I recall being disciplined when I worked for Lake County E-911, but I do not recall the reason that I was disciplined.  I voluntarily resigned from this position after I did not receive a response from my supervisor to concerns that I raised regarding a change in my employment from 8-hour shifts to 12-hour shifts.

I have not worked for any other employer in the past five years.

**INTERROGATORY NO. 5:**     Have you ever been a plaintiff, defendant, or witness in any legal proceeding (including a bankruptcy proceeding), or filed a claim or charge with any legal, administrative, or other body?  If so, please state:

(a)     all parties named in the action;

(b)     the cause number or docket number of the action, as well as the court or administrative body with which it was filed;

(c)     the nature of the dispute;

(d)     the manner in which the dispute was resolved; and

(e)     the nature of your testimony and/or your involvement.

**ANSWER:**     The plaintiff **OBJECTS** to this request insofar as it is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant evidence.  The request is not limited by time-frame or by subject-matter.  The plaintiff further **OBJECTS** insofar as the term "legal proceeding" is vague.  Interpreted literally, for instance, it is not clear whether this term includes an application for social security or other benefits or it might include a ticket received for a minor traffic infraction.  The plaintiff therefore interprets the term "legal proceeding" to refer only to

6

lawsuits filed in a court of law. The plaintiff further **OBJECTS** insofar as the phrase "a claim or charge with any legal, administrative, or other body" is vague. The plaintiff interprets this phrase to refer to formal claims or charges filed with a governmental body, and does not believe that the phrase includes applications for benefits or similar information. Notwithstanding and without waiving these objections, the plaintiff states as follows:

In addition to this case, I recall being a party to the following legal proceedings:

- I was the plaintiff in *Ostrowski v. Lake County Board of Commissioners, et al.*, No. 2:16-cv-00166-JEM (N.D. Ind). The case concerned the failure of my former employer, Lake County E-911, to reasonably accommodate my disability. In addition to the Lake County Board of Commissioners, I named as defendants the Lake County E-911 Commissioner, Brian Hitchcock, Jack Allendorf, and the Lake County Council. The case was settled through mediation, and the parties therefore stipulated to the dismissal of the case, with prejudice, and the Court acknowledged that dismissal.

- I was one of the plaintiffs in *Ostrowski v. Everest Healthcare Indiana, Inc., et al.*, 956 N.E.2d 1144 (Ind. Ct. App. 2011). That appeal arose from two different lawsuits that I filed in the Lake County Courts, which were consolidated in the trial court, concerning a hand injury that I suffered prior to a medical appointment. It is my recollection that my attorney in that case amended the complaint several times to include additional defendants and that, for a variety of reasons, the case was transferred between different courts in Lake County (and that it was therefore assigned a variety of cause numbers). I do not recall the identity of all defendants who were named in this lawsuit, nor do I recall the various cause numbers that the case was assigned, although I have been informed by my attorney that this information may be obtained through https://public.courts.in.gov. The trial court dismissed some defendants and entered summary judgment in favor of some defendants;

the case then resulted in a jury verdict in favor of the remaining defendants, which was affirmed on appeal. My ex-wife, Phyllis Ostrowski, was also a plaintiff, although she did not participate in the appeal. Additional information may be obtained by reviewing the published decision from the Indiana Court of Appeals in that case.

- I was the respondent in *In re: the Marriage of Phyllis Ostrowski and Thomas Ostrowski*, No. 45C01-1010-DR-000920 (Lake Circuit Court). This was a dissolution of marriage proceeding and resulted in a dissolution. The plaintiff **OBJECTS** to providing additional information concerning this proceeding as it is unduly burdensome, not reasonably calculated to lead to the discovery of relevant evidence, and unnecessarily intrudes upon his personal privacy.

I recall having offered testimony as a witness in a court martial in Montana in approximately 1984 when I was a security police officer for the United States Air Force. Additionally, when I was employed by the Lake County Sheriff's Department, I worked for a period of time for the jail records division; in that capacity I occasionally executed affidavits attesting to the authenticity of documents that were being produced, although I do not believe that I was ever asked to testify live regarding any such documents. And, also while I was employed by the Lake County Sheriff's Department, I worked for a period of time for the Lake County Drug Task Force. In this capacity I occasionally executed search warrant affidavits, although again I do not believe that I was ever asked to testify live regarding that information. Other than these instances, I do not recall serving as a witness in any legal proceeding other than in a proceeding where I was named as a party.

I have filed formal complaints or charges with a variety of governmental bodies. Prior to both this case and my earlier federal case, for instance, I filed a complaint with the U.S. Equal Employment Opportunity Commission; both times I received a right-to-sue letter from that commission. In or around November of 2015, I filed a complaint with the Office of the Indiana Public Access Counselor

concerning the failure of the pension trust fund of the Lake County Sheriff's Department to conduct open meetings. I received a response to that complaint from the Office of the Public Access Counselor concluding, among other things, as follows: "Because the Department has created the trust, the trust can be considered a governing body under Indiana Law. Therefore, meetings of the trust fund would be open to the public under the Open Door Law, Ind. Code § 5-14-1.5 *et seq.*" I also submitted a complaint regarding the issues giving rise to this lawsuit with Indiana Disability Rights, which I understand to be a state agency. This complaint was submitted for the purpose of securing legal representation, and the plaintiff **OBJECTS** to providing additional information regarding this complaint as it is therefore privileged.

**INTERROGATORY NO. 6:**   Have you ever been arrested and/or charged with any crime or infraction? If so, please state whether you pled guilty to any such charges or infractions, or whether you have been convicted of a crime or participated in any diversion program offered by any prosecuting agency. In addition, please describe the specific nature of the charges filed against you, the court in which the matter(s) was pending, and the date of each guilty plea, conviction and/or the date you were assigned to any diversion program.

**ANSWER:**   The plaintiff **OBJECTS** to this request as overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant evidence. Interpreted literally, the request appears to include minor traffic infractions, which are well beyond the scope of permissible discovery in this case. Notwithstanding and without waiving these objections, the plaintiff states as follows:

I have never been arrested and/or charged with any criminal offense.

**INTERROGATORY NO. 7:**   State any money or benefits (including wages, disability pension payments, disability benefits, worker's compensation benefits, and/or unemployment

benefits) which you have earned or received, or which you are entitled to earn or receive, since your employment with Defendants ended (including proceeds from self-employment). For all such money or benefits, please state:

    (a)    the source of the money or benefits;

    (b)    the amount earned or received, or to which you were entitled;

    (c)    the period of time over which you received, or were entitled to receive, the money or benefits;

    (d)    whether you must repay all or some of the money or benefits; and

    (e)    whether there is a written document evidencing receipt or entitlement to the money or benefits.

**ANSWER:** The plaintiff **OBJECTS** to this request as overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant evidence. The request is not remotely limited in its scope. Interpreted literally, for instance, the request would appear to include money that the plaintiff received from a garage sale or from selling used goods online, and might include instances where a friend paid for his dinner, where he received a gift of value for his birthday, or where a family member gave him a small amount of money. Notwithstanding and without waiving these objections, the plaintiff states as follows:

Since my employment with Lake County Sheriff's Department ended, I have received the following money or benefits:

- I have received monthly pension payments as a result of my disability in the amount of $1,831.04.

- At the time of my retirement, I had the option to maintain a $25,000 life insurance policy from the pension plan or to receive monthly payments of $250.00 for a period of five years and to maintain a life insurance policy of $10,000.00 from the pension plan. I chose to

receive monthly payments of $250.00 for a period of five years and to maintain a life insurance policy of $10,000.00 from the pension plan.

- I paid for a separate disability policy through private insurance. When I became disabled, I received $750.00 per month for a period of eighteen months through this policy.

- I have received social security benefits since 2004 or 2005. The amount of these benefits has changed over time, and I do not recall the precise amount that I have received from social security. My current monthly checks are in the amount of $1,814.00.

- From 2014 through 2015, as noted, I was employed by Lake County E-911. I received a salary and benefits as a result of this employment, although I do not recall the precise salary or benefits that I received. These records are in possession of the defendants.

- I reached a settlement in my federal lawsuit that concerned my employment with Lake County E-911. The terms of this settlement are confidential and so I cannot detail whether I received any money, or the amount of money that I may have received, from that settlement. That information should be in possession of one or more of the defendants.

- I also receive a couple of grants that assist in my education.

**INTERROGATORY NO. 8:**   Please detail each and every item of damage, and the amount thereof, which you allege to have suffered as a result of any actions allegedly taken against you by Defendants or purported omissions which you attribute to Defendants. State separately the amount of damages claimed with respect to each specified type of damage and describe separately the method of computation for each type of damage. Identify any and all documents you rely upon in providing the answer to this Interrogatory.

**ANSWER:**   I am seeking as damages reimbursement, dating to two years prior to the commencement of this suit, for cost of living increases that I did not receive in my monthly pension

11

payments. I believe that this reimbursement should be paid in the amount that I would have received had I retired (at the same time that I did retire) for reason other than disability, such that I would have received cost of living increases. I understand that the amount or percentage of cost of living increases paid to non-disabled retirees is known by the defendants and may be calculated by them; it is my understanding that my attorney has sought the information necessary for this calculation through discovery. I am also seeking pre- and post-judgment interest in a manner calculated by the Court or, as appropriate, by the finder of fact.

To the extent that the Court or finder of fact determines that it differs from the above, I am seeking an award of unpaid and/or under-paid past benefits, within the statute of limitations, in a "reasonable" amount as required by Indiana Code § 36-8-10-15.

I am also seeking compensation for my stress, anxiety, frustration, and other emotional harm resulting from the constitutional violations and the violations of law that I have alleged in my complaint. The amount of this type of damage that I have suffered should be determined by the Court or, as appropriate, by the finder of fact.

Finally, I am seeking an award of my attorneys' fees and costs, in accordance with prevailing law, although I do not consider this to be "damage" as specified in the request.


**INTERROGATORY NO. 9:**   Have you or any of your agents/representatives ever recorded any conversations or meetings with Defendants? If so, please state:

    (a)    the date of each recording;

    (b)    the location of the recording;

    (c)    the names of all persons present; and

    (d)    a summary of the content of the recording.

**ANSWER:**   The plaintiff **OBJECTS** to this request insofar as the term "Defendants" is vague and, interpreted literally, the request is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant evidence.  Among the defendants are Lake County, Indiana and the Lake County Sheriff's Department, both of which have numerous employees and other representatives, and the request is not limited by time or by subject-matter. Certainly the plaintiff is aware, for instance, that the Lake County Jail is under constant surveillance, and he therefore assumes that, when he worked at the jail, his interactions with other jail employees were recorded; he has also testified before a public meeting of the Lake County Council, and he understands that these meetings are similarly recorded.  He does not understand recordings such as these to have been made by himself or his agents or representatives.  Notwithstanding and without waiving these objections, the plaintiff states as follows:

I have never recorded any conversations or meetings with the defendants.


**INTERROGATORY NO. 10:**   Please state the identity of any attorney you have contacted in connection with your allegations in this case, and for each state:

    (a)    the date of your first contact with each such attorney;

    (b)    the method of contact (e.g., phone or in person);

    (c)    the identity of all persons present;

    (d)    whether you retained that attorney at any time; and

    (e)    the terms of any fee agreement.

**ANSWER:**   During public meetings of the Lake County Council, I have made inquiries of the county attorney, which he responded to during these meetings.  The dates and content of these communications should be reflected in the meeting minutes of the meetings.  However, I do not

understand the interrogatory to be seeking information concerning these communications. I have contacted three other attorneys in connection with my allegations that form the basis for this case.

At one point, I discussed my concerns with F. Harrison Greene, an attorney who at the time was representing David Crane in an independent lawsuit against the Lake County Sheriff and others. I first mentioned my concerns in an in-person meeting where Mr. Crane was also present; follow-up communications with Mr. Greene were conducted over the telephone. I do not recall when exactly I first spoke with Mr. Greene, although I assume it was in the summer or fall of 2018.

I also contacted Justin Schrock, an attorney with Indiana Disability Rights. My recollection is that I contacted Indiana Disability Rights by submitting a complaint through that organization's website, and that Mr. Schrock was the attorney who responded to my complaint. Follow-up communications with Mr. Schrock occurred over e-mail; I do not believe that we ever spoke on the telephone, although I am not positive about that. No other persons were present for any of these communications. Again, I do not recall when exactly I first spoke with Mr. Schrock, although I assume it was in the summer or fall of 2018.

And I of course contacted Gavin M. Rose of the ACLU of Indiana, who is representing me in this action. My recollection is that I contacted Mr. Rose by submitting a complaint through the website of the ACLU of Indiana, and that Mr. Rose was the attorney who responded to my complaint. I have been informed that the records of the ACLU of Indiana reflect that I first contacted that organization in July 2018 and that Mr. Rose first responded to my complaint by e-mail in October 2018. Subsequent communications have been over e-mail, by telephone, and by letter.

Of these attorneys, Mr. Rose is the only one that I have retained.

The plaintiff **OBJECTS** to disclosing the terms of any fee agreement as it is not reasonable calculated to lead to the discovery of relevant evidence at this juncture. *See, e.g., Monarch Productions, LLC v. Zephyr Grafix, Inc.*, No. 4:09CV02049-ERW, 2010 WL 3894206, at *1 (E.D. Mo. Sept. 23, 2010)

14

("Information about the flat fee and any contingency fee that Plaintiffs are required to pay to counsel is not relevant to the lodestar calculation."); *Pizel v. Monaco Coach Corp.*, 224 F.R.D. 642, 644 (N.D. Ind. 2004) ("[T]his Court cannot conclude that the information concerning the fee agreement between Plaintiff and his counsel is relevant at this time."); *In re McDonnell Douglas Corp. Sec. Litig.*, 92 F.R.D. 761, 763 (E.D. Mo. 1981) ("The appropriate time for inquiry into fee arrangements is after judgment under Rule 69 of the Federal Rules of Civil Procedure.") (citing cases).

**INTERROGATORY NO. 11:**   Have you kept any hard copy or electronic diary, journal, log, blog, notebook (or notes), or calendar of any type during and/or since your employment with Defendants?  If so, please identify its location and the time period covered.

**ANSWER:**   The plaintiff **OBJECTS** to this request as it is overbroad, unduly burdensome, not calculated to lead to the discovery of relevant evidence, and vague.  The terms "log," "notebook," and "notes" are undefined and might include, for instance, notes or any written document concerning a wide array of information (such as "notes" about what the plaintiff needs when he goes grocery shopping or completes household tasks, or a "log" of his activities while an employee with the Lake County Sheriff's Department).  Notwithstanding and without waiving this objection, the plaintiff states as follows:

I keep an annual calendar in hard-copy, and I dispose of this calendar each year after my taxes are filed.  Aside from this, I do not keep a diary, journal, or similar document that might reasonably be expected to reflect my day-to-day activities.  While I was employed by the Lake County Sheriff's Department, I am aware that documentation existed that reflected some of my employment activities. I assume that this documentation, if it still exists, is in possession of the Lake County Sheriff's Department.

**INTERROGATORY NO. 12:**   Has Plaintiff visited any social networking sites (e.g., Twitter, Facebook, Instagram, LinkedIn, etc.) or online media (blogs, comments on newspaper webpages, etc.) within the last five (5) years in which he obtained or sought to obtain information relating to this lawsuit, communicated with anyone concerning the allegations in this lawsuit or facts underlying such allegations, or otherwise accessed information in relation to Plaintiff's allegations set forth in this lawsuit? A complete answer to this Interrogatory would include:

(a)   the names of the social networking or online media sites visited and dates of such visits;

(b)   the names of individuals whom Plaintiff contacted or received messages from while using the social networking websites;

(c)   the date and substance of any conversations, contacts or postings that referenced Plaintiff's former position with Defendants, any of the allegations in this lawsuit, or the facts underlying such allegations;

(d)   a description of how the websites were accessed (e.g., whether through in-home computer, mobile devices, or elsewhere); and

(e)   an identification of any documents reflecting or concerning the websites, the content of the websites or Plaintiff's access to same.

**ANSWER:**   The plaintiff **OBJECTS** to this request as overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant evidence. The request is not significantly limited as to subject matter. For instance, the plaintiff has alleged in this case that he is a Lake County resident, that he is a former employee of the Lake County Sheriff's Department, and that he receives pension payments. The request therefore seeks information concerning any time he utilized any social networking sites or online media to "communicate[] with anyone" or "otherwise accessed information" concerning his status as a Lake County resident or concerning his status as a former employee of the Lake County Sheriff's Department. The plaintiff further **OBJECTS** to this request insofar as the term "online media" is vague insofar as it is not clear whether the term refers to any

website at all or whether it refers only to a website that allows different users to interact directly with one another.

**INTERROGATORY NO. 13:** Please describe your educational background, identifying all schools, institutions, or programs attended, the dates of each, and any degrees awarded.

**ANSWER:** The plaintiff **OBJECTS** to this request as it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant evidence. Interpreted literally, for instance, the request requires the plaintiff to state any nursery or elementary school that the plaintiff attended (and the dates that he attended those schools). The plaintiff also **OBJECTS** to this request insofar as the term "educational background" is vague as it is not clear whether the request is intended to refer to such matters as educational seminars, continuing education, or on-the-job training. The plaintiff assumes, therefore, that the request refers only to formal education obtained through schooling. Notwithstanding and without waiving these objections, the plaintiff states as follows:

I graduated from Andrean High School in Merrillville, Indiana in 1980. I received an Associate's Degree in Applied Science in Homeland Security Public Safety from Ivy Tech Community College in 2017. I attended additional courses at Ivy Tech Community College in 2017 and received a Technical Certificate in Homeland Security Public Safety. I am currently attending courses at Indiana University Northwest and intend to earn a Bachelor's Degree in general studies from that institution.

I have also received education from the United States Security Police Academy (Lackland Air Force Base) (1980), Officers Leadership School (3rd Air Force England) (1986), Indiana Law Enforcement Academy/Corrections (Indianapolis, Indiana) (1989), Indiana Law Enforcement Academy/Law Enforcement (Indianapolis, Indiana) (1996), National Academy of Emergency Medical Dispatch of the United States of America (Highland, Indiana) (2013), Indiana State Police IDACS

17

(Lafayette, Indiana) (2015). I received a variety of certificates and/or diplomas as a result of this additional education, but I do not understand the request to inquire as to these certificates and/or diplomas.

Finally, while I was employed by the Lake County Sheriff's Department, I was also required to take a certain amount of continuing education courses each year. I do not recall the name(s) of the classes that I took, although I assume that this information is in possession of the defendants.

**INTERROGATORY NO. 14:** Identify any statement(s) by any Defendant that Plaintiff contends or will contend is an admission by a party opponent.

**ANSWER:** The plaintiff **OBJECTS** to this request insofar as it is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant evidence. The plaintiff further **OBJECTS** to this request to the extent that it calls for a legal conclusion. The plaintiff assumes that the phrase "admission by a party opponent" is intended to reference Rule 801(d)(2)D) of the Federal Rules of Evidence, which provides that a statement "offered against an opposing party" that "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed" does not constitute hearsay. The request is not limited by subject-matter or time-frame and, therefore, appears to seek information concerning any statement that any agent or employee of any of the defendants has ever made on a matter within the scope of his or her agency or employment relationship and while that relationship existed. Additionally, discovery in this case is ongoing and the plaintiff can anticipate neither the admissions by a party opponent that will be made or revealed during the discovery process (for instance, in depositions or in produced documents) nor in further motions practice in this cause (for instance, in affidavit testimony). Finally, the plaintiff **OBJECTS** to this request insofar as statements by the defendants' agents or employees are known to

the defendants and may be obtained as easily by them as they may be by the plaintiff. Notwithstanding and without waiving these objections, the plaintiff states as follows:

I am aware of the following statements by one or more of the defendants' agents or employees on matters that I believe to have been within the scope of their agency or employment relationship while that relationship existed: a memorandum from then-Sheriff Roy Dominguez dated September 9, 2005 (produced in conjunction with my discovery responses); a response to my charge of discrimination with the Equal Employment Opportunity Commission from the attorney for the Lake County Sheriff's Department dated August 14, 2018 (produced in conjunction with my discovery responses); statements by members of the Lake County Council and/or the county attorney that have been made during public hearings concerning pension payments (including during several hearings conducted in 2016 and 2017, excerpts from the minutes of which are produced in conjunction with my discovery responses); a memorandum from Lake County Councilman Jamal Washington to the Lake County Sheriff's Merit Board dated April 12, 2017 (produced in conjunction with my discovery responses); and a memorandum from the Lake County Police Pension Committee dated March 15, 2018 (produced in conjunction with my discovery responses).

I have also, of course, applied for and been approved for pension payments as a result of my disability. It is my belief that determinations on these reoccurring applications, and determinations regarding my ongoing disability and my disability rating, also constitute statements by one or more of the defendants' agents or employees on matters that I believe to have been within the scope of their agency or employment relationship while that relationship existed. The determinations and related documents are in possession of the defendants. And, I assume that certain statements made during the course of this litigations—such as any allegations in my complaint that are admitted or deemed admitted, deposition and/or affidavit testimony, and other materials produced during discovery—may

also constitute statements by one or more of the defendants' agents or employees on matters within the scope of their agency or employment relationship while that relationship existed.

**INTERROGATORY NO. 15:**   Identify each person who participated in the preparation of the answers to these Interrogatories and state which Interrogatories each such person participated in answering.

**ANSWER:**   The answers to these Interrogatories were all prepared by myself with the assistance of my counsel, and objections to these Interrogatories were prepared by my counsel.

**VERIFICATION**

I affirm under the penalties for perjury that the foregoing statements and representations in response to each of the initial discovery requests are true and accurate to the best of my knowledge.

_8 - 19 - 19_
Date

_Thomas Ostrowski_
Thomas Ostrowski

As to objections:

_4/20/19_
Date

_Gavin M. Rose_
Gavin M. Rose
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202

## RESPONSES AND OBJECTIONS TO REQUESTS FOR PRODUCTION

For his Responses and Objections to Requests for Production, the plaintiff hereby states as follows:

**Introductory Production:**    In or around 2017, the plaintiff prepared and assembled a presentation and related materials concerning the potential to offer cost-of-living increases in pension payments to disabled retirees of the Lake County Sheriff's Department.   These materials were provided to each member of the Lake County Council.  Because many of these materials appear to be responsive to multiple requests propounded by the defendants, and to ensure that they are produced in the manner in which they were assembled for the members of the Lake County Council, the plaintiff attaches these materials as **Exhibit 1**.

The plaintiff is also in possession of a 2017 financial statement of Lake County from the State Board of Accounts (dated Oct. 17, 2018) as well as excerpts from a version of the Indiana Pension Handbook (dated Dec. 2011).  These documents may be responsive to multiple requests propounded by the defendants, and they are also produced as a part of **Exhibit 1**.  These documents, however, were not provided to the members of the Lake County Council along with the materials mentioned immediately above.

**REQUEST NO. 1:**    Please produce all documents you identified or reviewed in responding to Defendants' First Set of Interrogatories to Plaintiff.

**RESPONSE:** In responding to Interrogatory No. 14, the plaintiff identified several documents that contain statements that likely qualify as admissions by a party opponent within the meaning of the Federal Rules of Evidence.  These documents are produced in response to Request No. 16, below.  In responding to one or more interrogatories, the plaintiff also reviewed his recent

income tax returns. These documents are produced in response to Request No. 13, below. The plaintiff attaches as **Exhibit 2** additional documents that he reviewed in responding to the propounded interrogatories.

**REQUEST NO. 2:**   Please produce all documents that concern any communications or documents you have provided to or obtained from the Lake County Sheriff's Merit Board or Pension Committee regarding your disability determination, including but not limited to your disability application, the original determination regarding your disability, or annual documentation or submissions by you demonstrating that Plaintiff is or remains disabled.

**RESPONSE:** The plaintiff **OBJECTS** to this request insofar as all communications that have been provided to or obtained from the Lake County Sheriff's Merit Board or Pension Committee are in possession of the defendants, and this request is therefore unduly burdensome to the plaintiff. The plaintiff further **OBJECTS** to this request insofar as the term "concern" is vague and overbroad. It appears, for instance, that the request would include any correspondence between the plaintiff and any other person concerning his receipt of pension payments, as those would be documents that "concern . . . communications or documents" that he has provided to or obtained from the Lake County Sheriff's Merit Board or Pension Committee regarding his disability determination.

**REQUEST NO. 3:**   Please produce all documents that concern any communications or documents you have provided to or obtained from the Lake County Sheriff's Merit Board or Pension Committee regarding your disability benefits, any request for a cost-of-living increase or adjustment, or your allegations or claims in this case (to the extent not covered by Request 2 above).

**RESPONSE:** The plaintiff **OBJECTS** to this request insofar as all communications that have been provided to or obtained from the Lake County Sheriff's Merit Board or Pension Committee

are in possession of the defendants, and this request is therefore unduly burdensome to the plaintiff. The plaintiff further **OBJECTS** to this request as overbroad, vague, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant evidence. The request seeks, *inter alia*, documents concerning the plaintiff's correspondence regarding any of his allegations in this case. He has alleged, for instance, that he is a Lake County resident, that he is disabled, and that he receives pension payments, and the request is therefore unbelievably and unnecessarily broad. The plaintiff further **OBJECTS** to this request insofar as the term "concern" is vague and overbroad. It appears, for instance, that the request would include any correspondence between the plaintiff and any other person concerning his receipt of pension payments, as those would be documents that "concern . . . communications or documents" that he has provided to or obtained from the Lake County Sheriff's Merit Board or Pension Committee regarding his disability benefits.

**REQUEST NO. 4:**   Please produce all documents that concern any documents you have provided to or obtained from the Lake County Council regarding your disability benefits, any request for a cost-of-living increase or adjustment, or your allegations or claims in this case.

**RESPONSE:** The plaintiff **OBJECTS** to this request insofar as all documents that have been provided to or obtained from the Lake County Council are in possession of the defendants, and this request is therefore unduly burdensome to the plaintiff. The plaintiff further **OBJECTS** to this request as overbroad, vague, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant evidence. The request seeks, *inter alia*, any documents concerning the plaintiff's allegations in this case. He has alleged, for instance, that he is a Lake County resident, that he is disabled, and that he receives pension payments, and the request is therefore unbelievably and unnecessarily broad. The plaintiff further **OBJECTS** to this request insofar as the term "concern" is

vague and overbroad.  The plaintiff is unclear as to what might qualify as a "document[] that concern[s]" other documents.

**REQUEST NO. 5:**  Please produce all documents that concern Plaintiff's allegations regarding his entitlement to a cost-of-living adjustment with regard to disability benefits or your allegations or claims in this case.

**RESPONSE:** The plaintiff **OBJECTS** to this request as overbroad, vague, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant evidence.  The request seeks, *inter alia*, all documents concerning the plaintiff's allegations or claims in this case.  He has alleged, for instance, that he is a Lake County resident, that he is disabled, and that he receives pension payments, and the request is therefore unbelievably and unnecessarily broad.

**REQUEST NO. 6:**  Please produce all documents concerning payment of retirement or disability benefits to you by Defendants, including monthly benefits, expense reimbursements, and lump sum payment for any percentage of benefits paid from your life insurance policy through Defendant(s).

**RESPONSE:** The plaintiff **OBJECTS** to this request to the extent that it seeks documents that are in possession of the defendants, as the request is unduly burdensome in that regard.  To the extent that the request seeks documents not already in possession of the defendants, the plaintiff **OBJECTS** to the request insofar as the term "concern" is vague and overbroad.  It appears, for instance, that the request would include any correspondence between the plaintiff and any other person concerning his receipt of retirement or disability payments.

**REQUEST NO. 7:** Please produce all documents concerning the allegations in paragraph 35 of Plaintiff's Amended Complaint.

**RESPONSE:** The plaintiff **OBJECTS** to this request as overbroad, vague, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant evidence. In paragraph 35 of the Amended Complaint, the plaintiff claims generally that the refusal to provide cost-of-living increases in pension payments to disabled retirees, which providing such increases to non-disabled retirees and surviving spouses, violates the Equal Protection Clause. In order to prevail on this claim, the plaintiff will most likely have to demonstrate, for instance, that he was formerly an employee of the Lake County Sheriff's Department, that he is retired, that he is disabled or is considered to be disabled, that he receives and has received pension payments, that cost-of-living increases are not offered to disabled retirees, and the cost-of-living increases are offered to non-disabled retirees and/or surviving spouses. Not only are many if not all of these issues not subject to reasonable dispute, but it appears that the request seeks, for instance, any document indicating that the plaintiff is a former employee of the Lake County Sheriff's Department, that he is disabled, or that he receives and has received pension payments (as documents "concerning" the allegations in paragraph 35). The request is grossly and unnecessarily overbroad.

**REQUEST NO. 8:** Please produce all documents concerning the allegations in paragraph 36 of Plaintiff's Amended Complaint.

**RESPONSE:** The plaintiff **OBJECTS** to this request as overbroad, vague, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant evidence. In paragraph 36 of the Amended Complaint, the plaintiff claims generally that the refusal to provide cost-of-living increases in pension payments to disabled retirees, which providing such increases to non-disabled retirees and surviving spouses, violates Title I of the Americans with Disabilities Act as well as Section

504 of the Rehabilitation Act. In order to prevail on this claim, the plaintiff will most likely have to demonstrate, for instance, that he was formerly an employee of the Lake County Sheriff's Department, that he is retired, that he is disabled or is considered to be disabled, that he receives and has received pension payments, that cost-of-living increases are not offered to disabled retirees, and that cost-of-living increases are offered to non-disabled retirees and/or surviving spouses. Not only are many if not all of these issues not subject to reasonable dispute, but it appears that the request seeks, for instance, any document indicating that the plaintiff is a former employee of the Lake County Sheriff's Department, that he is disabled, or that he receives and has received pension payments (as documents "concerning" the allegations in paragraph 36). The request is grossly and unnecessarily overbroad.

**REQUEST NO. 9:** Please produce all documents concerning the allegations in paragraph 37 of Plaintiff's Amended Complaint.

**RESPONSE:** The plaintiff **OBJECTS** to this request as overbroad, vague, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant evidence. In paragraph 37 of the Amended Complaint, the plaintiff claims generally that the refusal to provide cost-of-living increases in pension payments to disabled retirees who become disabled in the line of duty violates Indiana law. In order to prevail on this claim, the plaintiff will most likely have to demonstrate, for instance, that he was formerly an employee of the Lake County Sheriff's Department, that he is retired, that he is disabled, that he suffered that disability in the line of duty, that he receives and has received pension payments, and that cost-of-living increases are not offered to disabled retirees who become disabled in the line of duty. Not only are many if not all of these issues not subject to reasonable dispute, but it appears that the request seeks, for instance, any document indicating that the plaintiff is a former employee of the Lake County Sheriff's Department, that he is disabled, or that he receives

and has received pension payments (as documents "concerning" the allegations in paragraph 37). The request is grossly and unnecessarily overbroad.

**REQUEST NO. 10:**  Please produce all documents concerning the allegations in Plaintiff's Amended Complaint that Plaintiff remains disabled and is a qualified individual with a disability within the meaning of the ADA.

**RESPONSE:** The plaintiff **OBJECTS** to this request to the extent that it seeks information already in possession of the defendants, and the request is therefore unduly burdensome to the plaintiff. Every two years or at the request of the Merit Board, the plaintiff is required to demonstrate his continued disability to the defendants in order to receive pension payments based on that disability: the documents submitted in conjunction with these requests, and the defendants' determinations pertaining to these requests, are in possession of the defendants.  Notwithstanding and without waiving these objections, the plaintiff states as follows:

The plaintiff identifies his medical records, which are not in his immediate possession. The plaintiff is willing to sign a release authorizing the defendants' attorney to receive access to these records. He attaches as **Exhibit 3** a list of the providers that he recalls having seen since his retirement from the Lake County Sheriff's Department (as well as some providers that he saw prior to his retirement). Because of the sheer number of providers that he has seen since this time, he cannot guarantee that this is a complete list. However, it is his understanding that Lake County has used the same insurance company since his retirement, and this company will have a complete list of the providers that the plaintiff has seen.

**REQUEST NO. 11:** Please produce all documents concerning the allegations in Plaintiff's Amended Complaint that conduct alleged constitutes disparate treatment of Plaintiff because of disability.

**RESPONSE:** The plaintiff **OBJECTS** to this request to the extent that it seeks information already in possession of the defendants, and the request is therefore unduly burdensome to the plaintiff. The plaintiff maintains that disparate treatment exists by reason of the differential treatment between disabled retirees and non-disabled retirees (as well as surviving spouses) in affording the latter but not the former cost-of-living increases in pension payments.  This disparate treatment is not subject to reasonable dispute, and documents sufficient to evidence this disparate treatment are in possession of the defendants.

**REQUEST NO. 12:** Please produce all documents concerning the damages allegedly sustained or suffered by Plaintiff as a result of any purported actions by Defendants.

**RESPONSE:** The plaintiff **OBJECTS** to this request to the extent that it seeks documents that are in possession of the defendants, as the request is unduly burdensome in that regard.  In response to Interrogatory No. 8, above, the plaintiff has described the damages that he has suffered as a result of the practices and/or policies of the defendants.  In order to calculate these damages, he intends to rely on documents sufficient to establish the amount of his monthly pension payments since his retirement from the Lake County Sheriff's Department as well as documents evidencing cost-of-living increases that have been afforded to non-disabled retirees (and surviving spouses) through the pension plan.  These documents are all in possession of the defendants.

**REQUEST NO. 13:** Please produce all of Plaintiff's state and federal tax returns, W-2's and 1099 Forms for the last ten (10) years.

<u>RESPONSE:</u> The plaintiff **OBJECTS** to this request as overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of relevant evidence, and intruding on the plaintiff's personal privacy. This case presents a straight-forward legal claim concerning the failure to afford cost of living adjustments in pension payments to disabled retirees, and the plaintiff's tax returns (and related documents) are not remotely relevant to that claim insofar as the facts that the plaintiff is a disabled retiree and that disabled retirees are not afforded cost of living adjustments in their pension payments cannot reasonably be contested. Subject to and without waiving these objections, the plaintiff states as follows:

The plaintiff attaches as **Exhibit 4** his tax returns (and associated documents) for the past five years, a period that includes his only period of employment since his retirement from the Lake County Sheriff's Department.

<u>REQUEST NO. 14:</u> Please produce all documents submitted to, prepared for, or received from the Equal Employment Opportunity Commission, any other federal or Indiana state agency, or any insurance carrier, healthcare provider, or other third party concerning or arising out of Plaintiff's employment with Defendants, his retirement, or any of the claims or allegations of his Amended Complaint.

<u>RESPONSE:</u> The plaintiff **OBJECTS** to this request as overbroad, vague, unduly burdensome, and not reasonably calculated to the discovery of relevant evidence. The request seeks, for instance, all documents submitted to or received from any person ("other third party") that concern or arise out the plaintiff's employment with the Lake County Sheriff''s Department or any of the plaintiff's claims or allegations of his Amended Complaint. Given that the plaintiff has alleged, for instance, that he is disabled, that he received a pension, that he was previously employed by the Lake County Sheriff's Department, and that he is a resident of Lake County, the request is virtually

boundless. The plaintiff further **OBJECTS** to this request insofar as it seeks information that is protected by the attorney-client privilege. As described in response to Interrogatory Nos. 5 and 10, the plaintiff contacted Indiana Disability Rights, a state agency, for the purpose of securing legal representation and/or advice with respect to the issues that form the basis of the plaintiff's claims in this case. Those communications are protected by the attorney-client privilege and will not be produced. Subject to and without waiving these objections, the plaintiff states as follows:

The plaintiff attaches as **Exhibit 5** documents submitted to, prepared for, and received from the Equal Employment Opportunity Commission concerning the claims that for the basis for this case.

**REQUEST NO. 15:** Please produce all documents concerning any of the claims or allegations of his Amended Complaint.

**RESPONSE:** The plaintiff **OBJECTS** to this request as overbroad, vague, unduly burdensome, and not reasonably calculated to the discovery of relevant evidence. The request seeks all documents concerning any of the plaintiff's claims or allegations in this case. Given that the plaintiff has alleged, for instance, that he is disabled, that he received a pension, that he was previously employed by the Lake County Sheriff's Department, and that he is a resident of Lake County, the request is virtually boundless.

**REQUEST NO. 16:** Please produce all documents concerning any statement by any Defendant that Plaintiff contends or will contend is an admission by a party opponent.

**RESPONSE:** The plaintiff **OBJECTS** to this request insofar as it is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant evidence. The plaintiff further **OBJECTS** to this request to the extent that it calls for a legal conclusion. The plaintiff

assumes that the phrase "admission by a party opponent" is intended to reference Rule 801(d)(2)D) of the Federal Rules of Evidence, which provides that a statement "offered against an opposing party" that "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed" does not constitute hearsay. The request is not limited by subject-matter or time-frame and, therefore, appears to seek information concerning any statement that any agent or employee of any of the defendants has ever made on a matter within the scope of his or her agency or employment relationship and while that relationship existed. Additionally, discovery in this case is ongoing and the plaintiff can anticipate neither the admissions by a party opponent that will be made or revealed during the discovery process (for instance, in depositions or in produced documents) nor in further motions practice in this cause (for instance, in affidavit testimony). Finally, the plaintiff **OBJECTS** to this request insofar as statements by the defendants' agents or employees are known to the defendants and may be obtained as easily by them as they may be by the plaintiff. For instance, any determinations on the plaintiff's applications for pension payments based on his disability likely constitute admissions by a party opponent, although these determinations are of course in possession of the defendants. Subject to and without waiving these objections, the plaintiff states as follows:

The plaintiff attached as **Exhibit 6** documents referenced in response to Interrogatory No. 14 that the plaintiff believes are or contain admissions by a party opponent.


**REQUEST NO. 17:** Please produce all documents concerning the Lake County Sheriff's Merit Board's determination that Plaintiff was completely disabled and unable to work resulting in his 2003 retirement from Defendants.

**RESPONSE:** The plaintiff **OBJECTS** to this request insofar as all documents concerning the Lake County Sheriff's Merit Board's determination regarding the plaintiff's disability are in possession of the defendants, and this request is therefore unduly burdensome to the plaintiff. The

plaintiff further **OBJECTS** to this request insofar as the term "concern" is vague and overbroad. It appears, for instance, that the request would include any correspondence between the plaintiff and any other person concerning his receipt of pension payments or the fact that he has been determined to be disabled, neither of which are subject to reasonable dispute.

**REQUEST NO. 18:** Please produce all documents concerning Plaintiff's mental, emotional, psychological, or physical condition from 2003 to present, including but not limited to any documents or records concerning whether Plaintiff remains disabled and is a qualified individual within the meaning of the ADA.

**RESPONSE:** Please see the plaintiff's response, including objections, to Request No. 10.

**REQUEST NO. 19:** Please produce all documents concerning or arising out of Plaintiff's employment with Defendants (whether created by Defendants, Plaintiff, or any other source) — whether related to employment terms, compensation, or benefits; his treatment by Defendants; the cessation of Plaintiff's employment; including, but not limited to, any and all personnel documents, booklets, notices, policies or summaries of policies and/or plans, employee handbooks, correspondence, notes of meetings, telephone conversations, and/or any other contacts between Plaintiff and any representative of Defendants.

**RESPONSE:** The plaintiff **OBJECTS** to this request insofar as it is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant evidence. The request is not limited by time-frame or subject matter and seeks a wide array of documentation, which is largely if not entirely within the defendants' possession already, unrelated to the discrete legal claims (or any issue surrounding the discrete legal claims) advanced in this case. It appears, for instance, that the request seeks any document where the plaintiff (or any other person) has even mentioned his past

employment with the Lake County Sheriff's Department, as well as any communication (and any document "concerning" any communication) between the plaintiff and any employee of the defendants on any subject whatsoever. The request is virtually boundless.

**REQUEST NO. 20:** Please produce all documents Plaintiff has received during and since his retirement which evidence receipt of or entitlement to money or benefits, including but not limited to pay stubs from any employer.

**RESPONSE:** The plaintiff **OBJECTS** to this request insofar as it is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant evidence. The request is not remotely limited in its scope. Interpreted literally, for instance, the request would appear to include money that the plaintiff received from a garage sale or from selling used goods online, and might include instances where a friend paid for his dinner, where he received a gift of value for his birthday, or where a family member gave him a small amount of money. Documents evidencing the plaintiff's receipt of pension payments are already in possession of the defendants. The plaintiff has further produced his tax returns for the past five years, which evidence payments received during that period.

**REQUEST NO. 21:** Please produce a download of Plaintiff's complete Facebook Profile. To do so, go to the Account Settings page (arrow button located next to the "Home" button) and click the "Download Your Information" button (located at the bottom of the general settings page). Once the page loads, click the "Start My Archive" button. Once Facebook verifies Plaintiff's identity, an email will be sent to Plaintiff advising that a zip file is ready for download. Once the zip file is received, forward it to jackie.gessner@btlaw.com. Plaintiff is hereby put on notice that deleting anything from his account from this point forward (including, but not limited to, posts, status updates,

mail messages, photographs, friends, links, etc.) is considered spoliation of evidence and Plaintiff's counsel has an ethical obligation to ensure that all evidence is preserved.

**RESPONSE:** The plaintiff **OBJECTS** to this request insofar as it is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant evidence, and it represents an intrusion on his personal privacy. This case presents a discrete legal issue concerning the defendants' failure to provide cost-of-living increases in pension payments to disabled retirees, and this request is not remotely limited by time-frame or subject-matter. The plaintiff further **OBJECTS** to the portion of the request describing spoliation of evidence the insofar as it represents an erroneous statement of the law. In the Seventh Circuit, spoliation of evidence does not occur unless a party, acting in bad faith, destroys evidence that he or she knew or should have known was relevant to pending or potential litigation. *See, e.g., Smith v. United States*, 293 F.3d 984, 988 (7th Cir. 2002); *Crabtree v. National Steel Corp.*, 261 F.3d 715, 721 (7th Cir. 2001). The deletion of a photograph of scenery, the removal of a "friend" with whom the plaintiff has lost touch, or the deletion of a link to an article that he found interesting would not represent spoliation of evidence, and the suggestion that these actions would constitute spoliation is erroneous and is not well-taken.

**REQUEST NO. 22:** Please produce all recordings made by Plaintiff, Plaintiff's agents, or any other individuals concerning Plaintiff's claims or allegations in connection with this case.

**RESPONSE:** The plaintiff **OBJECTS** to this request insofar as it is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant evidence. The request is not limited with respect to time-frame and, given that the plaintiff's allegations in this case include (for instance) that he is a Lake County resident and that he is a past employee of the Lake County Sheriff's Department, is barely limited with respect to subject matter. The plaintiff further **OBJECTS** to this request insofar as the term "recording" is vague. The plaintiff assumes that the term is intended

to refer to audio or visual recordings. Subject to and without waiving these objections, the plaintiff states as follows:

The plaintiff is not in possession, custody, or control of any audio or visual recordings concerning the failure of the defendants to provide him with cost-of-living increases in his monthly pension payments. He has appeared before the Lake County Council to provide testimony regarding that issue, and he understands that these meetings are recorded, but he is not in possession of these recordings (although he assumes that the defendants are). He was also previously employed by the Lake County Sheriff's Department, including as a correctional office in the Lake County Jail, and he understands that employees are likely recorded at times while performing their employment duties. Again, he is not in possession of these recordings. To the extent that an MRI or other medical test might constitute a "recording" as that term is used in this request, please see the plaintiff's response, including objections, to Request No. 10.

**REQUEST NO. 23:** Please produce any and all reports, letters, jottings, or other documents prepared, reviewed, or relied upon by any expert retained by Plaintiff in this case.

**RESPONSE:** No such documents exist. As discovery in this case is ongoing, the plaintiff's response to this request will be supplemented as necessary.

**REQUEST NO. 24:** Please produce copies of any and all online profiles, postings, messages (including, without limitation, tweets, replies, retweets, direct messages, status updates, wall comments, groups joined, activity streams and blog entries), photographs, videos, and online communications or emails that Plaintiff authored or otherwise contributed to that concern the allegations set forth in the Complaint, the Defendants, or any current or former employees or representatives of Defendants.

35

**RESPONSE:** The plaintiff **OBJECTS** to this request insofar as it is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant evidence. The request is not limited by time-frame and is barely limited by subject matter. Given that the plaintiff has alleged that he is a resident of Lake County, that he is disabled, that he is a past employee of the Lake County Sheriff's Department, and that he receives pension payments (among other things), the request appears to seek, for instance, every single e-mail the plaintiff has ever authored that identifies himself as a Lake County resident (or as a past employee of the Lake County Sheriff's Department or as disabled). It seeks every single online posting he has ever made concerning Lake County or any person who has ever been employed by Lake County. The request is virtually boundless.

**REQUEST NO. 25:** Please produce copies of all documents received in response to any subpoena or request for records sent to any third party by Plaintiff that concern this matter or the allegations in his Amended Complaint.

**RESPONSE:** No such documents exist. As discovery in this case is ongoing, the plaintiff's response to this request will be supplemented as necessary.

**REQUEST NO. 26:** Please produce any fee agreements entered in by you with any attorney you contacted concerning your retirement and/or your allegations in this case.

**RESPONSE:** The plaintiff **OBJECTS** to this request insofar as it is not reasonably calculated to lead to the discovery of relevant evidence at this juncture. *See, e.g., Monarch Productions, LLC v. Zephyr Grafix, Inc.*, No. 4:09CV02049-ERW, 2010 WL 3894206, at *1 (E.D. Mo. Sept. 23, 2010) ("Information about the flat fee and any contingency fee that Plaintiffs are required to pay to counsel is not relevant to the lodestar calculation."); *Pizel v. Monaco Coach Corp.*, 224 F.R.D. 642, 644 (N.D. Ind. 2004) ("[T]his Court cannot conclude that the information concerning the fee agreement between

Plaintiff and his counsel is relevant at this time."); *In re McDonnell Douglas Corp. Sec. Litig.*, 92 F.R.D. 761, 763 (E.D. Mo. 1981) ("The appropriate time for inquiry into fee arrangements is after judgment under Rule 69 of the Federal Rules of Civil Procedure.") (citing cases).

**REQUEST NO. 27:** Provide fully executed and completed copies of the authorizations for release of medical, employment, unemployment, Social Security and tax records which are attached to these Discovery Requests as Exhibit 1.

**RESPONSE:** The plaintiff attaches as **Exhibit 7** fully executed and completed copies of the authorization for the release of information from the Indiana Department of Workforce Development, the Request for Copy of Tax Return, the Consent for Release of Information from the Social Security Administration, the Request for Social Security Earning Information, and a revised version of the Authorization to Use or Disclose Health Information.

To the extent necessary, the plaintiff **OBJECTS** to executing the Authorization to Use or Disclose Health Information as originally provided; that document was not limited by time-frame and is therefore overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant evidence. Undersigned counsel has communicated with counsel for the defendants, and it is his understanding that the defendants have no objection to limiting this request to health information since January 1, 1996, and a revised authorization reflecting that agreement is attached. The plaintiff **OBJECTS** to executing the Authorization for Release of Information as that request is vague, overbroad, and not reasonably calculated to lead to the discovery of relevant evidence, and intrudes upon the plaintiff's personal privacy. The defendants have not indicated on the form to whom it will be provided, and so the plaintiff has no way of knowing which entity he is authorizing to release information. The form is also not limited by time-frame, and is overbroad for this reason as well. To the extent that the form is intended to be served only on past employers of the plaintiff, as described

above the plaintiff's only employment since his retirement from the Lake County Sheriff's Department was with Lake County E-911. It is assumed that these records are in possession of the defendants.

The plaintiff designates as **CONFIDENTIAL** all information obtained through requests from third-parties as a result of these executed releases, pending the further narrowing of that designation when and if such information is provided.

**REQUEST NO. 28:** Please produce all documents not already produced that in any way support or relate to Plaintiff's allegations or that Plaintiff intends to use at any deposition or trial of this matter.

**RESPONSE:** The plaintiff **OBJECTS** to this request insofar as it is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant evidence. The request is not limited by time-frame and is barely limited by subject matter. Given that the plaintiff has alleged that he is a resident of Lake County, that he is disabled, that he is a past employee of the Lake County Sheriff's Department, and that he receives pension payments (among other things), the request appears to seek, for instance, every single document that identifies the plaintiff as a Lake County resident (or as a past employee of the Lake County Sheriff's Department or as disabled). The request is virtually boundless. The plaintiff further **OBJECTS** to this request insofar as discovery is ongoing and the plaintiff has not yet determined which documents will be used at depositions or at trial in this matter. The plaintiff has identified documents that he may rely upon in his initial disclosures, and this list will be supplemented as required by the case management order in this case and by the Federal Rules of Civil Procedure.

_____

Gavin M. Rose
ACLU OF INDIANA
1031 E. Washington St.
Indianapolis, IN  46202
317/635-4059, x106
<grose@aclu-in.org>

*Attorney for the plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was served on the following persons by U.S. mail, postage pre-paid, on this 20th day of August, 2019:

> Jaclyn Gessner
> Bart Karwath
> Ken Yerkes
> Barnes & Thornburg LLP
> 11 S. Meridian St.
> Indianapolis, IN  46204

_____

Gavin M. Rose
Attorney at Law

RECEIVED

AUG 2 1 2019

Barnes & Thornburg LLP

# DEPOSITION EXHIBIT 5
# TO THOMAS OSTROWSKI DEPOSITION

IN THE UNITED STATES DISTRICT COURT  -FILED-
FOR THE Northern DISTRICT OF Indiana
Hammond DIVISION

MAY 12 2016

At _____ M
ROBERT N. TRGOVICH, Clerk
U.S. DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

Thomas Ostrowski

Case No. **2.16CV 166**

-against-

*(to be filled in by the Clerk's Office)*

**Lake County Board of Commissioners**

Jury Trial:   ☐ Yes   ☒ No
*(check one)*

**See attached**

CONFIDENTIAL

EXHIBIT

5

DEF1 00139

I.    The Parties to This Complaint

A.    The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint.  Attach
additional pages if needed.

| | |
|---|---|
| Name | Thomas Ostrowski |
| Street Address | ████████████ |
| City and County | ████████████ |
| State and Zip Code | Indiana, 46307 |
| Telephone Number | ███████ |
| E-mail Address | ████████████ |

B.    The Defendant(s)

Provide the information below for each defendant named in the complaint,
whether the defendant is an individual, a government agency, an organization, or
a corporation.  For an individual defendant, include the person's job or title (if
known).  Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | Lake County Board of Commissioners |
| Job or Title (if known) | Commissioners |
| Street Address | 2293 N. Main Street |
| City and County | Crown Point, Lake County |
| State and Zip Code | Indiana, 46307 |
| Telephone Number | 219-755-3200 |
| E-mail Address (if known) | |

Defendant No. 2

| | |
|---|---|
| Name | Lake County E-911 Commission |
| Job or Title (if known) | |
| Street Address | 2293 N. Main Street |
| City and County | Crown Point, Lake County |

2

CONFIDENTIAL

DEF1 00140

|                      |                    |
|----------------------|--------------------|
| State and Zip Code   | Indiana, 46307     |
| Telephone Number     | 219-755-3200       |
| E-mail Address       |                    |
| (if known)           |                    |

Defendant No. 3

|                      |                              |
|----------------------|------------------------------|
| Name                 | Brian Hitchcock              |
| Job or Title         | Director, Lake County E-911  |
| (if known)           |                              |
| Street Address       | 2293 North Main Street       |
| City and County      | Crown Point, Lake            |
| State and Zip Code   | Indiana, 46307               |
| Telephone Number     | 219-755-6510                 |
| E-mail Address       |                              |
| (if known)           |                              |

Defendant No. 4

|                      |                                       |
|----------------------|---------------------------------------|
| Name                 | Jack Allendorf                        |
| Job or Title         | Deputy Director, Lake County E-911    |
| (if known)           |                                       |
| Street Address       | 2293 North Main Street                |
| City and County      | Crown Point, Lake                     |
| State and Zip Code   | Indiana, 46307                        |
| Telephone Number     | 219-755-6510                          |
| E-mail Address       |                                       |
| (if known)           |                                       |

C.   **Place of Employment**

The address at which I sought employment or was employed by the defendant(s) is:

|                      |                              |
|----------------------|------------------------------|
| Name                 | Lake County E-911            |
| Street Address       | 2293 North Main Street       |
| City and County      | Crown Point, Lake            |
| State and Zip Code   | Indiana, 46307               |

3

CONFIDENTIAL

DEF1 00141

The Parties to This Complaint continued

Defendant No. 5.

| | |
|---|---|
| Name | Lake County Council |
| Job or Title | Council Members |
| Street Address | 2293 N. Main Street |
| City and County | Crown Point, Lake County |
| State and Zip Code | Indiana, 46307 |
| Telephone Number | 219-755-3280 |
| E-mail Address | |

CONFIDENTIAL

Telephone Number    219-755-6510

II.    **Basis for Jurisdiction**

This action is brought for discrimination in employment pursuant to *(check all that apply)*:

☐    Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (race, color, gender, religion, national origin).

*(Note: In order to bring suit in federal district court under Title VII, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☐    Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621 to 634.

*(Note: In order to bring suit in federal district court under the Age Discrimination in Employment Act, you must first file a charge with the Equal Employment Opportunity Commission.)*

☒    Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 to 12117.

*(Note: In order to bring suit in federal district court under the Americans with Disabilities Act, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☐    Other federal law *(specify the federal law)*:

_____

☐    Relevant state law *(specify, if known)*:

_____

☐    Relevant city or county law *(specify, if known)*:

III.    Statement of Claim:

Plaintiff, Thomas Ostrowski requested reasonable accommodations due to his known medical condition. Plaintiff had his doctor submit a letter to the E-911 Director with those accommodations. At first Defendants were willing to work with Plaintiff. Defendants than change the working condition. Plaintiff then requested to speak with the Director of the E-911 center in writing. Director refused. See Attachment.

4

CONFIDENTIAL

DEF1 00143

A.  The discriminatory conduct of which I complain in this action includes *(check all that apply)*:

        ☐    Failure to hire me.

        ☐    Termination of my employment.

        ☐    Failure to promote me.

        ☒    Failure to accommodate my disability.

        ☐    Unequal terms and conditions of my employment.

        ☐    Retaliation.

        ☐    Other acts *(specify)*: _____

        *(Note: Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court under the federal employment discrimination statutes.)*

B.  It is my best recollection that the alleged discriminatory acts occurred on date(s)

September 28th, 2015

C.  I believe that defendant(s) *(check one)*:

        ☒    is/are still committing these acts against me.

        ☐    is/are not still committing these acts against me.

D.  Defendant(s) discriminated against me based on my *(check all that apply and explain)*:

        ☐    race _____

        ☐    color_____

        ☐    gender/sex _____

        ☐    religion _____

        ☐    national origin _____

        ☐    age. My year of birth is _____. *(Give your year of birth only if you are asserting a claim of age discrimination.)*

        ☒    disability or perceived disability *(specify disability)*

        *Fail back fusion*

CONFIDENTIAL

E.   The facts of my case are as follows.  Attach additional pages if needed.

I was hired as a dispatcher for the Lake County E-911 Center in December of 2014.  I informed my employer that I was coming off of Social Security Disability for this job. In early 2015 my doctor sent the Director of the E-911 Center a letter for reasonable accommodations. At first my employer was willing to work with me until they changed the shift (hours) conditions which forced me from an 8 hour shift to a 12 hour shift.  See Attachment.

IV.   **Exhaustion of Federal Administrative Remedies**

A.   It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission or my Equal Employment Opportunity counselor regarding the defendant's alleged discriminatory conduct on *(date)*

On December 3rd 2015 EEOC acknowledges complaint.

B.   The Equal Employment Opportunity Commission *(check one):*

☐   has not issued a Notice of Right to Sue letter.

☒   issued a Notice of Right to Sue letter, which I received on *(date)*

21   MArch   2016

*(Note:  Attach a copy of the Notice of Right to Sue letter from the Equal Employment Opportunity Commission to this complaint.)*

C.   Only litigants alleging age discrimination must answer this question.

Since filing my charge of age discrimination with the Equal Employment Opportunity Commission regarding the defendant's alleged discriminatory conduct *(check one):*

☐   *60 days or more have elapsed.*

☐   less than 60 days have elapsed.

6

DEF1 00145

## V.     Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order.  Do not make legal arguments.  Include any basis for claiming that the wrongs alleged are continuing at the present time.  Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts.  Include any punitive or *exemplary damages claimed, the amounts, and the reasons you claim you are entitled to* actual or punitive money damages.

Plaintiff request the court to order the Defendants to pay the difference between his Social Security Disability Benefits of $20,796.00 and his Pay at the time of departure of $29,000.00 covering the next 10 years, up to age 65, for a total amount of $80,040.00. Plaintiff request the Defendants to pay the difference in County Insurance cost, Employee cost of $75.00 per month as compared to $200.00 per month as a retire for the next 10 year, up to the age of 65 for a total of $15,000.00.  Plus expenses for this law suit.

## VI.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.     For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: _5 - 12_ , 20_16_

Signature of Plaintiff

Printed Name of Plaintiff   _ThomAS   O Sirowski_

7

CONFIDENTIAL

DEF1 00146

B.    **For Attorneys**

Date of signing: _____, 20___.

| | |
|---|---|
| Signature of Attorney | _____ |
| Printed Name of Attorney | _____ |
| Bar Number | _____ |
| Name of Law Firm | _____ |
| Address | _____ |
| Telephone Number | _____ |
| E-mail Address | _____ |

8

DEF1 00147

Attachment #1

Thomas Ostrowski

Against

Lake County E-911 Commission
Mr. Brian Hitchcock, Director Lake County E-911
Mr. Jack Allendorf, Deputy Director Lake County E-911
Lake County Council

CONFIDENTIAL

DEF1 00148

Attachment #2

III. Claim:

The Plaintiff, requested that the Deputy Director put into writing his reason for not allowing the Plaintiff to work a 40 hour work week and not taking into consideration the request from his doctor for reasonable accommodations. The Deputy Director refused. The Plaintiff followed all written department policy to use his chain of command to resolve this issue.

The Plaintiff believes that the Defendants violated the Americans with Disabilities Act of 1967, as codified, 29 U.S.C. 621 to 634. By causing a breakdown in the interactive process and creating an adverse employment action.

The Plaintiff then had to give up his position as a dispatcher causing a decrease in income and an increase in monthly health insurance payments.

CONFIDENTIAL

Attachment #3

E. The fact of my case are as follows.

The letter that my doctor sent to the E-911 Director request an eight hour shift only. After being informed that the dispatchers were going to a twelve (12) hour shift, I made a good faith effort and requested to work four (4) ten hour shifts starting on Friday to Monday. This was due to the fact that no one wanted to work the weekends and that with this schedule, it created a forty (40) hour pay period within the department regulation.

I was informed by my supervisor that I would have to work the twelve (12) hour shift. I requested in writing that the Deputy Director put into writing his decision not to allow me to work a ten (10) hour shift and not to follow the request for reasonable accommodations. I also requested to speak to the Director of the E-911 Center.

Department policy is that "the Deputy Director will attempt to respond within five business days after receipt and acknowledgement of such communication. Such communication may be carried as far as the Office of the Executive Director, Brain Hitchcock, of the LCPSCD so long as each succeeding level of command within the department has been given written notice and a reply returned".

After three weeks of not hearing from the Deputy Director or the Director I put in my two (2) weeks' notice. It was clear to me that they did not wish to discuss the shift issue even through the department was shorthanded and that we had part time employees making up the hours due to a lack of full time employees. After putting in my two (2) weeks' notice I still did not hear from either the Deputy Director or the Director. I then had to quit due to an increase on medical issues due to the 12 hour shifts.

CONFIDENTIAL

# DEPOSITION EXHIBIT 6
# TO THOMAS OSTROWSKI DEPOSITION

## SETTLEMENT AND RELEASE AGREEMENT

This Settlement and Release Agreement ("Agreement") is entered into by and between THOMAS OSTROWSKI ("Ostrowski") and the County of Lake, Indiana, by and through its Board of Commissioners, its County Council, the Lake County 911 Department, the Lake County E-911 Commission, Brian Hitchcock, and Jack Allendorf ("Defendants").

### RECITALS

WHEREAS, Ostrowski was an employee of Lake County Government until he resigned from employment on or about October 14, 2015; and

WHEREAS, Ostrowski subsequently filed a lawsuit against Defendants in the United States District Court, Northern District of Indiana, Hammond Division; Case No. 2;16-CV-00166 (the "Lawsuit");

WHEREAS, in the Lawsuit, Ostrowski has asserted claims for, among other things, discrimination and failure to accommodate in violation of the Americans with Disabilities Act, as amended;

WHEREAS, Defendants, by and through their respective Counsel, have filed an answer and have denied any liability;

WHEREAS, Ostrowski and Defendants now desire to resolve all of their differences and to settle all claims conceivably available to Ostrowski arising from or related to his employment by Lake County Government, or its termination, in accordance with the terms of this Agreement, without any admission of liability or wrongdoing.

### AGREEMENT

In consideration of the payments, promises, agreements, recitals, and covenants contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Ostrowski and Defendants agree as follows:

1.     **Consideration.** The Defendants shall pay to Ostrowski a total of ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ in the form of a check for ▮▮▮▮▮▮ ("Settlement Payment") made payable to Ostrowski within thirty (30) days of the execution of this Agreement, as compensation for all losses and damages claimed by Ostrowski in his Lawsuit and his recoverable litigation expenses. Further, the Defendants shall issue, along with the Settlement Payment, an I.R.S. Form 1099 in the amount of the Settlement Payment. Defendants shall further pay all costs associated with the mediation process which brought the Lawsuit to a resolution. Ostrowski agrees that he is responsible for paying all taxes, if any, that may be owed by him on any amounts paid under this Agreement, and he agrees to indemnify Defendants for any and all liability, including, but not limited to, taxes, penalties, interest and attorneys' fees, if it is determined by a state or federal agency or court that tax liability arises from the consideration paid to him, or on his behalf, under this Agreement. Nothing in this Paragraph (1) or this Agreement shall change, modify, terminate, or affect in any way Ostrowski's pension, health

1

EXHIBIT

6

CONFIDENTIAL

DEF1 00231

benefits, or any other retirement benefits to which Ostrowski has a right, now or in the future.

2.     Release. Ostrowski, for his heirs, executors, administrators, relations, insurers, successors and assigns, hereby forever releases and discharges Defendants, their affiliates, subsidiaries, related entities, and each of their respective, successors, predecessors, past and present officers, shareholders, agents, employees, attorneys, and representatives, as well as its insurers (collectively the "Released Parties"), of and from any and all claims, demands, damages, causes of actions, rights, damages, obligations, controversies, debts, costs, expenses, fees (including attorneys' fees), compensation, judgments, losses, and liabilities, of whatsoever kind or nature, known or unknown, matured or contingent, asserted or unasserted, foreseen or unforeseen, arising prior to this Agreement, including, but not limited to those resulting in any way from or in any way growing out of or arising from Ostrowski's employment with Defendants and termination of such employment which could have been discovered, including, but not limited to, claims arising under the Americans with Disabilities Act, as amended, all claimed medical expenses, lost wages, back pay, future pay, lost income, emotional distress damage, punitive damages, liquidated damages, attorneys' fees costs and expenses, any and all claims under any other federal, state, or local employment or compensation law of any kind, to the extent permitted by law, and all claims asserted by or which could have been asserted by Ostrowski in the Lawsuit. Ostrowski understands and agrees that any claims he may have under the aforementioned statute, or any other federal, state or local law, ordinance, rule or regulation are effectively waived under this Agreement. No rights or claims arising after the execution of this Agreement are waived hereby.

Ostrowski acknowledges and agrees that the release provided in this paragraph is general and comprehensive in nature, and is intended to forever release and discharge all claims and potential claims, to the fullest extent permitted by law; provided, however, nothing contained in this Agreement is intended to or shall preclude Ostrowski from filing a claim or charge with the EEOC or a corresponding state or local administrative body, or any another other federal, state, or local governmental agency charged with enforcement of any law. Ostrowski retains the right to participate in any such action; however, Ostrowski shall not be entitled to any relief (monetary, equitable, or otherwise) as a result of any such claim, action, or charge. Ostrowski retains the right to communicate with any governmental authority and such communication can be initiated by Ostrowski or in response to the governmental authority and is not limited by any obligation Ostrowski has under this Agreement, including the nondisclosure and confidentiality provisions.

3.     Confidentiality. Ostrowski hereby covenants and agrees that the fact of and the terms and conditions of this Settlement Agreement and Release shall be kept strictly confidential at all times. The fact of and the terms and conditions of this Settlement Agreement and Release shall not be disclosed to any person or any governmental agency (except as required by law), with the exception of tax consultants, his attorneys, and immediate family. If inquiries arise, Ostrowski shall reply: "The matter was resolved." Should Ostrowski disclose any of the terms of this settlement and Defendants are successful in any litigation seeking enforcement of any such breach of confidentiality, Defendants shall be entitled to recover their attorney fees and costs. Nothing in this paragraph may be construed to prohibit disclosure of the fact of and terms and

2

CONFIDENTIAL

DEF1 00232

conditions of this Settlement Agreement and Release to any municipal, state or federal agency as the parties may be required to provide such information to any such entity, or as required by law.

4.   **Unknown Damages or Claims**. Ostrowski understands he may have damages or claims that are unknown to him at present and that these damages or claims may arise, develop, or be discovered in the future. Ostrowski acknowledges that the consideration received under this Agreement is intended to and does release and discharge the Released Parties for any claims or consequences arising directly or indirectly from such unknown damages or claims except to the extent they relate to events which have not yet occurred, and he hereby waives any rights to assert in the future any claims against the Released Parties not now known or suspected to have arisen from his employment with Defendants.

5.   **Adequate Consideration – Denial of Liability**. Ostrowski and Defendants agree and acknowledge that the delivery of this Agreement under the terms described herein is a full, complete, final, and binding compromise of matters involving disputed issues between them. It is understood that the execution of this Agreement effects the settlement of disputes and differences between Ostrowski and Defendants which are contested and denied. The execution of this Agreement shall not be construed as an admission of any kind and shall not imply any past or present fault or wrongdoing on the part of Defendants or any of the Released Parties.

6.   **Applicable Law**. It is understood and agreed that this Agreement and all performance, duties and obligations hereunder shall be governed by and construed in accordance with the laws of the State of Indiana, including without limitation, matters of construction, validity, enforcement, and interpretation. Excepted from this paragraph are Indiana's choice of law rules.

7   **Section Headings**. Section headings are inserted for convenience only and shall not affect any construction or interpretation of this Agreement.

8.   **Successors and Assigns**. This Agreement shall not be assigned or transferred to any third party without the prior express written consent of Ostrowski and Defendants.

9.   **Entire Agreement and Amendment**. This Agreement contains the entire agreement with regard to the matters set forth herein. There are no representations, warranties, understandings, or agreements, verbal or otherwise, in relation thereto, except as herein expressly set forth. All prior negotiations, representations, and promises between Ostrowski and Defendants concerning the matters described herein are merged into and expressed by this Agreement. This Agreement may not be amended, changed, waived, discharged, or terminated without the written consent of Ostrowski and Defendants.

10.   **Authority**. Ostrowski and Defendants (and/or their representatives) acknowledge and represent that they each have the full power, authority and capacity to enter into this Agreement and that the individuals signing this Agreement have the full power, capacity and authority to do so.

3

CONFIDENTIAL

DEF1 00233

11.     **Voluntary Agreement**.  By entering into this Agreement, Ostrowski agrees that he has carefully and completely read all the provisions of this Agreement and that such provisions are fully understood and voluntarily accepted by him, and that he is over the age of eighteen (18) and is competent to execute this Agreement.

12.     **Negotiation of Agreement**.  This Agreement has been negotiated by Ostrowski and Defendants through their attorneys. Ostrowski and Defendants agree that the rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendments to this Agreement.

13.     **Counterparts**.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

14.     **Severability**.  If any one or more of the provisions contained in this Agreement shall be invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of the remaining provisions contained therein shall not in any way be affected or impaired thereby.

15.     **Attorneys' Fees and Costs**.  Ostrowski and Defendants shall bear their own costs and attorneys' fees incurred in this dispute and the execution of this Agreement. In the event Ostrowski or Defendants bring a lawsuit relating to a breach of, or the enforcement of, this Agreement, or any of the Released Parties assert this Agreement as a defense to an action brought by or on behalf of Ostrowski, the prevailing party shall be entitled to seek attorneys' fees from the other party. This provision does not apply to any action or claim Ostrowski may assert under any federal or state statute or law that prohibits the recovery of such fees, costs and expenses by the Released Parties.

16.     **Assignment**.  Ostrowski represents and warrants that he has not assigned to any other individual or entity any claims of any kind against Defendants, and agrees to indemnify and hold harmless the Released Parties, including for attorneys' fees, costs and expenses, for any and all claims or causes of action brought against the Released Parties with respect to any claims assigned from Ostrowski against any of them.

17.     **Non-Disparagement**.  Ostrowski agrees, from this date forward, not to make any false, slanderous or libelous statements about the business or business practices of Defendants, or their respective officials, employees, or agents, to other persons or entities. Defendants agree, from this date forward, not to make any false, slanderous or libelous statements about Ostrowski to other persons or entities.

18.     **Liens and Claims**.  Ostrowski represents and warrants that he has, or will, satisfy and discharge all liens and claims against the settlement proceeds paid under this Agreement, and he hereby expressly agrees to indemnify and hold harmless Defendants, including attorneys' fees, costs and expenses, from and against any and all claims, demands, or causes of action, which are made on the basis of any subrogation claim or lien of any kind concerning the settlement proceeds, which are paid in connection with this Agreement.

4

CONFIDENTIAL

19.   **Forum and Venue.**   Ostrowski and Defendants agree that any action related to this Agreement shall be brought and tried in the United States District Court, Northern District of Indiana, Hamond Division. In this regard, the parties hereby: (a) agree that venue shall be in such courts; (b) irrevocably consent to service of process and to the jurisdiction and venue of such courts; and (c) irrevocably waive any claim of inconvenient forum if any such suit, claim, proceeding, litigation, dispute, or claim has been brought, filed, or made in any such court.

20.   *Stipulation of Dismissal With Prejudice.*   Ostrowski and Defendants shall promptly execute and file a Joint Stipulation of Dismissal with Prejudice, agreeing to dismiss any and all pending claims in the Lawsuit, with prejudice and with each party to bear their own attorneys' fees, costs and expenses.

   **IN WITNESS WHEREOF,** the parties have signed this Agreement on the dates shown below.

OSTROWSKI UNDERSTANDS THIS IS A COMPLETE RELEASE OF CLAIMS UNDER FEDERAL, STATE, AND LOCAL LAWS. OSTROWSKI READ THE ENTIRE AGREEMENT BEFORE SIGNING BELOW.

_-2-6-2017_

THOMAS OSTROWSKI,
Plaintiff

ACKNOWLEDGED AS TO FORM:

Gerald M. Bishop
Gerald M. Bishop & Associates
2115 West Lincoln Hwy.
Merrillville, IN 46410
Phone: (219)738-2400
Fax: (219)738-2500
gmb@bishopw-law.com

Counsel for Defendant,
Lake County Council

Nicholas Snow
Harris Law Firm, P.C.
11410 Broadway
Crown Point, Indiana 46307
Phone: (219) 661-1110
Fax: (219) 661-1118
nick@harrislawfirmpc.net

Counsel for Defendants,
Luke County Commissioners, Brian Hitchcock, Lake County E-911 Commission, and Jack Allendorf

5

CONFIDENTIAL

# <u>DEPOSITION EXHIBIT 8</u>
# <u>TO THOMAS OSTROWSKI DEPOSITION</u>

LAKE COUNTY

POLICE BENEFIT PLAN

(Restatement Effective July 1, 2013)

CONFIDENTIAL

EXHIBIT
8

DEF1 00254

LAKE COUNTY POLICE BENEFIT PLAN

WHEREAS, the Lake County Sheriff's Department (hereinafter referred to as the "Employer") wishes to establish the Lake County Police Benefit Plan (hereinafter referred to as "Plan") to be a continuation and complete restatement of Lake County Police Plan, originally effective January 1, 1962, and last amended by an entireties amendment, effective July 1, 2008; and

WHEREAS, the funds of the Plan are to continue to be held pursuant to the terms of the Contract with the Insurer;

NOW, THEREFORE, the revised Plan is hereby established effective January 1, 2013, as set forth herein.

CONFIDENTIAL                                        **DEF1 00255**

ARTICLE I
DEFINITIONS

Section 1.     "Actuarial Equivalent" or "Actuarially Equivalent" means a benefit of equivalent value computed on the basis of mortality determined as follows:

(1)     For Participants, the Unisex Pension 1984 Mortality Table (UP-1984 Table) with ages set forward one-half (1/2) year.  This age adjustment is determined by interpolating (straight line) between mortality rates with no age adjustment and mortality rates with ages set forward one (1) year.

(2)     For Beneficiaries, the Unisex Pension 1984 Mortality Table (UP-1984 Table) with ages set back three and one-half (3-1/2) years.  This setback is determined by interpolating (straight line) between mortality rates with a three (3) year age setback and mortality rates with a four (4) year age setback.

The mortality basis specified above is to be used in conjunction with an interest rate of six percent (6%) per annum, compounded annually, for the purpose of determining any Actuarially Equivalent benefit.

Section 2.     "Beneficiary" means, with respect to any benefit payable under this Plan, the beneficiary named by the Participant in writing to the Pension Committee, with unrestricted right of the Participant to change such beneficiary at any time during his lifetime, except after the commencement of a joint and survivor benefit payment.  In the absence of a valid Beneficiary designation by the Participant or in the event that no designated Beneficiary survives the Participant, such benefits shall be paid to the Participant's surviving spouse, or if there is no surviving spouse, then to the Participant's surviving children (in equal shares), or, if there are no surviving children, then to the Participant's surviving parents (in equal shares), if there are no surviving parents, then to the Participant's estate.

CONFIDENTIAL                    **DEF1 00256**

## ARTICLE II
## ELIGIBILITY

Any person employed by the Employer who is a County Policeman or Sheriff (hereinafter referred to as an "Employee"), as such terms are used in Indiana Code, Section 36-8-10, shall be eligible for the benefits provided herein only during such period of employment when he is participating in the Lake County Police Retirement Plan (hereinafter referred to as the "Retirement Plan").

CONFIDENTIAL                                                     DEF1 00257

ARTICLE III
BENEFITS

Section 1A.  Disability for Participants hired before December 1, 2004.  If an eligible
Employee becomes disabled, as defined herein, he shall be entitled to receive a monthly
disability benefit payable for the life of the Participant and an expense reimbursement under the
terms of this Plan.

A Participant shall be considered disabled if he has a medically determinable mental or
physical condition which, in the judgment of the Merit Board established under the Retirement
Plan, renders the Participant unable to engage in any substantial gainful activity and is expected
to result in death or to last for continuous period of not less than twelve (12) months.  To be
considered disabled under the terms of this Plan, a Participant shall apply in writing to the Sheriff
and Merit Board for a determination that his condition qualifies as a Disability.  Such application
shall comply with procedures adopted by the Merit Board.  The judgment of the Merit Board will
be based on guidelines it has adopted.  The Pension Committee shall review the Disability status
of all Participants who are receiving any Disability benefits pursuant to guidelines adopted by the
Merit Board.

To qualify for a disability benefit under this Plan, the Participant may not have declined
any offers for employment by the Employer within the Department made after the Participant
applied for disability.  In the event a Participant has declined such offers of employment, his
termination of employment shall not be considered a disability.

The disability benefit of such eligible Employee under this Plan shall be a monthly
benefit based on a formula adopted by the Merit Board and shall not exceed the pension benefit
to which he would otherwise be entitled at normal retirement age under the provisions of the
Retirement Plan computed as of the last date such Employee is included on the payroll of the
Employer and based upon his salary in effect as of such date and Credited Service projected to
his Normal Retirement Date.  A disabled Employee shall be allowed to have minimal income as
a result of employment outside the Department.  If the disabled Employee's earned income
exceeds the minimum set by the Merit Board, the amount of the disability benefit under this Plan
shall be reduced, pursuant to guidelines adopted by the Board.  The disability benefit shall begin
on the first day of the first month following his termination of employment because of disability
and shall cease upon the earlier of his recovery from disability or his death.

If the disability was incurred in the line of duty, the disability benefit of such eligible
Employee under this Plan shall be a monthly benefit based on the provisions of the Retirement
Plan computed as of the last date such Employee is included on the payroll of the Employer and
based upon his salary in effect as of such date and it shall be assumed that the Participant had
completed thirty-two (32) years of Credited Service.  The disability benefit shall begin on the
first day of the first month following his termination of employment because of disability and
shall cease upon the earlier of his recovery from disability or his death.

The disability expense reimbursement shall be for the actual medical expenses incurred
due to such eligible Employee's disability.  The payment of disability expense reimbursement to

**LC Police Benefit Plan (Restatement 07-01-2013)**                              **5 of 11**

CONFIDENTIAL                                        **DEF1 00258**

which an eligible Employee may be entitled will be based upon guidelines established by the Merit Board. If a disabled Employee should die pending the settlement of a disability expense reimbursement, the amount which would have been paid to such eligible Employee shall be paid to his Beneficiary.

The amount of the disability payments and/or expense reimbursement paid to a disabled Employee under the terms of this Plan shall be reduced by any amount paid under Workmen's Compensation to such disabled Employee.

The disability pension benefit payable under this Plan is in addition to the disability retirement benefit, if any, provided to the Participant under the Lake County Police Retirement Plan.

Section 1B.  Disability for Participants hired on or after December 1, 2004.  If an eligible Employee becomes disabled, as defined herein, he shall be entitled to receive a monthly disability benefit and an expense reimbursement under the terms of this Plan.

A Participant shall be considered disabled if he has a medically determinable mental or physical condition which, in the judgment of the Merit Board established under the Retirement Plan, renders the Participant unable to engage in any substantial gainful activity and is expected to result in death or to last for continuous period of not less than twelve (12) months.  To be considered disabled under the terms of this Plan, a Participant shall apply in writing to the Sheriff and Merit Board for a determination that his condition qualifies as a Disability.  Such application shall comply with procedures adopted by the Merit Board.  The judgment of the Merit Board shall be based on guidelines it has adopted.  The Pension Committee shall review the Disability status of all Participants who are receiving any Disability benefits pursuant to guidelines adopted by the Merit Board.

To qualify for a disability benefit under this Plan, the Participant may not have declined any offers for employment by the Employer within the Department made after the Participant applied for disability.  In the event a Participant has declined such offers of employment, his termination of employment shall not be considered a disability.

The disability benefit of such eligible Employee under this Plan shall be a monthly benefit based on the provisions of the Retirement Plan computed as of the last date such Employee is included on the payroll of the Employer and based upon his salary in effect as of such date and Credited Service as described herein.

If the actual years of Credited Service for the Participant with a disability not incurred in the line of duty are less than twenty (20) and the Participant has not yet attained age sixty (60), then the disability benefit shall be the vested monthly benefit as described in Section 7.01(a)(2) of the Lake County Police Retirement Plan based on the following vesting schedule:

LC Police Benefit Plan (Restatement 07-01-2013)                    6 of 11

CONFIDENTIAL

| Years of Credited Service | Applicable Percentage |
|---|---|
| Less than 5 | 0% |
| 5 but less than 6 | 25% |
| 6 but less than 7 | 30% |
| 7 but less than 8 | 35% |
| 8 but less than 9 | 40% |
| 9 but less than 10 | 45% |
| 10 but less than 11 | 50% |
| 11 but less than 12 | 55% |
| 12 but less than 13 | 60% |
| 13 but less than 14 | 65% |
| 14 but less than 15 | 70% |
| 15 but less than 16 | 75% |
| 16 but less than 17 | 80% |
| 17 but less than 18 | 85% |
| 18 but less than 19 | 90% |
| 19 but less than 20 | 95% |
| 20 or more | 100% |

If the disability was incurred in the line of duty, it shall be assumed that the Participant had completed thirty-two (32) years of Credited Service.

A disabled Employee shall be allowed to have a minimal income as a result of employment outside the Department. If the disabled Employee's earned income exceeds the minimum set by the Merit Board, the amount of the disability benefit under this Plan shall be reduced, pursuant to guidelines adopted by the Board. The disability benefit shall begin on the first day of the first month following his termination of employment because of disability and shall cease upon the earlier of his recovery from disability or his death.

The disability expense reimbursement shall be for the actual medical expenses incurred due to such eligible Employee's disability. The payment of disability expense reimbursement to which an eligible Employee may be entitled will be based upon guidelines established by the Pension Committee. If a disabled Employee should die pending the settlement of a disability expense reimbursement, the amount which would have been paid to such eligible Employee shall be paid to his Beneficiary.

The amount of the disability payments and/or expense reimbursement paid to a disabled Employee under the terms of this Plan shall be reduced by any amount paid under Workmen's Compensation to such disabled Employee.

The disability pension benefit payable under this Plan is in addition to the disability retirement benefit, if any, provided to the Participant under the Lake County Police Retirement Plan.

CONFIDENTIAL

DEF1 00260

Section 2.  Options.  In lieu of the monthly form of benefit payment payable for the Participant's life specified in Section 1A and 1B, the Participant may elect upon written notice to the Merit Board at any time prior to the commencement of his disability benefit to receive the Actuarial Equivalent of the disability benefit under one of the following options.

(a)     A monthly benefit payable during the Participant's lifetime, and in the event of his death within a period of ten (10) or twenty (20) years after his retirement (the Participant to select the applicable period when he elects this option), the same monthly benefit shall be payable for the remainder of the selected period to the Beneficiary or Beneficiaries designated by him.  A Participant can elect a period other than ten (10) or twenty (20) years, but such period shall in no event exceed twenty (20) years.  The Beneficiary or Beneficiaries may elect to have the Commuted Value of the unpaid installments distributed in a lump sum in final satisfaction of the benefit as provided herein.

(b)     A monthly pension during the Participant's lifetime in an adjusted level monthly amount with provisions for continuing level monthly payments of a specified percentage equal to fifty percent (50%), sixty-six and two-thirds percent (66-2/3%) or one hundred percent (100%), as selected by the Participant, of such adjusted monthly amount for the lifetime of the Participant's spouse.

Section 3.  Insurance.  Each eligible Employee, other than an eligible Employee who is receiving a disability benefit under Section 1 of this Article but is not considered totally and permanently disabled under the terms of the life insurance contract, shall be insured by a life insurance contract in the face amount of twenty-five thousand dollars ($25,000), with a matching amount of accidental death insurance.  The Employer shall purchase or direct the Trustee to purchase and maintain the necessary insurance contracts from a legal reserve insurance company.

The life insurance contract shall contain a disability provision that in the event of total and permanent disability, the insured may elect (1) to receive the sum of fifteen thousand dollars ($15,000) in equal monthly installments for five (5) years, with a benefit of ten thousand dollars ($10,000) payable at his death or (2) to have a benefit of twenty-five thousand dollars ($25,000) payable at his death.

Section 4.  Dependents.

(a)     Only dependents set forth in either classification (1) or (2) below shall be eligible to receive a dependent's pension benefit:

(1)     dependents (surviving spouse, dependent children or dependent parent) of a former Participant when such Participant dies from any cause after retiring and becoming eligible to receive any Early Retirement Benefit, Normal Retirement Benefit, Late Retirement Benefit or Disability Retirement Benefit under the Retirement Plan; or

(2)     dependents (surviving spouse, dependent children or dependent

CONFIDENTIAL

parent) of a Participant who is killed in the line of duty, or whose death is a result of action in the line of duty, or who shall die from any cause being actively employed as a County Policeman.

The monthly benefit payable to such Employee's surviving spouse or dependent parents shall be an amount equal to five hundred dollars ($500) per month with the last monthly payment being the payment just prior to the surviving spouse's death or just prior to the dependent parent's death, if applicable. In addition, for each dependent child of such Employee, there shall be payable a monthly benefit equal to one hundred dollars ($100) with the last monthly payment being the payment just prior to the child's eighteenth (18th) birthday. The amount paid on behalf of a dependent child shall be paid to the dependent spouse unless the Pension Committee designates a different recipient for such benefits.

In order to be eligible for a benefit under this Section 3, the surviving spouse of an eligible Employee or retired Participant must have been married to the eligible Employee or retired Participant at the time of his retirement or at the time of his death while actively employed as a County Policeman.

(b)     A surviving spouse who is receiving a dependent's pension benefit under (a), who has attained age fifty-five (55) as of July 1 of the Calendar Year in which monthly benefits are increased (hereinafter the payment Calendar Year), and who is in pay status as of the last day of the preceding Calendar Year shall be eligible for a cost of living adjustment, as provided in this subsection. Such cost of living adjustment shall not apply to any benefit other than the benefit payable under Section 4(a) to a surviving spouse.

The cost of living adjustment for a payment Calendar Year shall be a percentage increase in the eligible surviving spouse's monthly benefit paid during the last month of the preceding Calendar Year. The percentage increase shall equal the percentage increase, if any, in the average of the Consumer Price Index (United States city average) prepared by the United States Department of Labor for the first three (3) months of the payment Calendar Year over the average for the same three (3) months of the preceding Calendar Year. However, the annual percentage increase shall not exceed three percent (3%). No cost of living adjustment shall be made after the increases made pursuant to this Section total one hundred percent (100%) of the Participant's monthly retirement benefit payable prior to the application of this Section.

The cost of living adjustment for a payment Calendar Year shall be effective in July of the payment Calendar Year through June of the next Calendar Year.

CONFIDENTIAL

DEF1 00262

ARTICLE IV
ADMINISTRATION

This Plan shall be administered by the Employer for the exclusive benefit of those eligible Employees participating hereunder. A Pension Committee shall be formed as provided under Section 9.01 of the Retirement Plan, and the Pension Committee shall have similar duties with regard to both the Benefit Plan and the Retirement Plan. The Employer shall, by written direction, authorize the Trustee to make the necessary payments to any eligible Employee, insurance company, or beneficiary, and to pay the necessary expenses of the administration of the Plan. The Employer also reserves the right to amend this Plan by appropriate action.

Notwithstanding any provisions of this Plan to the contrary, the individual members of the Sheriff's Department, the Merit Board, the Pension Committee, or the County Council, shall not be liable for the payment of or loss of any benefits to an eligible Employee, his designated beneficiary or any other person; and the benefits created herein shall be contingent upon sufficient annual contributions being made by the County as a result of annual appropriations by the County Council.

Any legal reserve life insurance company issuing contracts to provide benefits under the terms of this Plan shall not be considered a party to this Plan nor shall such insurance company be bound by any of the provisions contained herein. The terms and conditions of any insurance contract issued hereunder shall be conclusive in determining the rights of any eligible Employees to the benefits as set forth in such contract.

The benefits payable under Article III of this Plan are in addition to any disability or death benefits provided to participants under the Retirement Plan.

CONFIDENTIAL

DEF1 00263

IN WITNESS of its adoption of the foregoing Plan, the Employer has caused its name to be hereunto subscribed by its authorized officer on this __19__ day of __SEPTEMBER__, 2013.

LAKE COUNTY SHERIFF'S DEPARTMENT

By _____

Approved and ratified at a meeting of the Lake County Sheriff's Merit Board on the __19__ day of __SEPTEMBER__, 2013.

LAKE COUNTY SHERIFF'S MERIT BOARD

By _____

Approved and ratified at a meeting of the County Council of Lake County on the __8th__ day of __October__, 2013.

COUNTY COUNCIL OF LAKE COUNTY

By _____

9

LᴳᴓPolice Benefit Plan (Restatement 07-01-2013)                    11 of 11

CONFIDENTIAL

# DEPOSITION EXHIBIT 9
# TO THOMAS OSTROWSKI DEPOSITION

LAKE COUNTY

POLICE RETIREMENT PLAN

(Restatement Effective January 1, 2013)



EXHIBIT
9

CONFIDENTIAL

**LAKE COUNTY**
**POLICE RETIREMENT PLAN**

WHEREAS, the County Council of Lake County has established a Sheriff's Merit Board pursuant to Indiana Code; and

WHEREAS, pursuant to the authority vested in the Sheriff's Department to establish certain benefits pursuant to Indiana Code, said department wishes to continue the retirement plan created for its eligible employees; and

WHEREAS, the retirement plan is intended to satisfy Internal Revenue Code Section 401(a) as a governmental plan defined in Section 414(d) of the Internal Revenue Code;

NOW, THEREFORE, this restatement of the Lake County Police Retirement Plan is hereby effective January 1, 2013, with the following modifications:

Section 2.01 – added a definition of Salary to be effective for all severances (of any type) on or after January 1, 2014 .

The provisions of this restated Plan shall only apply to an Employee who dies while employed after January 1, 2013, or who severs employment on or after January 1, 2013. The rights and benefits, if any, of an Employee who died while employed or who severed employment before such date shall be determined in accordance with the provisions of the Plan that were in effect on the date of his death or the date that he severed employment. This is a government plan pursuant to Section 414(d) of the Internal Revenue Code and is intended to comply with Section 401(a) of the Internal Revenue Code.

CONFIDENTIAL

CONTENTS

ARTICLE I  INTRODUCTION .................................................................................1
    Section 1.01.  Plan. .........................................................................................1
    Section 1.02.  Purpose.....................................................................................1
    Section 1.03.  Effective Date. .........................................................................1

ARTICLE II  DEFINITIONS AND INTERPRETATION .........................................2
    Section 2.01.  Definitions.................................................................................2
    Section 2.02.  Reference to Other Definitions. ...............................................5
    Section 2.03.  Interpretation............................................................................6
    Section 2.04.  Construction..............................................................................6

ARTICLE III  SERVICE..........................................................................................7
    Section 3.01.  Credited Service........................................................................7
    Section 3.02.  Reemployment. .........................................................................8
    Section 3.03.  Reinstatement of Participant Who Severed Employment...........9
    Section 3.04.  Benefits for Qualified Military Service. ..................................10
    Section 3.05.  Service Purchase. ....................................................................11

ARTICLE IV  ELIGIBILITY AND PARTICIPATION ...........................................13
    Section 4.01.  Eligibility. ...............................................................................13
    Section 4.02.  Entrance Date and Requirement of Participant Contributions....13
    Section 4.03.  Termination of Participation. ..................................................13
    Section 4.04.  Failure to Participate. ..............................................................13

ARTICLE V  RETIREMENT DATE........................................................................14
    Section 5.01.  Normal Retirement...................................................................14
    Section 5.02.  Early Retirement. .....................................................................14
    Section 5.03.  Late Retirement........................................................................14

ARTICLE VI  RETIREMENT BENEFITS ..............................................................15
    Section 6.01.  Normal Retirement Benefit.......................................................15
    Section 6.02.  Early Retirement Benefit. .........................................................15
    Section 6.03.  Late Retirement Benefit............................................................15
    Section 6.04.  Options.....................................................................................16
    Section 6.05.  Limitations on Benefits.............................................................16
    Section 6.06.  Age 70-1/2 and Other Distribution Rules. ...............................19
    Section 6.07.  Cost of Living Adjustments to Retirees....................................21
    Section 6.08.  Direct Rollovers. .....................................................................22
    Section 6.09.  Notification of Address. ...........................................................23

DEF1 00269

ARTICLE VII  SEVERANCE AND DISABILITY BENEFITS ..............................................24
    Section 7.01.  Severance Benefits. ..............................................................................24
    Section 7.02.  Disability Retirement Benefits. ...........................................................25

ARTICLE VIII  DEATH BENEFITS ..............................................................................27
    Section 8.01.  Death Benefits After Retirement. ........................................................27
    Section 8.02.  Death Benefits Before Retirement. .....................................................27

ARTICLE IX  ADMINISTRATION ...............................................................................30
    Section 9.01.  Pension Committee. .............................................................................30
    Section 9.02.  Qualified Domestic Relations Orders. .................................................32

ARTICLE X  FUNDING THE PLAN ..............................................................................33
    Section 10.01.  Employer Contributions. ...................................................................33
    Section 10.02.  Participant Contributions. .................................................................33
    Section 10.03.  Trustee. ..............................................................................................34
    Section 10.04.  Nondiversion and Exclusive Benefit. ................................................34

ARTICLE XI  AMENDMENT AND TERMINATION ...................................................36
    Section 11.01.  Amendment. .......................................................................................36
    Section 11.02.  Suspension or Termination of the Plan. ............................................36
    Section 11.03.  Effect of Termination. .......................................................................36

ARTICLE XII  LIABILITIES ...........................................................................................38
    Section 12.01.  Liabilities. ..........................................................................................38

ARTICLE XIII  GENERAL PROVISIONS ......................................................................39
    Section 13.01.  Limitation of Rights and Obligations. ...............................................39
    Section 13.02.  Restriction Against Claims and Assignments. ...................................39
    Section 13.03.  Internal Revenue Service Approval. ..................................................39

ARTICLE XIV  TOP-HEAVY RULES .............................................................................40
    Section 14.01.  Top-Heavy Rules Not Applicable to Government Plans. ....................40

DEF1 00270

# ARTICLE I

## INTRODUCTION

**Section 1.01.  Plan.** The "Plan" set forth in this instrument shall be known as the Lake County Police Retirement Plan.

**Section 1.02.  Purpose.** The purpose of this Plan is to provide retirement benefits or other benefits to such employees of the Employer and their Beneficiaries who qualify under the terms of the Plan from the Trust Fund created by contributions held by the Trustee under the provisions of the Contracts.  This Plan and Trust Fund shall be for the exclusive benefit of such persons.

**Section 1.03.  Effective Date.** The original effective date of the Plan which is known as the "Effective Date" is January 1, 1962; this restated plan is effective January 1, 2013.

1

CONFIDENTIAL

DEF1 00271

## ARTICLE II

### DEFINITIONS AND INTERPRETATION

**Section 2.01. Definitions.** As used herein, unless a different meaning is clearly required by the context:

(a)     "Actuarial Equivalent" or "Actuarially Equivalent" means a benefit of equivalent value computed on the basis of mortality determined as follows:

(1)     For Participants, the Unisex Pension 1984 Mortality Table (UP-1984 Table) with ages set forward one-half (1/2) year. This age adjustment is determined by interpolating (straight line) between mortality rates with no age adjustment and mortality rates with ages set forward one (1) year.

(2)     For Beneficiaries, the Unisex Pension 1984 Mortality Table (UP-1984 Table) with ages set back three and one-half (3-1/2) years. This setback is determined by interpolating (straight line) between mortality rates with a three (3) year age setback and mortality rates with a four (4) year age setback.

The mortality basis specified above is to be used in conjunction with an interest rate of six percent (6%) per annum, compounded annually, for the purpose of determining any Actuarially Equivalent benefit, unless otherwise specified.

For calendar years beginning on and after January 1, 2011, for determining Actuarially Equivalent lump sums, (other than the lump sum payable under Section 8.02(b) or 8.02(c)), the average of the PBGC rates in effect as of the five (5) January 1 dates preceding distribution shall be utilized, provided however, the average rate shall not be less than three percent (3%) and shall not be more than five percent (5%). Such average shall be rounded to the nearest .25%.

In determining the applicable rate of interest for this purpose, the applicable interest rate used by the PBGC in valuing deferred annuities shall be taken into account when a lump sum amount is being calculated with respect to a deferred annuity. The applicable interest rate used by the PBGC in valuing immediate annuities shall be taken into account when a lump sum amount is being calculated with respect to an immediate annuity.

(b)     "Actuary" means the person or firm appointed by the Employer or by the Merit Board and acting as technical advisor with respect to actuarial matters involved in the Plan.

(c)     "Beneficiary" means, with respect to any benefit payable under this Plan, the beneficiary named by the Participant in writing to the Committee, with unrestricted right of the Participant to change such beneficiary at any time during his lifetime, except after the commencement of a joint and survivor benefit payment. In the absence of a valid Beneficiary designation by the Participant or in the event that no designated Beneficiary survives the Participant, such benefits shall be paid to the Participant's surviving spouse, or if there is no surviving spouse, then to the Participant's surviving children (in equal shares), or, if there are no surviving children, then to the Participant's surviving parents (in equal shares), if there are no surviving parents, then to the Participant's estate.

2

DEF1 00272

(d)    "Commuted Value" means, as of the date of determination, an Actuarially Equivalent lump sum.

(e)    "Contract" means the contract with the Insurer under which the assets of the Plan are held.

(f)    "Disability" means a medically determinable mental or physical condition which, in the judgment of the Merit Board, renders the Participant unable to engage in any substantial gainful activity and is expected to result in death or to last for a continuous period of not less than twelve (12) months.  To be considered Disabled under the terms of this Plan, a Participant shall apply in writing to the Sheriff and Merit Board for a determination that his condition qualifies as a Disability.  Such application shall comply with procedures adopted by the Merit Board.  The judgment of the Merit Board shall be based on guidelines adopted by the Merit Board.  The Merit Board shall review the Disability status of all Participants who are receiving any Disability benefits pursuant to guidelines adopted by the Merit Board.

(g)    "Disability Retirement Date" means the first day of the first month following the Participant's severance from employment because of a Disability, provided, however, to qualify for Disability Retirement, the Participant may not have declined any offers of employment by the Employer within the Department made after the Participant applied for Disability.  In the event a Participant has declined such offers of employment, his severance from employment shall be treated as a severance under Section 7.01.

(h)    "Employee" means a person employed by the Employer who is a County Policeman or Sheriff with full police power, as such terms are used in Indiana Code.

(i)    "Employer" means the Lake County Sheriff's Department, Crown Point, Indiana.

(j)    "Final Average Monthly Salary" means for a Participant who severs employment or retires prior to July 1, 1997, one sixtieth (1/60th) of the total nondeferred compensation, plus the modifications set forth in the following paragraphs, paid by the Employer to a Participant during the highest paid five (5) years ending prior to the Participant's retirement date or severance date.  Such years do not need to be consecutive.  If a Participant has completed less than five (5) years of employment, Final Average Monthly Salary equals the average of his Salary for all of his years of employment.  For a Participant who severs employment or retires after June 30, 1997, one-thirty-sixth (1/36th) of his Salary, plus the modifications set forth in the paragraphs below, paid by the Employer to a Participant during the highest paid three (3) years ending prior to the Participant's retirement date or severance date.  Such years do not need to be consecutive.  If a Participant has completed less than three (3) years of employment, Final Average Monthly Salary equals the average of his Salary for all of his years of employment.  Please note that the definition of "Salary" changes for compensation paid after December 31, 2013.

Definition of Salary

"Salary" (and "Final Average Monthly Salary") means, in the case of each Participant, for amounts paid prior to January 1, 2014, the total nondeferred compensation subject to the

3

provisions contained in the subsections <u>Modifications to Salary</u>, <u>Statutory Limits</u>, <u>State Limit on Final Average Monthly Salary</u>, and <u>Federal Limit on Salary</u>.

"Salary" means in the case of each Participant, for amounts paid after December 31, 2013, the total compensation amount that would have been reported on U.S. Treasury Form W-2 for federal income tax purposes for the period in question, subject to the following modifications: 1) overtime pay (including banked compensatory time) in excess of five thousand dollars ($5,000.00) for each full or partial calendar year shall not be included, 2) termination bonus shall not be included, 3) compensatory pay paid in the final year of employment for vacation pay not taken shall not be included, and 4) compensatory sick pay paid in the final year of employment shall not be included. "Salary" (and "Final Average Monthly Salary") shall be subject to any further modifications or limitations described in the following provisions of this subsection.

<u>Modifications to Salary</u>

All Salary used to calculate a Participant's Final Average Monthly Salary shall include 1) all elective contributions made under a Section 401(k) plan, a cafeteria plan as defined in Internal Revenue Code Section 125, a simplified employee pension plan, or a Section 403(b) of the Internal Revenue Code tax deferred annuity; 2) all compensation deferred under an eligible deferred compensation plan as defined in Section 457, 3) all employee contributions under government plans that are treated as employer contributions under Section 414(h)(2) of the Internal Revenue Code, and 4) any amounts not included in taxable income by reason of Section 132(f)(4) of the Internal Revenue Code.

<u>Statutory Limits</u>

There are two statutory limits on compensation which apply to this Plan. One limit is on Final Average Monthly Salary and is prescribed by state law. The second limit is on Salary and is prescribed by federal law in Section 401(a)(17) of the Internal Revenue Code. Both limits shall apply in determining Final Average Monthly Salary.

<u>State Limit on Final Average Monthly Salary</u>

For a Participant who severs employment or retires after June 30, 1996, Final Average Monthly Salary may not exceed the minimum monthly salary that a full-time prosecuting attorney was entitled to be paid by the state of Indiana at the time the Participant severs employment or retires.

<u>Federal Limit on Salary</u>

For Plan Years beginning before January 1, 1996, the limitations on compensation under Code Section 401(a)(17) shall be deemed to be satisfied in accordance with applicable rules and regulations presented by the Secretary of the Treasury for governmental plans. For Plan Years beginning on or after January 1, 1996, pursuant to the requirements of Code Section 401(a)(17) for a governmental plan, (i) for an individual who became a Participant on or before December 31, 1995, Salary shall not be limited, because there was no Salary limit under the Plan in effect on July 1, 1993; (ii) for an individual who became a Participant after December 31, 1995, Salary

4

DEF1 00274

shall not exceed the Section 401(a)(17) limit (as increased by the cost of living adjustment pursuant to Code Section 401(a)(17)).  For Participants who sever employment in any Plan Year beginning after December 31, 2001, the Section 401(a)(17) limit for determination periods beginning before January 1, 2002, is two hundred thousand dollars ($200,000); the Section 401(a)(17) limit for determination periods beginning after December 31, 2001, is two hundred thousand dollars ($200,000) as increased for any cost of living adjustment.

(k)     "Insurer" means any legal reserve life insurance company licensed to operate in the State of Indiana that is selected by the Pension Committee.

(l)     "Merit Board" means the five (5) member Board appointed by the Sheriff and elected by the members of the police force pursuant to the Indiana Code, as said Board may be constituted at any given time.

(m)     "Net Amount of Contributions" means the amount of money actually paid into the Trust Fund from the wages of each Participant in accordance with the provisions of Section 10.02, plus interest at the rate of three percent (3%) compounded annually up to severance date, less any sums, plus interest at the same rate, paid from the Trust Fund to such Participant or to any governmental fund for the credit or benefit of such Participant.  Crediting of interest shall commence as of the end of the Plan Year in which contributions are made by the Participant.

(n)     "Participant" means an Employee who is eligible to participate and who is actively participating in the Plan as evidenced by his signature on an enrollment form wherein said Employee authorizes the deduction of the required Participant contributions as described hereinafter.  Participation shall cease upon severance from employment with the Employer or a change in status that does not satisfy the definition of "Employee", however, a former Participant may retain rights to payment of certain benefits in accordance with provisions of the Plan.

(o)     "Pensioner" means a former Participant who is receiving a benefit pursuant to the terms of this Plan.

(p)     "Plan Year" means a twelve (12) month period beginning January 1.

(q)     "Trust Fund" means the sum of all the assets of every kind and nature, both principal and income, at any time and from time to time held by the Trustee, which are available to pay benefits pursuant to the terms of the Contract with the Insurer.

(r)     "Trustee" refers to the trustee of the pension trust, who may be one (1) or more corporate trustees or the treasurer of the county serving under bond.

**Section 2.02. Reference to Other Definitions.**  In addition to the terms defined in Section 2.01, the following terms are defined in the following Sections of the Plan:

| Definition | Section |
|---|---|
| Credited Service | 3.01 |
| Defined Benefit Dollar Limitation | 6.05 |

5

CONFIDENTIAL

| | |
|---|---|
| Direct Rollover | 6.07 |
| Distributee | 6.07 |
| Early Retirement Age | 5.02 |
| Early Retirement Benefit | 6.02 |
| Early Retirement Date | 5.02 |
| Effective Date | 1.03 |
| Eligible Retirement Plan | 6.07 |
| Eligible Rollover Distribution | 6.07 |
| Entrance Date | 4.02 |
| Equivalent Annual Benefit | 6.05 |
| Late Retirement Benefit | 6.03 |
| Late Retirement Date | 5.03 |
| Maximum Permissible Benefit | 6.05 |
| Normal Retirement Age | 5.01 |
| Normal Retirement Benefit | 6.01 |
| Normal Retirement Date | 5.01 |
| Public Retirement Fund | 3.05 |

**Section 2.03.  Interpretation.**  Wherever appropriate, the masculine gender may be read as the feminine gender or as the neuter gender; and compound words beginning with the prefix "here" shall be read as referring to the entire Plan and not merely to the part thereof in which they occur.  Terms not specifically defined in this Article II shall be deemed defined by the most descriptive context of the Plan.

**Section 2.04.  Construction.**  This instrument is to be construed according to the laws of the State of Indiana.  In the event any provision of this Plan shall be held illegal or invalid for any reason, such illegality or invalidity shall not affect the remaining parts of this Plan, and the Plan shall be construed and enforced as if the illegal or invalid provision had never been included herein.

6

CONFIDENTIAL

DEF1 00276

## ARTICLE III

## SERVICE

**Section 3.01. Credited Service.** "Credited Service" is that portion of a Participant's service which is used in computing benefits or determining eligibility for benefits unless otherwise specifically provided in any other Section of the Plan. A Participant's Credited Service shall be equal to the sum of (a) service prior to the Effective Date and (b) service after the Effective Date, both of which shall be determined in accordance with the following rules:

(a)     An Employee who becomes a Participant on or after the Effective Date by agreeing to make the contributions required under the Plan shall be credited with Credited Service equal to the aggregate full and fractional years of his service with the Employer prior to the Effective Date and during which he was an Employee, as defined in Section 2.01(h), provided that such service shall cease to be recognized if he ceases to make the required contributions while remaining in the active employment of the Employer.

(b)     An Employee who becomes a Participant on or after the Effective Date by agreeing to make the contributions required under the Plan shall be credited with Credited Service equal to the full and fractional years of his service with the Employer after the Effective Date and during which he is a Participant hereunder, provided that such service shall cease to be recognized if he ceases to make the required contributions while remaining in the active employment of the Employer.

A Participant shall not receive any credit for any absence from the active service of the Employer during which the Participant is not making the required Participant contributions. For those absences without pay during which the Participant makes the required contributions at the same monthly rate as immediately preceding such absence, credit shall be given for a period not to exceed six (6) months. After such six (6) month period, no credit shall be given during the absence nor shall any contributions be accepted from the Participant. The granting of authority for the aforementioned absences shall be made pursuant to the Employer's published personnel policies and such policies shall be applied to all Participants in a uniform and nondiscriminatory manner. Failure to return from any leave of absence shall constitute a severance of the Employee's service as of the date of such failure to return.

A Participant who severs his employment with the Employer for any reason other than because of disability, who receives a lump sum distribution of his Net Amount of Contributions as of such date of severance pursuant to Section 7.01(a)(1), and who is later reemployed by the Employer shall only receive credit for prior service if such Employee or former Employee 1) provides written certification that such Credited Service was not credited to another Indiana retirement program pursuant to a service purchase agreement or some other arrangement and 2) repays to the Trust Fund, within two (2) years of reemployment, the full amount of the distribution received, plus interest at the rate of three percent (3%) compounded annually from the date of distribution to the date of full repayment. Credited Service will not be reinstated until the full amount of the distribution has been repaid. Repayments may be made in cash or rolled over from an Individual Retirement Account or another qualified plan. If repaid in cash, the repayments shall be treated on an after-tax basis. If rolled over the Participant shall provide

7

**DEF1 00277**

information on tax treatment of the refund, if any of the rollover amount is to be treated on a pre-tax basis. In addition, an Employee or former Employee who is absent from the active service of the Employer as a result of the voting or electoral process and subsequently return to the active service of the Employer and who has not taken a distribution pursuant to Section 7.01 of the Plan shall, upon return to active service, have all his prior Credited Service reinstated.

Determination of Credited Service by the Committee shall be binding upon all Participants and Beneficiaries. In the determination of Credited Service by the Committee, all Employees and Participants under similar circumstances must be treated alike. For a Participant who severs employment or retires prior to July 1, 1997, Credited Service shall be calculated to the nearest one-twelfth (1/12) year. For a Participant who severs employment or retires on or after July 1, 1997, Credited Service up to twenty (20) years shall be calculated to the nearest one-twelfth (1/12) year, and Credited Service in excess of twenty (20) years up to an additional twelve (12) years shall be based on full years and half years. If Credited Service in excess of twenty (20) years is not equal to full years or half years, Credited Service shall be rounded down to the nearest full year or half year.

To the extent the foregoing provisions do not credit service as required by the Family and Medical Leave Act, a Participant shall receive credited service as required by such Act. Basically, such Act requires the crediting of service for vesting purposes only for a family or medical leave of up to 12 weeks even if the Participant does not make the required Participant contributions.

### Section 3.02. Reemployment.

(a)    A Participant who severs his employment with the Employer and who is reemployed by the Employer prior to the distribution of his Net Amount of Contributions and prior to the commencement of any other benefit payments under this Plan shall not be entitled to any benefits under this Plan until his subsequent severance from employment, and upon such subsequent severance his benefit shall be determined based upon all his Credited Service with the Employer.

(b)    A Participant who severs his employment with the Employer, receives a lump sum distribution of his Net Amount of Contributions pursuant to Section 7.01(a)(1), and is reemployed by the Employer shall have the option of repaying his Net Amount of Contributions plus interest as provided in Section 3.01. The crediting of prior service shall depend on whether the Participant repays his Net Amount of Contributions plus interest and provides written certification that such Credited Service was not credited to another Indiana retirement program pursuant to a service purchase agreement or some other arrangement. Whether the Participant repays his Net Amount of Contributions or does not repay them, there shall be no offset of any benefits the Participant is subsequently entitled to receive.

(c)    This subsection applies to any Participant who was receiving a monthly benefit or who received a lump sum distribution pursuant to Section 6.04 or 10.02 prior to his reemployment. Any monthly benefit being paid to such reemployed Participant shall be suspended on his reemployment date. There shall be no obligation or opportunity for the Participant to repay prior distributions. Upon the subsequent severance from employment of a reemployed Participant

8

described in this subsection, his benefit shall be based on Credited Service prior to his severance from employment and subsequent to his return to employment, and his total Credited Service shall be subject to the maximum years of Credited Service provided in Section 6.01. Any benefits to which such a Participant is subsequently entitled shall <u>not</u> be offset by any prior disability benefits. Offsets for benefits, other than disability benefits, shall be determined as follows:

(1)     If the Participant was receiving a monthly benefit, other than disability benefits, the offset shall equal the monthly retirement benefit as of the date the benefit first commenced, unreduced for early commencement or optional form, times the ratio of the temporary life annuity for the period for which benefits were received over the immediate life annuity determined as of the date the initial benefit commenced. The cost of living adjustment provided in Section 6.07 of the Plan shall not be taken into consideration in determining the amount of offset.

(2)     If the Participant received a lump sum distribution pursuant to Section 6.04, then the monthly benefit payable at the Participant's subsequent severance of employment shall be converted to a lump sum value calculated as of the date of his subsequent severance of employment. The lump sum value calculated as of the date of the Participant's subsequent severance of employment shall be reduced by the initial lump sum benefit paid to the Participant adjusted for interest from the date of initial distribution to the date distribution of the final benefit is paid or commenced based on the interest rate used to calculate the initial lump sum distribution. After the lump sum value of the Participant's final benefit has been adjusted as provided in this paragraph the Participant may elect payment of that amount in the form of a lump sum distribution or may elect payment in another form of payment provided in Section 6.04. The monthly options provided under Section 6.04 shall be determined by converting the lump sum amount to a life annuity using the assumptions for lump sums provided in Section 2.01(a) and then converting the life annuity to other optional monthly forms using the 1984 Mortality Table and 6% interest rate provided in Section 2.01(a).

(3)     If the Participant received a lump sum distribution of his Net Amount of Contributions pursuant to Section 10.02, then the monthly benefit payable at the Participant's subsequent severance of employment shall be offset by the Actuarially Equivalent monthly benefit derived from his Net Amount of Contributions.

(d)     In no event shall a Participant receive either a greater benefit than he would have received from continuous service without interruptions or a lesser benefit than he was receiving immediately prior to his reemployment.

### Section 3.03.  Reinstatement of Participant Who Severed Employment.

Notwithstanding the foregoing, a Participant whose employment with the Employer was severed for any reason who is later reinstated with all backpay and seniority may elect to repay any benefit received as result of the severance together with the amount of Participant contributions which would have been made during the period between the severance and reinstatement if no

9

DEF1 00279

severance had occurred.  Such election will result in the Participant being credited with the amount of Credited Service he would have received if no severance had occurred.  The repayment amount may be made in a lump sum or in monthly installments provided the entire amount is repaid within one (1) year of the date of reinstatement.  Within thirty (30) days of reinstatement a Participant shall be presented with a written notice of his rights under this Section 3.03 and an election form to designate his intent to repay the above indicated amounts or forego the applicable Credited Service.

### Section 3.04.  Benefits for Qualified Military Service.

(a)　　Additional Service.  "Qualified Military Service" means military service as defined under the federal Uniformed Services Employment and Reemployment Act  and that satisfies the requirements of Internal Revenue Code Section 414(u) and 38 U.S.C. Section 2021 for veteran's reemployment rights.  To the extent required by Section 414(u) of the Internal Revenue Code, an Employee shall be granted Credited Service for purposes of benefit accrual and vesting upon his reemployment by the Employer for any period of time during which such Employee was on active military duty, if certain requirements are satisfied.  To be credited with service for benefit accrual and vesting purposes,  the Participant must be entitled upon his reemployment to veteran's reemployment rights with respect to such period of military duty under the Uniformed Services Employment and Reemployment Rights Act (38 U.S.C. 4301 et seq.).  In addition, to be credited with service for benefit accrual purposes, the Participant must make up any Participant contributions required under Article X based on the Salary the Participant would have received with reasonable certainty during the period of his military duty.  Such Participant shall have up to three (3) times the period of his military duty (but not to exceed five (5) years) to make up his missed required Participant contributions.

(b)　　Compensation During Qualified Military Service.  In determining the Final Average Monthly Salary of a reemployed veteran meeting all requirements of applicable federal law for reemployment rights, Salary shall be computed: (a) at the rate the reemployed veteran would have received but for the reemployed veterans period of qualified military service; or (b) in the case that the determination of such rate is not reasonably certain, on the basis of the reemployed veteran's average rate of salary during the twelve (12) month period immediately preceding such period of qualified military service (or, if shorter, the period of employment immediately preceding such period).

(c)　　Death Benefits.  If a Participant dies on or after January 1, 2007, while performing Qualified Military Service, the survivors of the Participant shall be entitled to any additional benefits (other than benefit accruals relating to the period of Qualified Military Service) provided under the Plan as if the Participant had been reemployed on the day prior to death and then terminated employment on the actual date of death.

(d)　　Differential Wage Payments.  For Plan Years beginning after December 31, 2008, any individual receiving a differential wage payment, as defined by Section 3401(h)(2) of the Internal Revenue Code from the Employer, shall be treated as an Employee of the Employer and the differential wage payment shall be treated as Compensation solely for the purpose of determining benefit limitations under Section 6.05.

10

DEF1 00280

(e)     All other provisions of the Plan shall be interpreted to provide a reemployed veteran who meets all requirements of applicable federal law for reemployment rights with all rights under the Plan which are required under applicable federal law.

### Section 3.05.  Service Purchase.

(a)     A Participant who satisfies the eligibility requirements of this Section 3.05 may elect to purchase additional Credited Service in this Plan for the Participant's prior service credited under a Public Retirement Fund.  A "Public Retirement Fund" refers to any of the following, either singly or collectively: 1) the public employees' retirement fund, 2) the Indiana state teachers' retirement fund, 3) the state excise police, gaming agent, gaming control officer, and conservation enforcement officers' retirement fund, 4) the state police pension trust,  5) the 1977 police officers' and firefighters' pension and disability fund, and 6) a county Sheriff's retirement plan established by a department other than the Employer.

(b)     A Participant must satisfy the following requirements to be eligible to purchase Credited Service:

1.     be employed by the Employer at the time of election to purchase additional Credited Service;

2.     may **not** have any vested benefit under the Public Retirement Fund; and

3.     may **not** be an active participant in the Public Retirement Fund at the time of application for the purchase of Credited Service.

The Participant shall complete any forms required by the Public Retirement Fund in which the prior service was earned and any forms required by this Plan.

(c)     If the Participant satisfies the eligibility requirements in (b), such Participant may make a transfer to purchase Credited Service under this Plan equal to the Credited Service that would be purchased by a contribution of the transferred amount computed at the actuarial present value for an individual whose salary and age would be the same as the salary and age of the Participant on the transfer date; provided, however, Credited Service may not be purchased for a period greater than the Participant's prior service in the Public Retirement Fund.

(d)     If the Participant is one hundred percent (100%) vested in this Plan or has satisfied the Credited Service requirement for Early Retirement when he severs employment with the Employer, the purchase of Credited Service **shall** be included in the calculation of the Participant's monthly benefit.

(e)     If the Participant is not one hundred percent (100%) vested in this Plan when he severs employment with the Employer, the purchase of Credited Service **shall not** be included in the calculation of the Participant's monthly benefit.  The Participant may request a refund of the transferred amount, with adjustment for interest at a rate that ensures the Plan remains actuarially cost neutral.

11

CONFIDENTIAL

(f)     To the extent permitted by the Internal Revenue Code and applicable regulations, the Plan may accept the following as payment by the Participant for the purchase of Credited Service:

> 1.     A direct rollover from a qualified plan under Section 401(a) or 403(a) of the Internal Revenue Code, a 403(b) plan, a 457(b) plan, or an individual retirement account or annuity under Section 408(a) or (b) of the Internal Revenue Code, or

> 2.     A trustee to trustee transfer from a 403(b) plan or an eligible deferred compensation plan under 457(b) to the extent permitted by the Internal Revenue Code.

The plan from which payment for the purchase of service is received does not have to be the same plan in which the prior service was earned.

(g)     The Employer may deny an application for purchase of service credit if the transfer would exceed the limitations under Section 415 of the Internal Revenue Code.  Any transfer pursuant to this Section is irrevocable, and a transfer may not exceed the amount necessary to fund the service purchase.  Any amounts in the Public Retirement Fund after the transfer shall remain subject to the Public Retirement Fund's provisions.

CONFIDENTIAL

DEF1 00282

## ARTICLE IV

## ELIGIBILITY AND PARTICIPATION

**Section 4.01.  Eligibility.**  Each Employee shall be eligible to participate on the later of the Effective Date or his date of employment by the Employer.

**Section 4.02.  Entrance Date and Requirement of Participant Contributions.**  The "Entrance Date" of a Participant is the date as of which an Employee becomes enrolled as a Participant and it is the date as of which his required Participant contributions commence as provided in Section 10.02.

**Section 4.03.  Termination of Participation.**  Participation by an active Participant in the Plan shall be severed upon 1) the commencement of a benefit to him as a Pensioner, 2) his death, 3) the severance from his employment with the Employer, 4) the termination of the Plan, 5) termination of his participation by operation of law or 6) his ceasing to be an Employee as defined in Section 2.01(h) of the Plan.

**Section 4.04.  Failure to Participate.**  Failure to participate when fully eligible shall cause a Participant to receive credit only for that service occurring subsequent to the eventual Entrance Date of such Participant.  A Participant who fails to elect to participate when fully eligible may thereafter enter the Plan on any January 1 following the delivery to the Merit Board of his written agreement to make the required Participant contributions.

13

CONFIDENTIAL

DEF1 00283

## ARTICLE V

### RETIREMENT DATE

**Section 5.01.  Normal Retirement.**  The Normal Retirement Date of a Participant is (a) his sixtieth (60th) birthday if his birthday falls on the first day of a month or (b) the first day of the first month following his sixtieth (60th) birthday, if his birthday falls on a day other than the first day of a month.  "Normal Retirement Age" means, with respect to a Participant, the Participant's age as of his Normal Retirement Date.

**Section 5.02.  Early Retirement.**  A Participant with at least twenty (20) years of Credited Service may retire any time.  In the event a Participant elects to retire early, his Early Retirement Date shall be (a) the date of his actual retirement if he retires as of the first day of a month or (b) the first day of the first month following his actual retirement, if he retires as of a day other than the first day of a month.  "Early Retirement Age" is the date the Participant completes twenty (20) years of Credited Service.

**Section 5.03.  Late Retirement.**  At the request of the Employer and with the consent of the Participant, a Participant may continue his employment beyond his Normal Retirement Date. In the event this occurs, the Participant's Late Retirement Date shall be (a) the day of his actual retirement if he retires as of the first day of a month or (b) the first day of the first month following his actual retirement, if he retires as of a day other than the first day of a month.  In no event shall a Participant's retirement benefit commence until the Participant actually severs his employment with the Employer.

14

CONFIDENTIAL

DEF1 00284

## ARTICLE VI

## RETIREMENT BENEFITS

**Section 6.01.  Normal Retirement Benefit.**  The Normal Retirement Benefit shall be a monthly benefit determined as the total of (a) and (b) follows:

(a)      two and one-half percent (2-1/2%) of the Participant's Final Average Monthly Salary, plus one dollar ($1.00); this sum multiplied by the Participant's years of Credited Service up to twenty (20) years; and

(b)      an additional two (2) percent of the Participant's Final Average Monthly Salary multiplied by the Participant's years of Credited Service in excess of twenty (20) years up to an additional twelve (12) years;

the total benefit under (a) and (b) above shall not exceed a maximum of seventy-four percent (74%) of his Final Average Monthly Salary plus twenty dollars ($20.00).

A Participant who severs employment with the Employer as of his Normal Retirement Date shall be entitled to receive his Normal Retirement Benefit commencing on his Normal Retirement Date and such Normal Retirement Benefit shall be payable monthly to him during his lifetime, with a final payment on the first day of the month in which he dies.

At the direction of the Committee, reasonable steps shall be taken to insure the accuracy of each benefit calculation under the Plan.  However, if there is an overpayment of a benefit to a Participant or Beneficiary for any reason, it shall be the responsibility of the Participant or Beneficiary to repay the overpayment to the Trust Fund after notification.  An overpayment may be corrected by a direct repayment by the Participant or the Beneficiary to the Trust Fund or by a reduction of future benefit payments from the Plan until the overpayment is repaid in full.

**Section 6.02.  Early Retirement Benefit.**  The Early Retirement Benefit shall be a monthly benefit based upon the Participant's Service and Final Average Monthly Salary as of his Early Retirement Date computed in accordance with the formula set forth in Section 6.01, with no reduction for early commencement.

The Early Retirement Benefit shall commence on the Participant's Early Retirement Date and shall be payable monthly to him during his lifetime, with a final payment on the first day of the month in which he dies, or according to the terms of the option elected under Section 6.04.

**Section 6.03.  Late Retirement Benefit.**  The Late Retirement Benefit shall be the amount of the Participant's benefit earned in accordance with the formula set forth in Section 6.01 with credit given for service subsequent to his Normal Retirement Date, provided that the maximums as to Credited Service in Section 6.01 above shall not be exceeded in computing the Late Retirement Benefit.

15

CONFIDENTIAL

DEF1 00285

If the Participant retires subsequent to his Normal Retirement Date, the Late Retirement Benefit shall commence on the Participant's Late Retirement Date and shall be payable monthly to him during his lifetime, with a final payment on the first day of the month in which he dies, or according to the terms of the option elected under Section 6.04.

**Section 6.04. Options.** In lieu of the form of benefit payment specified in Sections 6.01, 6.02, and 6.03 above, the Participant may elect upon written notice to the Merit Board at any time prior to the commencement of his pension benefit to receive the Actuarial Equivalent of the respective benefit under one of the following options, payments to commence under these options at the same time as provided in the respective Sections:

(a)     A monthly benefit payable during the Participant's lifetime, and in the event of his death within a period of ten (10) or twenty (20) years after his retirement (the Participant to select the applicable period when he elects this option), the same monthly benefit shall be payable for the remainder of the selected period to the Beneficiary or Beneficiaries designated by him. A Participant can elect a period other than ten (10) or twenty (20) years, but such period shall in no event exceed twenty (20) years. The Beneficiary or Beneficiaries may elect to have the Commuted Value of the unpaid installments distributed in a lump sum in final satisfaction of the benefit as provided herein.

(b)     A monthly pension during the Participant's lifetime in an adjusted level monthly amount with provisions for continuing level monthly payments of a specified percentage equal to fifty percent (50%), sixty-six and two-thirds percent (66-2/3%) or one hundred percent (100%), as selected by the Participant, of such adjusted monthly amount for the lifetime of the Participant's spouse.

The percentage for any survivor annuity and the number of any guaranteed payments selected by the Participant under any Optional Form of Payment shall be limited at the date that benefits commence so that all the rules set forth in Section 6.06 regarding minimum required distribution and incidental death benefits are satisfied.

(c)     A lump sum cash settlement, provided that the Participant has twenty (20) years of Credited Service and completes the employee benefit counseling designated by the Pension Committee and is approved by the Employer and the Merit Board.

**Section 6.05. Limitations on Benefits.**

(a)     All benefits payable under this Plan shall be limited as required by Section 415 of the Internal Revenue Code; Section 415 and the applicable Treasury regulations under Section 415 are herein incorporated by reference and shall supersede any inconsistent provisions in the Plan. Benefit increases resulting from any increase in the limitations of Section 415(b) of the Internal Revenue Code shall be provided to all current and former Participants. The "Limitation Year" referred to in Section 415 of the Internal Revenue Code is the calendar year for this Plan.

(b)     The aggregate annual benefit to which a Participant is entitled under all qualified defined benefit pension plans maintained by the Employer, payable as a straight life annuity for

16

CONFIDENTIAL

the Participant's life, or as an Equivalent Annual Benefit for a benefit payable in any other form, except to the extent otherwise specifically provided herein, shall not exceed the Defined Benefit Dollar Limitation, adjusted as required under subsection (c). For purposes of determining an Equivalent Annual Benefit, the survivor annuity portion of a benefit that is payable as a qualified joint and survivor annuity within the meaning of Section 417(b) of the Internal Revenue Code shall not be taken into account. The definitions of Defined Benefit Dollar Limitation and Equivalent Annual Benefit are as follows:

(1)     Defined Benefit Dollar Limitation. The "Defined Benefit Dollar Limitation" is one hundred sixty thousand dollars ($160,000), as adjusted, effective January 1 of each year under Section 415(d) of the Internal Revenue Code in such manner as the Secretary of the Treasury shall prescribe, and payable in the form of a straight life annuity. The Defined Benefit Dollar Limitation shall be determined as of the date benefits commence, and no increase in benefits that have commenced shall be made as a result of cost-of-living increases in the dollar limitation which become effective after the date of commencement, unless the Plan is specifically amended to take such a subsequent increase into account. A limitation as adjusted under Section 415(d) of the Internal Revenue Code will apply to the calendar year for which the adjustment applies, adjusted for years of participation less than ten (10).

(2)     Equivalent Annual Benefit. For a form of payment other than a lump sum, the "Equivalent Annual Benefit" shall be the greater of (A) the equivalent annual amount of the straight life annuity payable to the Participant under the Plan computed using the interest rate and mortality table or tabular factor specified in the Plan for purposes of determining an Actuarially Equivalent benefit payable in the particular form of benefit or (B) the equivalent annual amount of the straight life annuity that has the same actuarial present value as the particular form of benefit, computed using a five percent (5%) interest rate assumption and the mortality table described in regulations under Internal Revenue Code Section 415 (which currently is the mortality table described in Treasury Regulation Section 1.417(e)-1(d)(2)).

If the Plan offers a lump sum option, then beginning January 1, 2006, the Equivalent Annual Benefit for a lump sum distribution shall be the greatest of the following: (A) the annual amount of the straight life annuity commencing at the annuity starting date that has the same actuarial present value as the particular form of benefit payable computed using the interest rate and mortality table specified by Section 417(e) of the Internal Revenue Code, (B) the annual amount of the straight life annuity commencing at the annuity starting date that has the same actuarial present value as the particular form of benefit payable computed using a five and one-half percent (5-1/2%) interest rate and the mortality table described in regulations under Internal Revenue Code Section 415 (which currently is the mortality table described in Treasury Regulation Section 1.417(e)-1(d)(2)), or (C) the annual amount of the straight life annuity commencing at the annuity starting date that has the same actuarial present value as the particular form of benefit payable using the applicable interest rate and mortality table under Section 415 of the Internal Revenue Code divided by one and five-hundredths

17

DEF1 00287

(1.05) (which are currently the applicable interest rate and mortality table specified in Treasury Regulation Section 1.417(e)-1(d)). For lump sum distributions which have annuity starting dates that occur in 2004 or 2005, except as provided in Section 101(d)(3) of the Pension Funding Equity Act of 2004, the Equivalent Annual Benefit is the greater of (A) the annual amount of the straight life annuity that has the same actuarial present value as the particular form of benefit payable, computed using the interest rate and mortality table or tabular factor specified in the Plan for Actuarially Equivalent benefits or (B) the equivalent annual amount of the straight life annuity that has the same actuarial present value as the particular form of benefit payable, computed using a five and one-half percent (5-1/2%) interest rate assumption and the mortality table specified in section 417(e) of the Internal Revenue Code.

(c)     Adjustment to the Defined Benefit Dollar Limitation shall be as follows, except in the case of disability retirement benefits:

If the Participant has fewer than ten (10) years of participation in the Plan, the Defined Benefit Dollar Limitation shall be multiplied by a fraction, the numerator of which is the number of years (or part thereof) of participation in the Plan and the denominator of which is ten (10). The portion of a year of participation is determined using the same method that is used to determine a fractional year of Credited Service.

Note: Since there is no late retirement factor, there is no increase factor applied to the Defined Benefit Dollar Limitation at age 65.

(d)     Benefits for Participants whose benefits commenced prior to January 1, 2000, shall be limited to the extent necessary to comply with the combination of plans limit under Section 4.15(e) of the Internal Revenue Code.

(e)     Notwithstanding the foregoing, effective January 1, 2009, the mortality table for adjusting any benefit or limitation under Internal Revenue Code Section 415(b)(2)(B)(C) or (D) shall be the mortality table prescribed by the Secretary of the Treasury pursuant to Section 417(e)(3) of the Internal Revenue Code modified as appropriate by the Secretary of the Treasury based on the mortality table specified for the Limitation Year by the Secretary and determined under subparagraph (A) of Section 430(h)(3) of the Internal Revenue Code (without regard to subparagraph (C) or (D) of such Section), Revenue Ruling 2007-67 and any other guidance provided by the Internal Revenue Service.

(f)     For Limitation Years beginning after December 31, 2001, the Participant's mandatory contributions and any other annual additions on behalf of a Participant under any qualified defined contribution plan maintained by the Employer for any Limitation Year shall not exceed the lesser of (1) forty thousand dollars ($40,000) or (2) one hundred percent (100%) of his Compensation from the Employer for such Limitation Year. The forty thousand dollar ($40,000) limitation shall be automatically adjusted annually to take into account increases in any permissible cost-of-living increases in such limitation, pursuant to Section 415(d) of the Internal Revenue Code.

18

CONFIDENTIAL                                                     **DEF1 00288**

For purposes of this subsection "Compensation" shall mean the total wages, salaries and other amounts actually received by the Participant, as reportable for federal income tax purposes, plus the following salary deferral amounts:

      (1)     all elective contributions made under an Internal Revenue Code Section 401(k) plan, an Internal Revenue Code Section 125 cafeteria plan, a simplified employee pension plan, or an Internal Revenue Code Section 403(b) tax deferred annuity;

      (2)     all compensation deferred under an eligible deferred compensation plan as defined in Internal Revenue Code Section 457;

      (3)     effective January 1, 2001, any amounts not included in taxable income as a qualified transportation fringe benefit by reason of Section 132(f) of the Internal Revenue Code.

"Compensation" shall be subject to the federal limit on Salary described in Section 2.01.

**Section 6.06.  Age 70-1/2 and Other Distribution Rules.**  Distributions shall be made in accordance with Section 401(a)(9) of the Internal Revenue Code and Treasury Regulations 1.401(a)(9)-2 through 1.401(a)(9)-9, which are herein incorporated by reference.  The incidental death benefit requirement of Section 401(a)(9)(G) is reflect in Section 6.06(c).  The requirements of this Section 6.06 will take precedence over any inconsistent provisions of the Plan.

      (a)     Time and Manner of Distribution.  Any form of payment must be designed at date of commencement so that it will comply with the rules of this Section when the Participant attains the age of seventy and one-half (70-1/2) years and thereafter.  However, nothing in the Treasury regulations or the other provisions of this Section shall be interpreted to allow a Participant to change a form of payment once it has commenced or to provide a form of payment not otherwise available under the Plan (unless required to comply with Section 401(a)(9) of the Internal Revenue Code and the regulations thereunder).  The applicable rules are as follows:

          (1)     Distribution to a Living Participant:

              (A)     Distribution to a living Participant must begin not later than the required beginning date.  For purposes of this Section, "required beginning date" shall mean the later of April 1 of the calendar year following the calendar year in which the Participant attains age seventy and one-half (70-1/2) or April 1 of the calendar year following the calendar year in which the Participant retires.

              (B)     If a lump sum is available under the Plan and if the Participant elects a lump sum distribution of his entire vested benefit, then the portion of the single sum distribution that represents the required minimum distribution is not eligible for rollover.  If the lump sum distribution is being made in the

19

DEF1 00289

calendar year containing the required beginning date, and the required minimum distribution for the Participant's first distribution calendar year has not been distributed, then the portion of the single sum distribution that represents the required minimum distribution for the Participant's first and second distribution calendar years is not eligible for rollover.

(2)    Death of Participant Before Distributions Begin. If the Participant dies before distributions begin, the Participant's entire interest shall be distributed, or begin to be distributed, no later than as follows:

(A)    If the Participant's surviving spouse is the Participant's sole designated Beneficiary, then distributions to the surviving spouse shall begin by December 31 of the calendar year immediately following the calendar year in which the Participant died, or by December 31 of the calendar year in which the Participant would have attained age seventy and one-half (70-1/2), if later. However, if the Plan provides a lump sum option to Beneficiaries, then payment of the death benefit shall comply with this Section if the benefit is paid in full not later than December 31 of the calendar year containing the fifth (5th) anniversary of the death of the Participant.

(B)    If the Participant's surviving spouse is not the Participant's sole designated Beneficiary, then distributions to the designated Beneficiary shall begin by December 31 of the calendar year immediately following the calendar year in which the Participant died. However, if the Plan provides a lump sum option to Beneficiaries, then payment of the death benefit shall comply with this Section if the benefit is paid in full not later than December 31 of the calendar year containing the fifth (5th) anniversary of the death of the Participant.

(C)    If there is no designated Beneficiary as of September 30 of the year following the year of the Participant's death, the Participant's entire interest shall be distributed by December 31 of the calendar year containing the fifth (5th) anniversary of the Participant's death.

(D)    If the Participant's surviving spouse is the Participant's sole designated Beneficiary and the surviving spouse dies after the Participant but before distributions to the surviving spouse begin, this subsection (a)(2), other than subparagraph (a)(2)(A), will apply as if the surviving spouse were the Participant.

(E)    For purposes of this Section, if death benefits are to be paid to a Beneficiary who is a child until the child reaches the

20

CONFIDENTIAL

age of majority and then any remaining death benefits are to be paid to the Participant's surviving spouse, the amount of payments to the child shall be treated as if the payments were being made to the surviving spouse.

For purposes of this subsection (a)(2), distributions are considered to begin on the Participant's required beginning date (or, if Section 6.06 (a)(2)(D) applies, the date distributions are required to begin to the surviving spouse under Section 6.06 (a)(1)). If annuity payments irrevocably commence to the Participant before the Participant's required beginning date (or to the Participant's surviving spouse before the date distributions are required to begin to the surviving spouse under Section 6.06 (a)(2)(A)), the date distributions are considered to begin is the date distributions actually commence.

(b)    Determination of Amount to be Distributed Each Year. If the Participant's interest is paid in the form of annuity distributions under the Plan, payments under the annuity shall satisfy the following requirements:

(1)    the annuity distributions shall be paid in periodic payments made at intervals not longer than one year;

(2)    the distribution period shall be over a life (or lives) or over a period certain not longer than the period described in the table under Section 1.401(a)(9) of the Treasury Regulations;

(3)    once payments have begun over a period certain, the period certain shall not be changed even if the period certain is shorter than the maximum permitted.

(c)    Incidental Death Benefit Rule for Distributions that Commence During the Participant's Lifetime. If the Participant's interest is being distributed in the form of a joint and survivor annuity for the joint lives of the Participant and a nonspouse Beneficiary, annuity payments to be made on or after the Participant's required beginning date to the designated Beneficiary after the Participant's death must not at any time exceed the applicable percentage of the annuity payment for such period that would have been payable to the Participant using the table set forth in Q&A-2 of Section 1.401(a)(9)-6 of the Treasury Regulations.

**Section 6.07. Cost of Living Adjustments to Retirees.** A Participant who retired as of an Early Retirement Date, Normal Retirement Date or Late Retirement Date, who has attained age fifty-five (55) as of July 1 of the Calendar Year in which monthly benefits are increased (hereinafter the payment Calendar Year), and who is in pay status as of the last day of the preceding Calendar Year shall be eligible for a cost of living adjustment, as provided in this Section. Such cost of living adjustment shall not apply to any severance or disability benefits payable under Article VII or to any death benefits payable under Article VIII. However, any death benefit payable under Article VIII after retirement shall be based on the monthly benefit payable to the Participant for the month immediately preceding his date of death.

21

CONFIDENTIAL

The cost of living adjustment for a payment Calendar Year shall be a percentage increase in the eligible retiree's monthly benefit paid during the last month of the preceding Calendar Year. The percentage increase shall equal the percentage increase, if any, in the average of the Consumer Price Index (United States city average) prepared by the United States Department of Labor for the first three (3) months of the payment Calendar Year over the average for the same three (3) months of the preceding Calendar Year. However, the annual percentage increase shall not exceed three percent (3%). No cost of living adjustment shall be made after the increases made pursuant to this Section total one hundred percent (100%) of the Participant's monthly retirement benefit payable prior to the application of this Section.

The cost of living adjustment for a payment Calendar Year shall be effective in July of the payment Calendar Year through June of the next Calendar Year.

### Section 6.08.  Direct Rollovers.

(a)     Notwithstanding any provision of the Plan to the contrary that would otherwise limit a Distributee's election under this Section, a Distributee may elect, at the time and in the manner prescribed by the Committee, to have any portion of an Eligible Rollover Distribution paid directly to an Eligible Retirement Plan specified by the Distributee in a Direct Rollover.

(b)     Definitions. The following terms shall have the following meanings:

(1)     An "Eligible Rollover Distribution" means any distribution of all or any portion of the balance to the credit of the Distributee, except that an Eligible Rollover Distribution does not include:  any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the Distributee and the Distributee's Designated Beneficiary, or for a specified period of ten (10) years or more; any distribution to the extent such distribution is required under Section 401(a)(9) of the Internal Revenue Code; and the portion of any distribution that is not includible in gross income (determined without regard to the exclusion for net unrealized appreciation with respect to Employer securities).  A portion of a distribution shall not fail to be an Eligible Rollover Distribution merely because the portion consists of after-tax Employee contributions which are not includible in gross income.  However, such portion may be paid only to an individual retirement account or annuity described in Internal Revenue Code Sections 408(a), 408(b), or 408A (as permitted by the Internal Revenue Code), or to a qualified plan described in Section 401(a),  403(a), or 403(b) of the Internal Revenue Code that agrees to separately account for amounts so transferred, including separately accounting for the portion of such distribution which is includible in gross income and the portion of such distribution which is not so includible.

(2)     An "Eligible Retirement Plan" means (i) a traditional individual retirement account described in Sections 408(a), (ii) a Roth IRA described in Section 408A of the Internal Revenue Code, (iii) an individual retirement annuity

22

DEF1 00292

described in Section 408(b) of the Internal Revenue Code, (iv) an annuity plan described in Section 403(a) of the Internal Revenue Code, (v) a qualified trust described in Section 401(a) of the Internal Revenue Code, (vi) a plan described in Section 403(b) of the Internal Revenue Code, and (vii) an eligible plan under Section 457(b) of the Internal Revenue Code which is maintained by a state, political subdivision of a state, or any agency or instrumentality of a state or political subdivision of a state and which agrees to separately account for amounts transferred into such plan from this Plan. All definitions of "Eligible Retirement Plan" shall apply in the case of a distribution to a spouse, surviving spouse, or to a former spouse who is the Alternate Payee under a qualified domestic relations order, as defined in Section 414(p) of the Internal Revenue Code. An Eligible Retirement Plan is limited to items (i), (ii), and (iii) of this subsection (b)(2) for a Designated Beneficiary who is not the Participant's spouse.

(3)     A "Distributee" includes: (i) an Employee, (ii) former Employee, (iii) the Employee's or former Employee's surviving spouse, (iv) the Employee's or former Employee's Alternate Payee under a Qualified Domestic Relations Order, and (v) the Employee's or former Employee's Designated Beneficiary. The Direct Rollover of a Designated Beneficiary who is not the Participant's spouse must be made to an inherited IRA pursuant to the provisions of Internal Revenue Code Section 408(d)(3)(C).

The provisions of Section 401(a)(9) of the Internal Revenue Code and the regulations thereunder shall apply in determining the timing of distributions from the non-spouse Beneficiary's Eligible Retirement Plan. This means that the entire amount must be distributed from the Eligible Retirement Plan within five (5) years of the date of the Participant's death if the direct rollover is made to the Eligible Retirement Plan after the last day of the Plan Year following the Plan Year during which the Participant died. Distribution from the non-spouse Beneficiary's Eligible Retirement Plan may extend beyond the five (5) year period following the Participant's date of death, only if the direct rollover is made no later than the last day of the Plan Year following the Plan Year in which the Participant's death occurs and the minimum distributions begin from the Eligible Retirement Plan under the life expectancy rule.

(4)     A "Direct Rollover" is a payment by the Plan to the Eligible Retirement Plan specified by the Distributee.

**Section 6.09. Notification of Address.** Each person entitled to a benefit under the Plan shall file with the Committee, from time to time, in writing, his post office address and each change of post office address, and neither the Committee nor the Trustee shall be obliged to search for or ascertain the location of any such person, except as otherwise required by law.

23

CONFIDENTIAL

DEF1 00293

## ARTICLE VII

## SEVERANCE AND DISABILITY BENEFITS

### Section 7.01. Severance Benefits.

(a)   Upon attainment of Normal Retirement Age, a Participant shall be one hundred percent (100%) vested even if he has not severed employment. In the event of severance of a Participant's employment with the Employer for reasons other than death, retirement or disability, and after completion of at least five (5) years of Credited Service, he shall be entitled to receive either (1) or (2) below, at his option:

(1)   A lump sum payment which shall consist of the Net Amount of Contributions as of the date of severance plus the amount transferred by the Participant (adjusted for interest at a rate that ensures the Plan remains actuarially cost neutral) pursuant to Section 3.05 for the purchase of Credited Service. Such payment shall be made within ninety (90) days after his severance date (or within ninety (90) days after the date his application is received by the Merit Board, if later.

(2)   A **monthly** benefit with payments commencing at age fifty (50) equal to the amount of benefit earned by the Participant as of his date of severance times the percentage set forth in the following table:

| Credited Service At Severance | Vested Percentage Of Earned Benefit |
|---|---|
| Less than 5 | 0% |
| 5 but less than 6 | 25% |
| 6 but less than 7 | 30% |
| 7 but less than 8 | 35% |
| 8 but less than 9 | 40% |
| 9 but less than 10 | 45% |
| 10 but less than 11 | 50% |
| 11 but less than 12 | 55% |
| 12 but less than 13 | 60% |
| 13 but less than 14 | 65% |
| 14 but less than 15 | 70% |
| 15 but less than 16 | 75% |
| 16 but less than 17 | 80% |
| 17 but less than 18 | 85% |
| 18 but less than 19 | 90% |
| 19 but less than 20 | 95% |
| 20 or more | 100% |

The severed Participant shall elect the benefit under this subsection (a)(2) within thirty (30) days after receiving his severance benefit application from the Merit Board. A former Participant who elects the benefit under this subsection (a)(2)

24

CONFIDENTIAL

must notify the Merit Board of his then current address when such individual attains his commencement date so that benefit payments may commence thereafter. Failure to so notify the Merit Board within five (5) years following the commencement date shall cause the benefit described herein to be forfeited.

A Participant who elects his benefit to be paid as provided in Section 7.01(a)(2) shall not be eligible to elect a lump sum settlement as described in Section 6.04 unless he is credited with at least twenty (20) years of Credited Service at his date of severance.

Notwithstanding the foregoing provisions of this subsection (a), a Participant who severs his employment with the Employer and who was credited with twenty (20) years of Credited Service shall be considered to have retired on an Early Retirement Date and shall be entitled to the retirement benefit described in Section 6.02.

Notwithstanding the foregoing, the Severance Benefit payable to a Disabled Participant who recovers from his Disability and has completed at least five (5) years of Credited Service shall be the benefit described in subsection (a)(2) above as provided in Section 7.02(b).

(b)    A Participant whose employment with the Employer severs for reasons other than death, retirement or disability and who, as of his date of severance, has not completed five (5) years of Credited Service, shall be entitled to the payment as set forth in subsection (a)(1) above.

(c)    At any time prior to the application of Section 11.02,the Merit Board shall have the power to cause the Participant to forfeit the benefit for which he would otherwise be eligible, except a return of his Net Amount of Contributions plus the amount transferred by the Participant (adjusted for interest at a rate that ensures the Plan remains actuarially cost neutral) pursuant to Section 3.05 for the purchase of Credited Service for the following reasons:

(1)    Said Participant's dishonesty or misconduct which relates to his employment with the Employer, or

(2)    Said Participant's admittance to or conviction of a felony and said Participant's felony occurred while the Participant was employed by the Department.

The Merit Board shall apply this power in a nondiscriminatory and uniform manner to all Participants in similar circumstances.

### Section 7.02. Disability Retirement Benefits.

(a)    If a Participant's employment with the Employer severs as of a Disability Retirement Date and the Participant has not started to receive any other benefit under this Plan, such Participant shall be entitled to a Disability Retirement Benefit commencing as of his Disability Retirement Date. The Disability Retirement Benefit shall be a monthly benefit based on a formula adopted by the Merit Board and shall not exceed the Participant's projected Normal Retirement Benefit determined as of the last date such Participant is included on the payroll of the Employer in accordance with the provisions of Section 6.01 based on his Final Average Monthly Salary as of such date and Credited Service projected to his Normal Retirement Date.

25

Such pension shall be payable monthly but only so long as or until the aggregate amount of monthly payments equals the Participant's Net Amount of Contributions as of severance plus the amount transferred by the Participant (adjusted for interest at a rate that ensures the Plan remains actuarially cost neutral) pursuant to Section 3.05 for the purchase of Credited Service. As of the date such aggregate amount of monthly payments equals the Participant's Net Amount of Contributions and transferred amount, the benefits shall cease. Notwithstanding the foregoing, a Participant who is eligible for the disability benefit hereunder may elect to receive such benefit as a lump sum payment of his Net Amount of Contributions plus the amount transferred by the Participant (adjusted for interest at a rate that ensures the Plan remains actuarially cost neutral) pursuant to Section 3.05 for the purchase of Credited Service as of his date of severance from employment in lieu of the monthly benefit provided in this subsection (a).

Disabled Participants shall be allowed to have minimal income as a result of employment outside the Department without penalty. If the Participant's earned income exceeds the minimum set by the Merit Board, the amount of the Disability Retirement Benefit under this Plan shall be reduced, pursuant to guidelines adopted by the Board.

(b)     In the event a Disabled Participant who is eligible for the benefit described in this Section 7.02 later recovers from his Disability, his Disability Retirement Benefit shall cease as of his date of recovery. The Participant shall be entitled to his Severance Benefit, if any, pursuant to the provisions of Section 7.01(a)(1) if he has not received his Net Amount of Contributions plus the transferred amount as provided in the first paragraph in Section 7.02(a) above and if he has completed less than five (5) years of Credited Service. The Participant shall be entitled to his Severance Benefit, if any, pursuant to the provisions of Section 7.01(a)(2) if he has completed five (5) or more years of Credited Service, with reduction for disability payments received that were equal to the amount transferred by the Participant (adjusted for interest pursuant to Section 3.05 for the purchase of Credited Service. The Severance Benefit shall be determined as though he had severed his employment with the Employer as of the last day he is included on the payroll of the Employer. The payments of the Severance Benefit for a Participant with at least five (5) years of Credited Service shall be deferred as provided in Section 7.01(a)(2). However, notwithstanding the provisions of Section 7.01(a)(2), once the Severance Benefit payable to a Participant who has recovered from Disability commences, it shall only be payable in a monthly benefit during his lifetime with a final payment on the last day of the month in which he dies, as described in Section 6.01. The options available under Section 6.04 shall not be available to a Participant who has recovered from Disability. The Severance Benefit shall be payable regardless of whether the Participant returns to the active employment of the Employer and shall not be reduced for Disability Retirement Benefit payments that he has received except for the amount transferred by the Participant (adjusted for interest at a rate that ensures the Plan remains actuarially cost neutral) pursuant to Section 3.05 for the purchase of Credited Service.

(c)     The Disability Retirement Benefit payable under this Section 7.02 is in addition to the disability benefit provided to any Participant under the Lake County Police Benefit Plan.

26

DEF1 00296

## ARTICLE VIII

## DEATH BENEFITS

**Section 8.01. Death Benefits After Retirement.** If a Participant dies after retirement benefits have commenced, the death benefit shall be in accordance with the provisions of the form of benefit paid under Article VI at the time of retirement. If at the time of the death of a Beneficiary receiving a benefit in accordance with Section 6.04 the aggregate payments to the Pensioner and the Beneficiary do not equal or exceed (a) the Participant's Net Amount of Contributions plus (b) the amount transferred by the Participant (adjusted for interest at a rate that ensures the Plan remains actuarially cost neutral) pursuant to Section 3.05 for the purchase of Credited Service, then the difference between such aggregate and (a) the Net Amount of Contributions plus (b) the transfer amount for the purchase of Credited Service (adjusted for interest at a rate that ensures the Plan remains actuarially cost neutral) shall be paid to such Beneficiary's estate in a lump sum. Any lump sum provided under this Section shall be paid within one year after the date of the Participant's death.

**Section 8.02. Death Benefits Before Retirement.** In the event a Participant dies prior to the commencement of any benefit from this Plan, a death benefit shall be payable in accordance with subsection (a) and (b) as follows:

(a)     If an unmarried Participant dies while employed by the Employer or after severance from employment for any reason, but prior to the commencement of any benefit from this Plan, his designated Beneficiary shall be entitled to receive a death benefit which shall be a lump sum equal to his Net Amount of Contributions at time of death plus the amount transferred by the Participant pursuant to Section 3.05 for the purchase of Credited Service (adjusted for interest at a rate that ensures the Plan remains actuarially cost neutral). If a married Participant dies, his designated Beneficiary shall be entitled to receive a death benefit which shall be a lump sum equal to his Net Amount of Contributions at time of death. If the married Participant does **not** have a vested interest in the Plan, his Beneficiary shall also be entitled to the amount transferred by the Participant pursuant to Section 3.05 for the purchase of Credited Service (adjusted for interest at a rate that ensures the Plan remains actuarially cost neutral).

(b)     In addition to the amount payable under subsection (a), if a married Participant who has a vested benefit in the Plan dies while employed by the Employer or after severance from employment, for any reason, but prior to the commencement of any benefit from this Plan, his surviving spouse shall be entitled to elect (i) a lump sum benefit described in this subsection (b) or (ii) a monthly survivor benefit payable in accordance with this subsection (b) for the remaining lifetime of such surviving spouse.

**Monthly Survivor Benefit**

If the Participant had satisfied the requirements for Early Retirement at the date of his death, then such monthly survivor benefit shall commence as of the first day of the month following his date of death, unless the spouse elects a later commencement date. However, such later commencement date may not be later than the Participant's Normal Retirement Date. The

27

CONFIDENTIAL

amount of the death benefit shall be equal to the survivor annuity that would have been payable if the Participant had severed employment and immediately prior to his date of death had commenced receipt of his retirement benefits in the form of an Actuarially Equivalent one hundred percent (100%) joint and survivor annuity with adjusted level monthly payments to the Participant during his lifetime and continued monthly payments in the same amount for the lifetime of his surviving spouse.

If the Participant had not satisfied the requirements for Early Retirement under the Plan at the date of his death, the payment of benefits to the surviving spouse shall commence on the date specified by the spouse, provided the date is not earlier than the Participant's Early Retirement Date and is not later than the Participant's Normal Retirement Date. The amount of benefit is calculated assuming the Participant had (i) severed employment with the Employer on the earlier of the Participant's actual severance from employment or the date of the Participant's death, (ii) survived to the date of commencement of the death benefit elected by the surviving spouse, (iii) commenced receipt of his deferred vested Severance Benefit as of his Early Retirement Age or his Normal Retirement Age, depending on the commencement date elected by his surviving spouse, in the form of an Actuarial Equivalent one hundred percent (100%) joint and survivor annuity with adjusted level monthly payments to the Participant during his lifetime and continued monthly payments in the same amount for the lifetime of his surviving spouse, and (iv) died on the day after the commencement date elected by his surviving spouse.

**Lump Sum Benefit**

For purposes of this subsection, "Lump Sum Value" is the Actuarial Equivalent (based on forms of payment other than lump sums for Beneficiaries under Section 2.01(a)(1)) of the Participant's "monthly survivor benefit" as described in the preceding paragraphs of this Section 8.02(b). The death benefit provided under this subsection shall be paid within one year after the date of the Participant's death.

(c)     In addition to the amount payable under subsection (a), if an unmarried Participant who has a vested benefit in the Plan dies while employed by the Employer or after severance of employment, for any reason, but prior to the commencement of any benefit from this Plan, a death benefit shall be payable as provided in this subsection (c). The Lump Sum Value of the Participant's benefit shall be paid to his Beneficiary. For purposes of this subsection, the following rules apply:

- If the Participant has not yet satisfied the requirements for Early Retirement or Normal Retirement, "Lump Sum Value" means eighty percent (80%) of the Actuarial Equivalent (based on forms of payment other than lump sums for Participants under Section 2.01(a)(1)) of the Participant's vested monthly benefit payable under Section 6.01 at Normal Retirement Date.

- If the Participant has satisfied the requirements for Early Retirement or Normal Retirement, "Lump Sum Value" means eighty percent (80%) of the Actuarial Equivalent (based on forms of payment other than lump sums for Participants under Section 2.01(a)(1)) of the Participant's

28

DEF1 00298

monthly benefit payable under Section 6.01, 6.02 or 6.03 that would have been paid if the Participant had retired on his date of death.

The death benefit provided under this subsection shall be paid within one year after the date of the Participant's death.

CONFIDENTIAL

DEF1 00299

## ARTICLE IX

### ADMINISTRATION

**Section 9.01. Pension Committee.** The Pension Committee was created with the approval of the Employer, the Merit Board and the Participants. The Employer, the Merit Board and the Participants are all represented on the Pension Committee. The purpose of the Pension Committee is to have one well informed and experienced committee that represents all of the above parties, and makes all of the decisions necessary to administer and oversee the benefits and investments of the Lake County Police Plans (Retirement Plan, Benefit Plan, Trust Agreement for the Retirement Plan and Supplementary Trust Agreement for the Benefit Plan).

A Pension Committee will be formed and will operate as a part of the Plan as set forth in the following paragraphs.

Membership of Committee and Terms Of Office

The Pension Committee will consist of the following members:

- The Sheriff of Lake County (until his successor as Sheriff is sworn in);

- A Member of the Merit Board;

- Four members of the Sheriff's Department;

    1. Sheriff's Appointment (four (4) year term);

    2. Merit Board's Appointment (two (2) year term)

    3. Police Association Local No. 72 AFL-CIO (two (2) year term);

    4. Fraternal Order of Police Anton Lodge No. 125 (two (2) year term); and

- Seventh member chosen by secret ballot (three (3) year term).

In no event shall an individual Pension Committee member be allowed to hold more than one (1) membership concurrently. There is no requirement that each and every Pension Committee membership position be filled at all times.

The members of the Pension Committee will be chosen or selected as follows: The Sheriff of Lake County is automatically a member. One of the four (4) members from the Lake County Sheriff's Department will be selected by the Sheriff. A second (2nd) member from the Lake County Sheriff's Department will be selected by the Merit Board. The member from the Merit Board will be selected by the Merit Board in any manner deemed appropriate by it. A third (3rd) member from the Lake County Sheriff's Department will be selected by the members of the Lake County Police Association Local No. 72 AFL-CIO, and the fourth (4th) member from the Lake County Sheriff's Department will be selected by the Fraternal Order of Police Anton Lodge No.

30

CONFIDENTIAL

125. The seventh (7th) member will be chosen by secret ballot by a vote of the four (4) members of the Lake County Sheriff's Department. The position requires knowledge of or experience in pensions and/or investments, including previous experience as a member of the Pension Committee. In the even the four (4) members of the Department become deadlocked (in selecting the seventh (7th) member) the decision will be tabled until the next meeting. If a decision remains deadlocked for a second (2nd) meeting, selection of the seventh (7th) member will be decided by a formal vote of the active Participants. A formal vote is defined as:

An election to be held at a neutral location or the same location as a contested FOP or Union election would be (or has been) held. An official voting machine is to be used for the election.

If any member of the Pension Committee should resign or for any other reason fail to serve his full term on the Committee, said member shall be immediately replaced by an individual chosen from the same group and chosen in the same manner as the member being replaced and shall serve the remainder of the unfinished term. There is no limitation on the number of terms an individual eligible for membership may serve.

### Procedures

All members of the Pension Committee will have one vote and a majority vote is necessary. In case of a tie, the member from the Merit Board will have one extra vote to break the tie.

Meetings of the Pension Committee are to be held at times designated by its chairman. It is the intent of this Committee that meetings should be held no less frequently than quarterly. In the event that the Chairman has not scheduled a meeting within a six (6) month period, meeting dates shall be set by a quorum of the remaining committee members.

### Duties, Powers and Responsibilities

The Pension Committee shall have the power and duty to do all things necessary or convenient to effect the intent and purposes of the Plan, not inconsistent with any of the specific provisions hereof, whether or not such powers and duties are specifically set forth herein and, not in limitation but in amplification of the foregoing, shall have power to:

(a)     adopt rules governing its action and appoint officers;

(b)     provide rules and regulations for the administration of the Plan, and from time to time, to amend or supplement such rules and regulations, including but not limited to actuarial procedures and tables;

(c)     construe the Plan and Trust Agreement in its discretion regarding any issues arising under the Plan, including the eligibility for and amount of any benefits due to a Participant or Beneficiary; the Committee's construction thereof shall be final and conclusive if such construction is reasonable and made in good faith, and benefits under this Plan will be paid only if the Committee decides in its discretion that the applicant is entitled to them.

31

CONFIDENTIAL                                                    DEF1 00301

(d)     correct any defect or supply any omission or reconcile any inconsistency in the Plan in such manner and to such extent as it shall deem expedient to carry the same into effect, and the Committee shall be the sole and final judge of such expediency;

(e)     determine all questions that shall arise under the Plan, including questions submitted by the Trustee, in all matters necessary for the Pension Committee to discharge its powers and duties;

(f)     employ such counsel, consultants, auditors, actuaries and other specialists, who may also be employed by the Employer, and such clerical and other assistants as in the Pension Committee's judgment may be reasonable or necessary for the proper administration of the Plan;

(g)     obtain information, conduct research, and recommend policies and/or changes regarding the Plan; and

(h)     seek information from any source, including but not limited to McCready and Keene, Inc., and such companies are authorized to release information to the Pension Committee.

(i)     seek input and make recommendations and/or decisions when requested to do so by the Merit Board, the Employer, the Trustee or Participants.

**Section 9.02.  Qualified Domestic Relations Orders.**  This Plan, as a governmental plan, is not required to comply with Section 414(p) of the Internal Revenue and may not, under Indiana law except as proved in Section 10.04, assign or transfer a Participant's benefits to another person prior to actual payment.  Therefore, this Plan is not subject to domestic relations orders.  If the Committee receives a domestic relations order, it shall notify the Participant and alternate payee accordingly.

CONFIDENTIAL

DEF1 00302

## ARTICLE X

## FUNDING THE PLAN

**Section 10.01. Employer Contributions.** The Employer intends to contribute to the Plan each year such amounts as may be required to operate the Plan on a sound actuarial basis including the expenses in connection with the operation and administration of the Plan. Contributions shall be made to the Trust Fund either by the Lake County Sheriff's Department through a general appropriation provided to the Department, a line item appropriation directly to the Trust Fund, or both. The minimum annual contribution by the Department must be sufficient, as determined by the pension engineers, to prevent deterioration in the actuarial status of the Trust Fund during the year.

Any forfeitures arising under this Plan must not be applied to increase the benefits that any Participant would otherwise receive under the terms of this Plan.

**Section 10.02. Participant Contributions.**

(a)     Each Participant shall be required to make Participant contributions in the amount and for the period specified below:

(1)     Prior to January 1, 2008, each Participant was required to contribute an amount equal to four percent (4%) of his monthly salary until the Participant attained his sixtieth (60th) birthday unless the Participant was permitted to continue his employment in accordance with Section 5.03, in which event the Participant ceased making contributions on the earlier of (i) the date he completed twenty (20) years of Credited Service or (ii) the date his Credited Service ended under the terms of the Plan. The final deduction shall occur in the pay check immediately following the later of the Participant's sixtieth (60th) birthday or the date he completed twenty (20) years of Credited Service.

(2)     Effective to January 1, 2008 and prior to the first payroll in 2011, each Participant was required to contribute an amount equal to four percent (4%) of his monthly salary until the Participant attained his sixtieth (60th) birthday unless the Participant was permitted to continue his employment in accordance with Section 5.03, in which event the Participant ceased making contributions on the earlier of (i) the date he completed thirty-two (32) years of Credited Service or (ii) the date his Credited Service ended under the terms of the Plan. The final deduction shall occur in the pay check immediately following the later of the Participant's sixtieth (60th) birthday or the date he completed thirty-two (32) years of Credited Service.

(3)     Effective with the first payroll in 2011, and prior to January 1, 2013, each Participant was required to contribute an amount equal to six percent (6%) of his monthly salary until the Participant attained his sixtieth (60th) birthday unless the Participant was permitted to continue his employment in accordance with Section

33

DEF1 00303

5.03, in which event the Participant ceased making contributions on the earlier of (i) the date he completed thirty-two (32) years of Credited Service or (ii) the date his Credited Service ended under the terms of the Plan. The final deduction shall occur in the pay check immediately following the later of the Participant's sixtieth (60th) birthday or the date he completed thirty-two (32) years of Credited Service.

(4)     Effective January 1, 2013, each Participant is required to contribute an amount equal to six percent (6%) of his monthly salary. Any Participant who ceased making contributions because of the attainment of age sixty (60) or completion of thirty-two (32) years of Credited Service prior to January 1, 2013, shall again be required to contribute an amount equal to six percent (6%) of his monthly salary, effective January 1, 2013.

(5)     Money so contributed shall be deducted from each pay check of the Participant and transferred by the Employer to the Trustee to become part of the Trust fund as described herein.

(b)     In the event of a Participant's retirement as of an Early Retirement Date, Normal Retirement Date, or Late Retirement Date, such Participant may elect to receive a lump sum equal to his Net Amount of Contributions plus the amount transferred by the Participant (adjusted for interest at a rate that ensures the Plan remains actuarially cost neutral) pursuant to Section 3.05 for the purchase of Credited Service at any time after his retirement and prior to the commencement of his monthly benefit. Such lump sum payment shall be made within ninety (90) days after the later of his severance from employment or the date his application is received by the Merit Board. In the event a Participant elects such lump sum payment, a Participant's Net Amount of Contributions plus the amount transferred pursuant to Section 3.05 shall be converted into a life annuity on an Actuarially Equivalent basis and his monthly retirement benefit payable under Article VI shall be reduced by the monthly amount of such life annuity. The conversion shall be based on the interest rate described in Section 2.01(a) used to determine Actuarially Equivalent lump sums. Specifically, this means that the Actuarially Equivalent life annuity shall be that annuity which has a lump sum value as of the determination date equal to the Participant's Net Amount of Contributions as of the determination date.

**Section 10.03. Trustee.** The contributions shall be deposited with the Trustee to provide the benefits and to pay the expenses of the administration of the Plan.

### Section 10.04. Nondiversion and Exclusive Benefit.

(a)     Prior to the satisfaction of all liabilities for expenses and benefits under the Plan except as provided in subsection (b), no part of the corpus or of the income of the Trust Fund shall be used for or diverted to any purpose not for the exclusive benefit of Participants, their Beneficiaries, and retired Participants and their Beneficiaries. The right to any interest in the Trust Fund, or any part of the corpus, or income, or assets thereof is limited for any Participant, his Beneficiary, or any other person to the extent expressly provided in the Plan.

34

CONFIDENTIAL

DEF1 00304

(b)      A former Participant, other than a former Sheriff, who is receiving a disability benefit pursuant to Section 7.02 or a Normal Retirement Benefit may authorize the Trustee to pay a portion of his disability benefit or Normal Retirement Benefit to an insurance provider for payment of a premium on a policy of insurance for accident coverage, health coverage, or qualified long-term care coverage (as defined in Section 7702B(b) of the Internal Revenue Code). Such insurance policy may only benefit the Participant, his spouse, or his dependents as defined in Section 152 of the Internal Revenue Code. Payment of premiums under this subsection (b) is limited to insurance programs sponsored by the Employer. The Participant's distribution from this Plan shall be reduced by the amount of the premium, and the premium shall be paid directly to the provider of the accident or health plan or qualified long-term care insurance contract. This subsection (b) shall not apply to any former Participant who holds the office of Sheriff on or after July 1, 2007.

CONFIDENTIAL

DEF1 00305

## ARTICLE XI

## AMENDMENT AND TERMINATION

**Section 11.01.  Amendment.**  The Employer reserves the right to amend this Plan.  The process for amending the Plan requires the recommendation of the Pension Committee and approval of the Employer, Merit Board and the County fiscal body.  A retroactive amendment may not reduce or diminish any benefits to the extent protected by Indiana law.

Whereas, the sole purpose of this Plan shall be for the exclusive benefit of the Participants and their Beneficiaries, the Pension Committee shall propose and communicate amendments (effecting Participant benefits) to the Participants, the Employer and the Merit Board.

**Section 11.02.  Suspension or Termination of the Plan.**  The Employer reserves the right to terminate this Plan at any time by appropriate action.  As of the termination of the Plan for whatever reason or the complete discontinuance of Employer contributions, all rights of the Participants under the Plan shall be nonforfeitable to the extent then funded.

The temporary suspension of Employer contributions to the Plan shall not act as a discontinuance of such contributions during such time as the following two conditions are met: (1) the benefits to be paid or made available under the Plan are not affected at any time by the suspension, and (2)  the unfunded past service cost at any time (including any unfunded prior normal cost and unfunded interest on any unfunded cost) does not exceed the unfunded past service cost as of the date of establishment of the Plan, plus any additional past service or supplemental cost added by amendment.

If any suspension of Employer contributions to the Plan shall not be followed by the resumption thereof, the date of termination shall be deemed, for purposes of determining the rights of the Participants, to be the date when this suspension first became effective.  As of such date of termination, all rights of the Participants under the Plan shall be nonforfeitable to the extent then funded.

Notwithstanding the foregoing provisions of this Section 11.02, in the event that the Employer shall fail to make the minimum contribution determined by the Actuary to prevent deterioration in the actuarial status of the Trust Fund for three (3) consecutive years, the Plan shall terminate and the Trust Fund shall terminate and be liquidated in accordance with the following Section 11.03.

**Section 11.03.  Effect of Termination.**  Upon termination of the Plan, all expenses in connection with the Trust shall be paid, and thereafter the assets of the Trust Fund shall be allocated in the following order of priorities:

(a)     To all pensioners an amount proportionate to but not in excess of that amount sufficient to continue their pension for the remainder of their lives.

36

CONFIDENTIAL

(b)     To all Participants an amount equal to their Net Amount of Contributions as determined on the date of termination of the Plan plus the amount transferred by the Participant (adjusted for interest at a rate that ensures the Plan remains actuarially cost neutral) pursuant to Section 3.05 for the purchase of Credited Service.

(c)     The remaining funds, if any, to be distributed on a prorata basis to all Participants in proportion to the total Net Amount of Contributions for each Participant.

After the Trustee has received a determination letter from the Internal Revenue Service approving the allocations under this Section, the Merit Board shall determine the method in which the amount allocated to each party shall be paid from the Trust Fund.

37

CONFIDENTIAL                                                    **DEF1 00307**

## ARTICLE XII

### LIABILITIES

**Section 12.01. Liabilities.** Payment of benefits hereunder shall be made solely from the Trust Fund. The Sheriff's Department, the Merit Board, the County Council or the Pension Committee shall not be liable for the payment of any benefits to a Participant, his designated Beneficiary, or any other person.

Neither the Sheriff's Department nor any of its employees shall be liable for the payment of any benefit to a Participant or his designated Beneficiary or any other person, for the payment of any contributions to the Plan or Trust, or for any action taken or not taken by the Merit Board or agents appointed by the Merit Board in connection with the administration of this Plan.

CONFIDENTIAL

DEF1 00308

## ARTICLE XIII

## GENERAL PROVISIONS

**Section 13.01.  Limitation of Rights and Obligations.**  Participation in the Plan shall not be construed as an agreement, consideration or inducement of employment or as affecting in any manner or to any extent whatsoever the rights or obligations of the Employer or any Employee to continue or sever the employment relationship at any time.

**Section 13.02.  Restriction Against Claims and Assignments.**  In accordance with the applicable state laws, none of the benefits or rights of any Participant or any Beneficiary hereunder shall be subject to the claim of any creditor of any such person nor subject to attachment or garnishment or any other legal process by any such creditor, nor shall any Participant or Beneficiary have the right to assign, encumber, pledge, transfer, or in any way anticipate any of his or her benefits or rights hereunder.

**Section 13.03.  Internal Revenue Service Approval.**  In the event that within a reasonable time after submission, the Internal Revenue Service shall fail or refuse to approve the restated Plan, the Employer may amend the Plan to the extent necessary to secure such approval, or may withdraw such request for approval.  If the restated Plan does not receive approval from the Internal Revenue Service, this restated Plan shall be null and void, and the Plan shall continue to be administered and held in accordance with the provisions of the Plan in effect prior to the adoption of such restatement.

39

CONFIDENTIAL

## ARTICLE XIV

## TOP-HEAVY RULES

**Section 14.01.  Top-Heavy Rules Not Applicable to Government Plans.**  The rules contained in Section 416 of the Internal Revenue Code regarding top-heavy rules are inapplicable to this Plan because it is maintained by a government entity and none of its Participants can ever be "key employees" within the meaning of Section 416 of the Internal Revenue Code.

40

CONFIDENTIAL

DEF1 00310

IN WITNESS of its adoption of the foregoing Plan, the Employer has caused its name to be hereunto subscribed by its authorized officer on this _19_ day of _SEPTEMBER_, 2013.

LAKE COUNTY SHERIFF'S DEPARTMENT

By _____

_19_ Approved and ratified at a meeting of the Lake County Sheriff's Merit Board on the day of _SEPTEMBER_, 2013.

LAKE COUNTY SHERIFF'S MERIT BOARD

By _____

_8th_ Approved and ratified at a meeting of the County Council of Lake County on the day of _October_, 2013.

COUNTY COUNCIL OF LAKE COUNTY

By _____

41

L1109

# DEPOSITION EXHIBIT 10
# TO THOMAS OSTROWSKI DEPOSITION

M.A. *Dilts*

& ASSOCIATES, INC.

July 15, 2003

Mr. Thomas J. Ostrowski

████████████████

Personal Delivery

Re: <u>Lake County Police RETIREMENT Plan</u>
Disabled Retiree: Thomas J. Ostrowski

Dear Mr. Ostrowski:

As we discussed today the following items are enclosed:

1. Original Check #087563 – $9,791.84
   Refund of Non-Taxable Portion of Employee Contributions
2. Original Check #087564 – $ 752.98
   Refund of Taxable Portion of Employee Contributions
   ($941.23 less mandatory 20% federal withholding)

Attached are 3 copies of these checks.  Please sign each copy where indicated.
The File Copy and Plan Administrator Copy will remain in our office.  The third
copy is for your file.

In the meantime, if you have any questions, feel free to call.

Sincerely,

Christopher W. Dilts, CFP™, CEBS, CLU

By:
Robin L. Ellis
Office Manager

Enclosures

cc: Sheriff Rogelio "Roy" Dominguez, c/o Commander Dennis Heaps
    Elaine Beaty, McCready & Keene, Inc.

Moses A. Dilts, CLU, ChFC, CFP™          Robin L. Ellis, Office Manager
Christopher W. Dilts, CFP™, CEBS, CLU    Shelley O. Harris, Employee Benefit Analyst
                                         Joseph M. Harris, CPA, Account Analyst

526 EAST 80th AVENUE • MERRILLVILLE, INDIANA 46410 • PHONE (219) 769-4950 • FAX (219) 769-4805
E-MAIL: madilts@netnitco.net



EXHIBIT
10

CONFIDENTIAL

DEF1 00600

**BANK CALUMET**
5231 Rohman Ave., Hammond, Indiana 46320

PAYEE:

THOMAS J. OSTROWSKI

ACCOUNT #/NAME:
40 00 4168 01 5
LAKE CTY POL RET PL
000018 004168 04500
SS# Redacted

Gross     9,791.84   YTD     9,791.84

DESCRIPTION:
NON-TAXABLE PORTION OF DISTRIBUTION

CHECK #:    0087563
DATE:      Jul 11, 2003
AMOUNT:       $9,791.84

---

VERIFY THE AUTHENTICITY OF THIS MULTI-TONE SECURITY DOCUMENT. CHECK BACKGROUND AREA CHANGES COLOR GRADUALLY FROM TOP TO BOTTOM

**TRUST & INVESTMENT SERVICES**

**BANK CALUMET**
Hammond, Indiana

087563

ACCOUNT #/NAME:
40 00 4168 01 5 LAKE CTY POL RET PL

DATE   Jul 11, 2003

Nine thousand seven hundred ninety one and 84/100

AMOUNT
*****$9,791.84

PAY TO THE ORDER OF:

THOMAS J. OSTROWSKI

VOID AFTER 90 DAYS

AUTHORIZED SIGNATURE

Redacted

THE ORIGINAL DOCUMENT HAS A WHITE REFLECTIVE WATERMARK ON THE BACK.   HOLD AT AN ANGLE TO SEE THE MARK WHEN CHECKING THE ENDORSEMENTS.

Received by _Thomas J. Ostrowski_
Date:   7-15-03

CONFIDENTIAL

DEF1 00601



**BANK CALUMET**
5231 Hohman Ave., Hammond, Indiana 46320

PAYEE:

THOMAS J. OSTROWSKI

ACCOUNT #/NAME:

40 00 4168 01 5
LAKE CTY POL RET PL
000018 004168 04500
SS# Redacted

| | | |
|---|---|---|
| Gross | 941.23 YTD | 941.23 |
| FEDERAL W/H | 188.25 YTD | 188.25 |

DESCRIPTION:

TAXABLE PORTION OF DISTRIBUTION LESS
20% FEDERAL WITHHOLDING

CHECK #: 0087564
DATE: Jul 11, 2003
AMOUNT:        $752.98

---

VERIFY THE AUTHENTICITY OF THIS MULTI-TONE SECURITY DOCUMENT.  CHECK BACKGROUND AREA CHANGES COLOR GRADUALLY FROM TOP TO BOTTOM

**TRUST & INVESTMENT SERVICES**

**BANK CALUMET**
Hammond, Indiana

DATE

077-88
719

087564

ACCOUNT #/NAME:
40 00 4168 01 5 LAKE CTY POL RET PL

Jul 11, 2003

AMOUNT

Seven hundred fifty two and 98/100          *******$752.98

PAY TO THE ORDER OF:

THOMAS J. OSTROWSKI

VOID AFTER 90 DAYS

*Thomas R. Jewellen*
AUTHORIZED SIGNATURE

Redacted

THE ORIGINAL DOCUMENT HAS A WHITE REFLECTIVE WATERMARK ON THE BACK.    HOLD AT AN ANGLE TO SEE THE MARK WHEN CHECKING THE ENDORSEMENTS.

CONFIDENTIAL

**DEF1 00602**

**FILE COPY**

M.A. *Dilts*

& ASSOCIATES, INC.

July 9, 2003

Mr. Thomas Lewallen, Vice President & Trust Officer
Attn.: Jackie Pruim
Bank Calumet
5231 Hohman Avenue
Hammond, IN 46320
Airborne Express: #2077814130

Re: Lake County Police Retirement Plan
Disabled Retiree: Thomas J. Ostrowski

Dear Mr. Lewallen:

Enclosed please find paperwork prepared and authorized for Thomas J. Ostrowski, who has retired from the Lake County Sheriff's Department, effective May 22, 2003, under a Disability Retirement.

Mr. Ostrowski has elected to receive the cash refund of his employee contributions of $10,733.07 in the form of a lump sum payment. Please refer to the withholding rules on page 2 and process his distribution as follows:

| | | |
|---|---|---|
| 1. Non-Taxable Portion of Distribution | $ 9,791.84 | |
| 2. Taxable Portion of Distribution | $ 941.23* | |
| * 20% federal withholding | | |

Please return the check to Sheriff Rogelio "Roy" Dominguez, attention Commander Dennis Heaps, for distribution. Should you have any questions regarding the above or the enclosed, please feel free to contact our office.

Sincerely,

Christopher W. Dilts, CFP™, CEBS, CLU
By: *Robin L. Ellis*
Robin L. Ellis
Office Manager

Enclosure

cc: Sheriff Rogelio "Roy" Dominguez, c/o Commander Dennis Heaps
    Elaine Beaty, McCready & Keene, Inc.
    Thomas J. Ostrowski

Moses A. Dilts, CLU, ChFC, CFP™          Robin L. Ellis, Office Manager
Christopher W. Dilts, CFP™, CEBS, CLU     Shelley D. Harris, Employee Benefit Analyst
                                          Joseph M. Harris, CPA, Account Analyst

526 EAST 86+ AVENUE • MERRILLVILLE, INDIANA 46410 • PHONE (219) 769-4950 • FAX (219) 769-4805
E-MAIL  madilts@netnitco.net

CONFIDENTIAL

**DEF1 00603**

# DEPOSITION EXHIBIT 11
## TO THOMAS OSTROWSKI DEPOSITION

Participant _____ Thomas J. Ostrowski _____ Date of Birth ___[Redacted]___ Soc. Sec. No. ___Redacted___

Address _____ Indiana _____ 46307
        Street        City       State     Zip Code

Employer ___ Lake County Sheriff's Department ___ Location ___ Crown Point, Indiana ___

Name of Plan ___ Lake County Police Retirement Plan ___

Trustee ___ Bank Calumet, N.A. ___ Account No. ___

**REASON FOR PAYMENT**

( ) Normal Retirement    ( ) Early Retirement    ( ) Postponed Retirement    (X) Disability Retirement    ( ) Deferred Vested Termination

Date of Termination ___ May 22, 2003 ___ Date of First Monthly Payment ___ June 1, 2003 ___

**FORM OF PAYMENT**    (Choose only one)

( ) a. Monthly Income Payable Only to Participant* $ ___1,848.61___ for a total of 5 payments commencing June 1, 2003, and 1 final payment of $1,490.02 on November 1, 2003.

*Guaranteed for the Refund of Employee Contributions of $9,791.84 & interest of $941.23 for a total of $10,733.07.

(X) b. Cash Refund of Employee Contributions    $ ___10,733.07___

( ) c. Direct Rollover of $_____ (cannot exceed $___941.23___) to Another Employer's Plan or an Individual Retirement Account or Annuity (with any remaining interest plus your employee contributions to be paid in cash):

_____
(specify name of plan or name of IRA trustee)

( ) d. Direct Rollover of $___10,733.07 to Another Employer's Plan or an Individual Retirement Account or Annuity (Page two of this form indicates the amount of the rollover which is nontaxable):

_____
(specify name of plan or name of IRA trustee)

I hereby apply for the above designated benefit. I understand that neither I nor my beneficiaries have any other claim for benefits under the plan except as designated above. Under penalties of perjury, I certify that my name, address and social security number are correct. If I have elected a direct rollover, I also certify that the named plan is eligible to receive a direct rollover.

Employee's Signature _____ Date ___7-5-03___
      (This form is a substitute for IRS forms W-9 and W-4P.)

Authorization by Employer _____ Date ___7/7/03___

Forms mailed or delivered to Participant (if different from authorization date):    Date _____

McCready and Keene DB Pension Benefit/Lump Sum (1-93)    Government Plan    Page 1    DB1 (LS-G)

(DISTRIBUTION OF FORMS: TRUSTEE, EMPLOYER, EMPLOYEE, McCREADY AND KEENE, INC.)



EXHIBIT
11

CONFIDENTIAL

DEF1 00604

# DEPOSITION EXHIBIT 13
# TO THOMAS OSTROWSKI DEPOSITION

County Council                    Regular Meeting                    October 11, 2016
                                                                      10:00 A.M.

meeting between the negotiation team, on the issues that were raised by the Council in Executive Session. Bilski asked the gentleman if he was aware of these concerns?
The gentleman said, he was aware from a phone call from Dabertin.  Not to sit back down at the table, he wanted us to make a change to the Agreement, that was already signed, on both sides, that was signed by both negotiating representatives, and he wanted to make a change to that Agreement, that was already put out, emailed to the County Council, and Commissioner's Office, and said he wanted to make a change to what was already presented.  We don't have the authority to do that.  That Agreement, and that bargaining closed, and we stood up at the table, we shook hands, the bargaining had closed in June.  We've been trying to get the Agreement reviewed, properly, and either certified, or denied by both the Council and Commissioners.  We reached an agreement in "good faith", and if there is an issue, there is a process written into it, to say that no part of it can be..

Bilski said, I think that's the misunderstanding, is that that team should have brought forward to us, prior to your ratification, should have brought it forward to us, and said, okay now we have a complete document. Bilski said for whatever reason, that didn't happen.  Now we have a document with issues in there, regarding overtime, and Bilski said, I agree, I'm not overly concerned with binding arbitration, but there was scheduling, and other issues on that bullet point, and I don't have that with me right now.  Bilski said we had a bullet point list of items of concern that should have been addressed, on behalf of the taxpayers of Lake County, these are concerns that our Attorneys' have decided "hey, time out".  Bilski said I don't think it would be in our best interest to vote down a CBA that is in work, I think what would be the best would be those bullet points excluding, changing your binding arbitration language, but at least that conversation with Dabertin, Attorney Szarmach, and myself, will ask you to make the phone call with, when we adjourn this meeting to find out why we haven't gotten this thing resolved, so we can ratify it.  Bilski said. I can give you my word that as soon as that gets done, I would be willing to call an emergency meeting here, not having to wait for our next agenda' meeting.

Dernulc said, none of us are trying to hold this back, we just want to get it all resolved. I know you have your positions, but we have ours.  I think, going forward, we will get this done.  Dernulc said he agrees President Bilski.  If we have to call a special meeting to get this done, we will do that.

The gentleman said he respects that, and he is not asking the Council to immediately take action, one way, or the other, my issue is, here we are, three months after the Agreement, and even the issue that's in conflict isn't clear, because the scheduling language was actually a county proposal for the 12 hour schedules.

Bilski said he thinks if we can get a letter of intent, to attach on there, sign off, a memorandum of understanding, and the provision within there, or .....

The gentleman said he will point out, when we have a chance after the council meeting, he will point out the severability clauses that absolutely already address that concern.  He said he respects the Council' decision, and he understands the frustration, and he is sure that the Council understands ours as well.

Bilski said as soon as the meeting is over, he will be on a conference call with our Attorney, Tony, and Tom Dabertin, and if we can get that resolved, and it's acceptable with you guys, he has no issue on scheduling and advertising for a special meeting to get that resolved, prior to our next meeting.

No action was taken on this matter.

In the Matter of Lake County Benefit Plan

Discussion

Bilski said, after our last month's meeting Councilman Washington asked for this to be put on the agenda. Councilman Washington shared some concern about the Police Benefit Plan, and we were supposed to, and Bilski said, he doesn't have the breakdown in front of him.  The concern was the adjustment of the accrual rates pay out for existing retirees, and beneficiaries.

Mr. Ostrowski said the question that I brought up to you was the benefits for the widows of Officers killed in the line of duty, and the second one was an adjustment that the Council, under the Indiana Code that I presented to you, for the disabled officers, was my question.
Mr. Ostrowski said he discussed this before with their union representatives, and as Mr. Blanchard has stated, they have no interest in helping these individuals.  That's why I came to the County Council.

Attorney Szarmach said the statute that you gave me, I looked at, and you are correct.  We can give a cost of living raise, or you can give a lump sum raise, you have those 2 options.  Attorney Szarmach said, I think at this time, you may want to present this to Mr. Dilts, and maybe put it in front of the Merit Board for consideration, or recommendation to us.  Attorney Szarmach said, the County Council is the last entity to do anything with pension amounts, etc.  It comes from the Merit Board, through Resolution, Mr. Dilts, and they bring everything here, and I can't remember ever that the Council not approving this.  So you should contact Mr. Dilts, contact the Sheriff, and Merit Board, and have them take a look at this, and whatever they bring to us, we will take a serious look at.



EXHIBIT
13

PLA1 00211

# DEPOSITION EXHIBIT 14
# TO THOMAS OSTROWSKI DEPOSITION

County Council                    Regular Meeting                    July 11, 2017
                                                                      10:00 A.M.

Bilski said that he next time that he is here, Bilski would love for him to come in and be introduced.  Bilski said he would like the opportunity to shake his hand.

<u>Public Portion</u>

Wayne Weltbrook, from Lowell, In gave information about the Lake County Fair.

Thomas Ostrowski, a citizen from Winfield had spoke about increasing the pension for disabled Lake County Police Officers.  He is asking the Council to join with Councilman Washington, to put pressure on the Lake County Sheriff Merit Board to work with the County Council, who has the authority to give increases.

Bilski asked Attorney Szarmach, about the established rate for the Merit Officer' Pensions.
Bilski said, it's my understanding that they have to petition the Council, because otherwise, they want money on their check, and a 10% increase, that's a 20% increase overall.  How do we negotiate a wage rate, when we are paying in 3 different fashions?
Bilski said that's something, I think needs to be negotiated with the Council.

Attorney Szarmach said, I don't know the answer to that.

Hamm said that Councilwoman Cid, as well as himself along with Mr. Overholt are in the midst of negotiations right now.  He said we pay about 40 cents on the dollar for a County Officer retiree, and about 19 cents on the dollar for a municipal Police Officer, so there is a difference, but we are in the midst of these negotiations right now.

Bilski said his question is directly about Lake County Police and Retirees.  Bilski said he think that if we are going to give an increase, it has to be paid for somehow, so the overall package, whether we're going to increase pension contributions, and active duty wages, it's a bundled figure.  It's no different when I negotiate Contracts in the private sector.  Those dollars are those dollars, you can either put money in your pension, or put money on your check.

Hamm asked if Mr. Ostrowski is negotiating on behalf of the disabled officer?

Mr. Ostrowski said he had brought this up a number of times, and then said he is negotiating for himself.

Bilski said he respects this, and thanks him for his service, and he deserves every benefit there is.

Bilski said if we want an increase in Pension, that money has to come from somewhere, and that money is going to have to come from, in Bilski's opinion, the general fund, the only place for it to come from.

Bilski said, that means, to give that dollar amount, whatever that total is, there has to be an equal reduction somewhere in that general fund to match that.

Bilski asked, who makes the decision, who is the actuary, saying whether or not, is this fund fully funded. Meaning that if everyone in County that's entitled to a pension walked out the door today, there's money there to cover that, that's what fully funded means.  Who makes that determination?

Mr. Ostrowski answered, the Administrator of the Fund, which is the Sheriff, which he stated at a County Council meeting before, that he wanted to change part of the pension, that the fund was fully funded.

Bilski said, I would need that in writing, and I would need that actuary to come up, and I need the true representatives.  Bilski said I am not going to arbitrarily give an increase, not knowing that the fund is fully funded, and not knowing that the Administration and the Union Officials are requesting this.

Bilski said even though you brought out a valid point, there is only one place to get the revenue.

Mr. Ostrowski said, that's why when Councilman Washington requested information from them, they have not responded, and I am asking you as the County Council, to join with Councilman Washington, and requesting whatever information you need from them, because this is budget time.

Bilski said, we need the request from them.  They need to come in and say, "our Pension people need more money.

Hamm asked, they have a Board of Trustees, do they not?

Mr. Ostrowski said, the Sheriff, the Treasurer, I believe is the Board of Trustee.  Exactly who it is, I have no idea.

Bilski said maybe we need an Oversight Committee, strictly for that, there is this Pension Fund out there, with a Board of Trustees saying that the Council inevitably, we are the fiduciaries of this fund, yet, we are not choosing the actuary, we are not choosing the investments.  Bilski said, I want to be taken off of that.



EXHIBIT
14

PLA1 00212

County Council                    Regular Meeting                    July 11, 2017
                                                                      10:00 A.M.

Without a control over who that money manager is, Bilski said, I don't want that liability, and I don't think anyone of us sitting here does. We need to have that answer because I don't want to be the fiduciary of a fund that I have no control over for spending, and whether or not who the investment money managers are. If we truly are, where the "buck stops at the Council", then the Council should have the appointments on that Board of Trustee, to make decisions.

Dernulc said to Attorney Szarmach, "I think you need to look into that".

Mr. Ostrowski said, I am just looking for some assistance in this. This has been going on for 9 months, and Councilman Washington has been very gracious, and pursuing this matter, and this is budget time.

Bilski said, if the fund can sustain it, then that Board of Trustees, in my opinion, should make a recommendation. It would be insane for this Council to make any recommendations on any percentage increase, without knowing the fundability. That Board of Trustees should say, "in the best interest of our membership, we recommend this, and this is why we recommend it, because this is the increase, here's the cost".

Bilski said, we don't have that authority, we don't have that information, so we can not make that recommendation without that. Bilski said, I am not going to belabor this anymore.

There being no further business to come before the Council, it was moved and seconded that the Council does now adjourn, to meet again as required by law.

_____
President, Lake County Council

ATTEST:

_____
John Petalas,
Lake County Auditor

PLA1 00213

# DEPOSITION EXHIBIT 15
# TO THOMAS OSTROWSKI DEPOSITION

| County Council | Regular Meeting | November 14, 2017 |
| --- | --- | --- |
| | | 10:00 A.M. |

Hamm nominates John Brezik as the Citizen Appointment.

Washington made the motion to close the nominations. The majority voted "Yes". Dernulc was "absent". Motion to close the nominations carried 6-yes, 1-absent.

Washington made the motion to approve Councilwoman Elsie Franklin, and John Brezik. The majority voted "Yes". Dernulc was "absent". Motion carried 6-yes, 1-absent.

In the <u>Matter of Petition for Ad Hoc Payment to the Disabled Lake County Police Officers</u>

<u>Discussion</u>

President Bilski said to Sheriff Martinez, there was a petition for the ad hoc payment to the Disabled Lake County Police Officers. Bilski said Officer Murchek is present representing the collective bargaining group as well.

Bilski said this was placed on the agenda, with a request for a discussion on this matter, and he didn't know if there were any comments that the Union needed to make, or open up a discussion on this matter.

Councilman Hamm asked how did this matter get on the agenda?
Bilski said it was put on by the Auditor, and it came to the Council because there was no place on the current agenda for discussion that the public wanted to have.
Bilski said, for the purpose of everyone in the room, at the end of each agenda, we've always opened up for public discussion, but they didn't have a place where the public wanted to add something. Bilski said we have now rectified that, and from this point forward, ....

Hamm said, there is no sponsor, no committee. Bilski said, in the future, this will be at the end of the agenda, in discussion, but Bilski feels that there is no action we can take today.

Bilski asked the gentleman to identify himself, you have asked for a petition for the ad hoc payment of $7,500 approximately, for each officer?

Thomas Ostrowski answered, yes sir, and for the last 13 years, I have been trying to get an increase for the disabled Lake County Police Officers. Before you've been given information showing that in 2004, at that time, Sheriff Dominguez asked the actuaries to find out how the Lake County disabled Police Officers could get an increase, and the at that time, Sheriff Dominguez tried to work with the, according to the information that you gave us, the Pension Advisory Committee, and no form of recommendation was ever forwarded to him, or to the Police Merit Board. At the same time, there were individuals who were against this increase. We fast forward now to 2017 where the National FOP has notified me that once an Officer retires that they are no longer considered as being represented by the FOP for negotiations, so the Disabled Officers have no other choice to get an increase, except through an ad hoc, or a cost of living, which has to come through the County Council. We had this discussion last October, Councilman Washington sent a letter to the Sheriff Department, trying to find out how we could get this taken care of, we went through 3 administrations. I had a discussion last month with Sheriff Martinez on this subject. It was my opinion, and maybe I'm wrong, but the pension has in the benefit portion of, according to my document, has enough money to cover for this ad hoc payment. It would take one-fifth of the interest earned from that account, never touching the principal. And the only place, like I said, that we can come to, to get an increase is from the County Council.

Murchek said that Mr. Ostrowski doesn't speak for the Lake County FOP, or the Lake County Union. He said, they are not opposed, to looking at things down the road. The budget has been set this year. Recently, it was just paid out of their fund to have a Study done, by McCready and Keene, and there is a mechanism in there, they have a Pension Advisory Committee, they have a Merit Board, the Lake County Sheriff, and we also have the County Council, that all work together within this Pension. He said he would ask to put a Committee together where everyone is involved to see what is feasible to do, that won't impact the current pension, and current officers that are in the pension fund. He said he believes that is the place for discussion, and bring that forward, if necessary down the line.

Franklin said she agrees with Murchek. There has not been enough discussion amongst ourselves, as it relates to this matter, and he gave us a figure of $7,500, and Franklin said we can not just arbitrarily say yes, to this today. The Council needs to sit down and work with the FOP, and whomever else is responsible for pensions, as it relates to the Sheriff's Department, to get a true picture because we don't know if this is a one-time payment, or how much money we would have to come up with every year.

Bilski said, without the actuary studies being done, with all respect, he knows that it's the accrual rate, and the amount paid off that you need your actuary study. We need to adjust, and you as a committee need to adjust, and there is a union need to adjust those accrual rates, and that amount in that fund, whether or not how much you take care of your retirees.


EXHIBIT
15

PLA1 00214

| County Council | Regular Meeting | November 14, 2017 |
| --- | --- | --- |
| | | 10:00 A.M. |

Bilski said in organized labor, that he has a little bit of experience in, when it comes to pension funds adjustments, are made, and it's made through that accrual rate, but that in no way entitles a retiree that retired 30 years ago, to shake down as much money as I retire at in 2018, or 2017. It's based on the amount of money that is put in there, that's why we have actuarial studies, otherwise you are going to run that fund into the red so fast, no one is going to have a pension, so that's where it needs to start.  We need to make those adjustments, and the union needs to make it as part of their proposal, and that actuary group needs to bring those numbers to us, for us to review.  The negotiation end on that is up to you guys to figure where that is, and where you guys want a retirement, and how your retirement pension is structured. Bilski said, what I expect in front of me is an actuary study that says, this is financially prudent, and this is what the Council will made a decision on.  Do I think that everyone deserves, I'm a labor guy, I think that everyone deserves an extra $10,000 dollars a year, there is not a doubt in my mind. The fact is, can we afford it, and that's the question that has to be answered.

Mr. Ostrowski said, if you look at page 9 of the actuary study that was given to you by the Sheriff's Department, you will see that the money that is being requested, comes out of the part of which is the benefit fund, which does not affect the county officers themselves.  There are 2 different funds, there is the pension fund, and there is the benefit fund.  The benefit fund takes of the disabled officers.  If you look at that sir, it made over $500,000 dollars last year, so what we are asking for is just a portion of that money to take care of it.  Mr Ostrowski asked now, will the Union and the FOP support this?  He said the Union and the FOP knew last October that he was here asking the County Council for help.  The Union and the FOP negotiated with the County Council, and the disabled officers were left out of it.  The only option that the disabled officers have, is to come to the County Council, ask you, or more likely beg you to use the authority given to you by the State of Indiana, under the IC code, to authorize an ad hoc payment.

Mr. Ostrowski said, I understand that you are a union, I understand you talk about a living wage and so forth, like many other Council members here talk about that.  But when you have Officers making less than $1,000 dollars a month, their insurance goes up, the County Council just approved an increase in the taxes that these officers are going to have to pay for their property taxes.  My question is, where are these officers going to get the money  for all of these increases, if it's not going to come from the County Council sir?

Washington said it sounds like to me, you just want a voice, from the very beginning, you just want a voice, a seat at the table to see what they can do.  Washington recommended that you guys get together, and make sure you guys have that voice, and come up with something like the President said, something that's feasible for everyone.

Chief Paterson said, for the record, we have done the actual studies, you guys should have received it, if you haven't we will make sure that you get it.  We, as the Pension Committee have decided that a annual cost of living increase was the right way to do this.  We've provided how that could be done, how the fund would be done, what would be the effect on the big picture.  You guys should have that.

Bilski said, if it needs to be put on the agenda, we can put it on for discussion.

Dante said the Council approved everything that was required in that booklet, that was submitted to them, they approved everything, and we went at the maximum amount.

Chief Paterson said, this is at his request.

Dante said then, it's an amended version, which we didn't have at the time, but what you had at the time, submitted to us by McCready and Keene, and their representative Mr. Dilts, we went to the maximum, and gave them everything that you requested, so if there is an amendment that happened, after the fact, it happened after the fact.

Bilski said when you have a guy that has been 100% disabled, the maximum pay out for someone that is disabled and can not go to work is $1,000 a month?

The Sheriff's representative said, it's based on when he retired, from the actual year he retired at 74%, with your best 3 years, at the highest you get, so if you retired 13 years ago, went on disability 13 years ago, your disability is going to be different from an officer that goes on disability now.

Bilski asked is that based on whether or not you qualify for social security.

Chief Paterson said, we do not reduce for social security.

Bilski asked are they allowed to go work, is there a limit on what they could make?

The representative answered yes.

Bilski said so, if you are not 100% disabled, you could earn up to, let's say, a benchmark of $30,000 to $40,000 a year, something like that, or less.

PLA1 00215

County Council                    Regular Meeting                    November 14, 2017
                                                                     10:00 A.M.

The answer was, whatever the Pension Board decides.

Bilski said maybe that's something that needs to be looked at, which maybe it hasn't, so if someone is not fully disabled, but they are collecting a disability, but if they can't go back to work because they would lose that $1,000 a month, then maybe the simple adjustment would be to allow them to work, to earn a little extra money.

Chief Paterson said, the Benefit Plan covers 100% of that disabled participant' insurance, relating to their disability, it's a very generous one.

Strong asked Chief Paterson, you said your cost of living increase was included?

Chief Paterson said, we submitted it to you, we had an Actuary Study done.

Strong asked, nothing in the budget?

Chief Paterson said, no, no, nothing in the budget, but we have provided it to the Council.

No Action was taken on this matter.


In the Matter of Joint Interlocal Cooperation Agreement for the Intersection Improvement of West 109th Avenue and Calumet Avenue Lake County, Indiana, Between the Town of St. John, Indiana, a Municipal Corporation and Unit of Local Government, and Lake County, Indiana, a Unit of Local Government.

Hamm made the motion, seconded by Strong to approve.  The majority voted "Yes".  Dernulc was "absent".  Motion carried 6-yes, 1-absent.


PLA1 00216

# DEPOSITION EXHIBIT 16
# TO THOMAS OSTROWSKI DEPOSITION

# Lake County Sheriff's Merit

## Probationary Patrol Offic

## A P P L I C A T I O N



NAME  OSTROWSKI   ThomAS   JosePH
    Last        First      Middle

ALIAS(ES) _____
        Nickname(s), Maiden Name, other changes in name

ADDRESS  ███████████████████████████████     Apt. No. _____
         Street or Rural Route

███████████████   LAke       IN       46307
   City          County     State    Zip Code

TELEPHONE  Home- ████████████   Business-(219) 755·3425
            Area Code                  Area Code    EXT.

THE FACTS SET FORTH IN MY APPLICATION FOR EMPLOYMENT WITH THE LAKE COUNTY SHERIFF'S DEPARTMENT
ARE TRUE AND COMPLETE. I UNDERSTAND THAT FALSE STATEMENTS ON THIS APPLICATION SHALL BE CONSIDERED
SUFFICIENT CAUSE FOR ELIMINATION FROM FURTHER CONSIDERATION.

DATE  12 June 95          _Thomas J. Ostrowski_
                              (signature of applicant)

An  Equal  Opportunity  Employer

**EXHIBIT**
**16**

CONFIDENTIAL                                    DEF1 00006

## I. INITIAL REQUIREMENT DATA

A. Are you a U.S. Citizen? Yes   Native Yes   Naturalized No. _____

B. Your Age 34 . Date of Birth _____ . Place of Birth IN  GARY

C. Sex M . Social Security Number Redacted

D. Your Height (without shoes) in Feet 6   Inches 1

E. Your Weight (stripped) 220 , Color of Eyes BRN , Color of Hair BRN

F. Scars, Distinguishing Marks or Tatoos N/A

G. Are you a Regular Graduate of an Accredited High School? Yes (ANDREAN)

H. If no, have you been issued an equivalency diploma from an accredited High School? _____

I. Do you currently possess a valid automobile driving licence? Yes
   Licence Number _____ Type of Licence OPERATOR  State IN.
   Is your Licence Restricted? Yes   If yes, for what reason? GLASSES
   RESTRICTION (A)
   Number of years driving experience 18 yrs

J. Present Automobile Insurance Company ILLINOIS FARMERS INC CO.

## II. FAMILY DATA .

A. Marital Status: Married ✓ Single ____ Widowed ____ Divorced ____ Separated ____
   Engaged ____
   Name of Fiancee (if applicable) _____

B. DEPENDENTS

| NAME | AGE | RELATIONSHIP |
|------|-----|--------------|
| Phyllis Ann OSTROWSKI | 29 | Wife. |
|  |  |  |
|  |  | . |
|  |  |  |

C. List Father (full name) Mother (maiden name)      Present Address if Living

| | | |
|---|---|---|
| RAymunD J. OSTROWSKI | ▮▮▮▮ | GARy IN. |
| Frances J SPISAK | " | " |

List all Brothers and Sisters (use back page if necessary) and Present Address if living

| | | |
|---|---|---|
| Ron OSTROWSKI | | GARy |
| Cindy Kenneth (sister) | ▮▮▮▮ | SCOTTSdAle AZ |
| Terri Quinn (Sister) | | PH. AZ. |
| Frances OStrowski (sister) | ▮▮▮▮ | SCOTTSdAle AZ. |

SPOUSE (maiden name)  and Address

D. Is Spouse Employed? ✓ . If yes, where employed? Community Hospital Munster

# <u>DEPOSITION EXHIBIT 17</u>
# <u>TO THOMAS OSTROWSKI DEPOSITION</u>

First Report of Employee Injury/Illness

Please Return Completed Form to: 402 W. Washington St., Room W196
Indianapolis, IN 46204-2753
(317) 232-3808

**PLEASE TYPE or PRINT IN INK**

NOTE: Your Social Security Number is being requested by this state agency in order to pursue its statutory responsibilities. Disclosure is voluntary and you will not be penalized for refusal.

## EMPLOYEE INFORMATION

| SOCIAL SECURITY NUMBER | DATE OF BIRTH | SEX | OCCUPATION/JOB TITLE | NCCI CLASS CODE |
|---|---|---|---|---|
| Redacted | | ☒ MALE ☐ FEMALE ☐ UNKNOWN | Police officer | |

| LAST NAME | FIRST | MIDDLE | MARITAL STATUS | DATE HIRED | STATE OF HIRE | EMPLOYEE STATUS |
|---|---|---|---|---|---|---|
| Ostrowsk. | Thomas | J | ☐ UNMARRIED ☒ MARRIED ☐ SEPARATED ☐ UNKNOWN | 1-5-87 | | |

ADDRESS (INCL ZIP)

| | HRS/DAY | DAYS/WK | AVG WG/WK | PAID DAY OF INJ ☐ SALARY CONT'D ☐ |
|---|---|---|---|---|

| PHONE 219·662-2502 | # OF DEPENDENTS  2 | WAGE $ | PER: ☐ HR ☐ DAY ☐ WK ☐ MO ☐ YR ☐ OTHER: |
|---|---|---|---|

## EMPLOYER INFORMATION

| EMPLOYER (NAME, ADDRESS, CITY, STATE, ZIP) Lake County Sheriff - 2293 N. Main St Crown Point IN | EMPLOYER FEDERAL ID# | SIC CODE | INSURED REPORT NUMBER |
|---|---|---|---|
| | LOCATION # | | EMPLOYER'S LOCATION ADDRESS (IF DIFFERENT) |
| | PHONE # 755-3372 | | |
| | CARRIER/ADMINISTRATOR CLAIM NUMBER | | REPORT PURPOSE CODE |

Actual Location of Accident/Exposure (if not on employer's premises):

## CARRIER/CLAIMS ADMINISTRATOR INFORMATION

| CLAIMS ADMINISTRATOR (NAME, ADDRESS, PHONE NO) | CARRIER FEDERAL ID# | CHECK IF APPROPRIATE ☐ SELF INSURANCE |
|---|---|---|
| | ☐ INSURANCE CARRIER | POLICY/SELF-INSURED NUMBER |
| | ☐ THIRD PARTY ADMIN | POLICY PERIOD FROM            TO |
| PHONE: | CODE NUMBER | |
| AGENT NAME | | |

## OCCURRENCE/TREATMENT INFORMATION

| DATE OF INJ/EXP 5-16-96 | TIME OF OCCURRENCE ___ M | DATE EMPLOYER NOTIFIED 5-17-96 | TYPE OF INJURY/EXPOSURE INSULT TO Lower BALK | TYPE CODE |
|---|---|---|---|---|
| LAST WORK DATE | TIME WORKDAY BEGAN | DATE DISABILITY BEGAN | PART OF BODY | PART CODE |

| RTW DATE | DATE OF DEATH | INJURY/EXPOSURE OCCURRED ON EMPLOYER'S PREMISES? ☒ YES ☐ NO | CONTACT NAME | PHONE NUMBER |
|---|---|---|---|---|

| DEPARTMENT OR LOCATION WHERE ACCIDENT/EXPOSURE OCCURRED Indiana Law Enforcement School | ALL EQUIPMENT, MATERIALS, OR CHEMICALS INVOLVED IN ACCIDENT CAR - PATROL |
|---|---|
| SPECIFIC ACTIVITY ENGAGED IN DURING ACCIDENT/EXPOSURE E.V.O.C. Training | WORK PROCESS EMPLOYEE ENGAGED IN DURING ACCIDENT/EXPOSURE School - Training - Driving |

HOW INJURY/EXPOSURE OCCURRED, DESCRIBE THE SEQUENCE OF EVENTS AND INCLUDE ANY RELEVANT OBJECTS OR SUBSTANCES
School vehicles did not have Seat belts in the rear Seats but did have Belt Conectors - Student Driver cut wheel Hard During Training. Officers Slid Across Back.

See BACK

| | CAUSE OF INJURY CODE |
|---|---|

| NAME OF PHYSICIAN/HEALTH CARE PROVIDER Hendricks Co. ER | INITIAL TREATMENT ☐ NO MEDICAL TREATMENT ☐ MINOR: BY EMPLOYER ☐ MINOR: CLINIC/HOSP ☒ EMERGENCY CARE ☐ HOSPITALIZED >24 HRS ☐ FUTURE MAJOR MEDICAL/ LOST TIME ANTICIPATED |
|---|---|
| WITNESSES (NAME, PHONE #) | DATE ADMINISTRATOR NOTIFIED 5-17-96 | |

| DATE PREPARED | PREPARER'S NAME | TITLE | PHONE NUMBER | |
|---|---|---|---|---|

... injury or illness may result in a $50 fine (IC 22-3-4-13)

STATE FORM 34401 (R8 2/96)

CONFIDENTIAL

**EXHIBIT 17**

**DEF1 00077**

# DEPOSITION EXHIBIT 21
# TO THOMAS OSTROWSKI DEPOSITION



LAKE COUNTY, INDIANA
# SHERIFF MERIT BOARD
2293 NORTH MAIN STREET
CROWN POINT, INDIANA 46307

July 2, 2003

Disability Determination Bureau
P.O. Box 7069
Indianapolis, IN 46207

RE: Ostrowski, Thomas
　　SSN: ███████
　　DOB ███████

The above captioned employee was approved as eligible and granted the disability benefit as outlined in the Lake County Police Pension and Disability Plan.

This action was taken on May 22, 2003 by the Lake County Police Merit Board.

Should you have any further questions, please call Dennis Heaps, Commander of Staff Services Division, at 219-755-3435. His email is dheaps@lakecountysheriff.com.

Sincerely,

Otho Lyles, President
Lake County Police Merit Board
2293 N. Main St.
Crown Point, In 46307

Cc: file
Ostrowski, T.

**EXHIBIT**

**21**

# <u>DEPOSITION EXHIBIT 27</u>
# <u>TO THOMAS OSTROWSKI DEPOSITION</u>

Mr. Ted Nowakowski                                          21 January 2003
President, Lake County Sheriffs' Merit Board
Lake County Sheriffs Department
2293 North Main Street
Crown Point, IN 46307

Dear Sir,

As the Lake County Sheriffs Merit Board is aware I was operated on the 30th of July 2002 for lower back problems. On November 1 2002, I returned to temporary modified light duty.

On January 7th, 2003 I met with my neurosurgeon Dr. Gropper of the Chicago Institute of Neurosurgery and Neuroresearch. Dr. Gropper and I discussed my present medical condition of lower back pain, numbness of the outer right leg, leg cramps which interferes with my sleeping, weight gain due to lack of exercise because of the lower back pain and depression due to the above listed problems.

We talked about the outlook for my medical problems and Dr. Gropper believes that this will be a long-term problem for me with the possibility of more surgery in the near future. I have also enclosed a letter from Dr. Gropper.

As per the Lake County Sheriffs' Rules and Regulations, section 5.07.02, Sick Leave-Major Illnesses, sub-section F. I here by apply for my disability pension.

Sincerely,

Thomas J. Ostrowski

**EXHIBIT**

**27**

SSA1 00330

# DEPOSITION EXHIBIT 46
# TO THOMAS OSTROWSKI DEPOSITION

**M.A.** *Dilts* & ASSOCIATES, INC.

**FILE COPY**

July 15, 2003

Mr. Thomas J. Ostrowski

██████████

Personal Delivery

Re: <u>**Lake County Police BENEFIT Plan**</u>
Disabled Retiree: Thomas J. Ostrowski

Dear Mr. Ostrowski:

As we discussed today the following item is enclosed:

    1.  Check #087565 – $3,477.22
        06/01/03 & 07/01/03 Monthly Annuity Payments
        ($3,697.22 less withholding)

Enclosed are 3 copies of this check. Please sign each copy where indicated.
The File Copy and Plan Administrator Copy will remain in our office. The third
copy is for your file.

In the meantime, if you have any questions, feel free to call.

Sincerely,

Christopher W. Dilts, CFP™, CEBS, CLU

By:
Robin L. Ellis
Office Manager

Enclosures

cc:  Sheriff Rogelio "Roy" Dominguez, c/o Commander Dennis Heaps
    Elaine Beaty, McCready & Keene, Inc.

Moses A. Dilts, CLU, ChFC, CFP™
Christopher W. Dilts, CFP™, CEBS, CLU

Robin L. Ellis, Office Manager
Shelley D. Harris, Employee Benefit Analyst
Joseph M. Harris, CPA, Account Analyst

525 EAST 86th AVENUE • MERRILLVILLE, INDIANA 46410 • PHONE (219) 769-4950 • FAX (219) 769-4805
E-MAIL: madilts@netnitco.net



EXHIBIT
46

CONFIDENTIAL

**DEF1 00607**

FILE COPY



**BANK CALUMET**
5231 Hohman Ave., Hammond, Indiana 46320

PAYEE:

THOMAS J. OSTROWSKI

| | | |
|---|---|---|
| Gross | 3,697.22 YTD | 3,697.22 |
| FEDERAL W/H | 220.00 YTD | 220.00 |

ACCOUNT #/NAME:
40 00 4168 01 5
LAKE CTY POL RET PL
000018 004168 04500
SS# Redacted

DESCRIPTION:
JUNE & JULY 2003 ANNUITY PAYMENTS
EACH ($1,848.61 LESS FED W/H $110.00)

CHECK #: 0087565
DATE: Jul 11, 2003
AMOUNT: $3,477.22

---

VERIFY THE AUTHENTICITY OF THIS MULTI-TONE SECURITY DOCUMENT. CHECK BACKGROUND AREA CHANGES COLOR GRADUALLY FROM TOP TO BOTTOM

**TRUST & INVESTMENT SERVICES**

**BANK CALUMET** Hammond, Indiana

DATE   Jul 11, 2003

087565

ACCOUNT #/NAME:
40 00 4168 01 5 LAKE CTY POL RET PL

AMOUNT
*****$3,477.22

Three thousand four hundred seventy seven and 22/100

PAY TO THE ORDER OF:

THOMAS J. OSTROWSKI

VOID AFTER 90 DAYS

_Thomas R Jewellex_
AUTHORIZED SIGNATURE

Redacted

THE ORIGINAL DOCUMENT HAS A WHITE REFLECTIVE WATERMARK ON THE BACK.   HOLD AT AN ANGLE TO SEE THE MARK WHEN CHECKING THE ENDORSEMENTS.

Received by: _Thomas Ostrowski_
date:   7-15-03

CONFIDENTIAL

# DEPOSITION EXHIBIT 47
# TO THOMAS OSTROWSKI DEPOSITION

M.A. *Dilts*

& ASSOCIATES, INC.

**FILE COPY**

July 9, 2003

Mr. Thomas Lewallen, Vice President & Trust Officer
Attn.: Jackie Pruim
Bank Calumet
5231 Hohman Avenue
Hammond, IN 46320
Airborne Express: #2077814130

Re: Lake County Police Benefit Plan
Disabled Retiree: Thomas J. Ostrowski

Dear Mr. Lewallen:

Enclosed please find paperwork prepared and authorized for Thomas J. Ostrowski who retired from the Lake County Sheriff's Department, effective May 22, 2003, under a Disability Retirement.

Under the terms of this plan Mr. Ostrowski is eligible to receive a monthly income of $1,848.61 with the first payment commencing June 1, 2003, to cease upon recovery or death, plus Disability Medical Expense Reimbursement as approved by the Merit Board. Mr. Ostrowski has elected to have federal income taxes withheld from his annuity payments – filing status Married – Allowances Claimed 1.

Please return the June & July annuity checks to Sheriff Rogelio "Roy" Dominguez, attention Commander Dennis Heaps, for distribution. Benefits due August 1, 2003, and after are to be forwarded to Mr. Ostrowski's home address.

Should you have any questions regarding the above or the enclosed, please feel free to contact our office.

Sincerely,

Christopher W. Dilts, CFP™, CEBS, CLU
By: *Robin L. Ellis*
Robin L. Ellis
Office Manager

Enclosure

cc: Sheriff Rogelio "Roy" Dominguez, c/o Commander Dennis Heaps
Elaine Beaty, McCready & Keene, Inc.
Thomas J. Ostrowski



Christopher W. Dilts. CFP™, CEBS, CLU

Robin L. Ellis. Office Manager
Shelley D. Harris. Employee Benefit Analyst
Joseph M. Harris. CPA. Account Analyst

526 EAST 86th AVENUE • MERRILLVILLE, INDIANA 46410 • PHONE (219) 769-4950 • FAX (219) 769-4805
E-MAIL: madilts@netnitco.net

**EXHIBIT**
**47**

CONFIDENTIAL

**DEF1 00611**

# APPLICATION FOR PENSION BENEFITS

Participant _____ Thomas J. Ostrowski _____ Date of Birth _____ [Redacted] _____ Soc. Sec. No. [Redacted]

Address _____ [Redacted] _____
Street _____ City _____ Indiana _____ 46307
State _____ Zip Code

Employer _____ Lake County Sheriff's Department _____ Location _____ Crown Point, Indiana

Name of Plan _____ Lake County Police Benefit Plan

Trustee _____ Bank Calumet, N.A. _____ Account No. _____

## REASON FOR PAYMENT

( ) Normal Retirement  ( ) Early Retirement  ( ) Postponed Retirement  (X) Disability Retirement  ( ) Deferred Vested Termination

Date of Termination _____ May 22, 2003 _____ Date of First Monthly Payment _____ June 1, 2003

## FORM OF PAYMENT

Monthly Annuity payable only to the Participant in the amount of $1,848.61 commencing June 1, 2003 for life or recovery from disability PLUS disability expense reimbursement for medical expenses incurred.

I hereby apply for the above designated benefit. I understand that neither I nor my beneficiaries have any other claim for benefits under the plan except as designated above. Under penalties of perjury, I certify that my name, address and social security number are correct.

Employee's Signature _____ [signature] _____ Date _____ 7-8-03
(This form is a substitute for IRS Forms W-9 and W-4P.)

Authorization by Employer _____ [signature] _____ Date _____ 7/8/03

Forms mailed or delivered to Participant (if different from authorization date): _____ Date _____

McCready and Keene DB Pension Benefit (1-93)       Government Plan       Page 1       DB 1(G)

(DISTRIBUTION OF FORMS: TRUSTEE, EMPLOYER, EMPLOYEE, MCCREADY AND KEENE, INC.)

CONFIDENTIAL

## NOTICE ABOUT FEDERAL TAX WITHHOLDING

Your plan payments are subject to federal income tax withholding, but you may <u>waive</u> withholding. Withholding only applies to the taxable part of your payment. To speed up the processing of your benefits, a withholding form is provided below. You may submit another acceptable withholding form if you do so timely. For example, you can use the official IRS Form W-4P.

You have the right to change your election before payment begins. You may change simply by notifying your Employer in writing. If you do not complete a withholding form, federal income tax will be withheld at the rate required by law.

If you choose <u>not</u> to have any withholding, you may owe estimated tax. You may also have to pay estimated tax if you do not have enough tax withheld. You may incur penalties if your withholding plus any estimated tax payments are not enough.

Your plan permits only periodic payment of pension benefits. Periodic payments are regular payments like a monthly annuity or installments. The payor uses special tables to figure this withholding. These tables are based on your marital status and the number of allowances you claim.

Your withholding election for your pension benefit on this form will continue until you change it. You should give 30 days advance notice of any change. The change will generally be made by the next January 1, May 1, July 1, or October 1. If you receive annuity payments from an insurance company, you may have to fill out a separate withholding form. Any change of that election must be made under insurance company rules.

## ELECTION REGARDING INCOME TAX WITHHOLDING

( )  I do <u>not</u> want any federal income taxes withheld from my plan payments.

(✓)  The payor should withhold tax from each <u>periodic</u> payment based on the following information:

    a.  Filing Status:   ( ) Single   (✓) Married   ( ) Married but withhold at higher Single rate.
    b.  Enter number of allowances claimed: _____1_____ .
    c.  I want the following additional amount withheld from each periodic payment:   $_____ .

Under penalties of perjury, I certify that my name, address, and social security number on the front are correct.

Signed _____    Date 2-5-03

    *(This form is a substitute for IRS Forms W-9 and W-4P.)*

Form 1099-R Distribution Code for Trustee's use: _____3_____

YOUR MONTHLY PENSION PAYMENTS ARE NOT ELIGIBLE FOR ROLLOVER TO AN INDIVIDUAL RETIREMENT ACCOUNT (OR OTHER ELIGIBLE RETIREMENT PLAN).

McCready and Keene DB Pension Benefit (1-93)

CONFIDENTIAL    DEF1 00613

# <u>DEPOSITION EXHIBIT 48</u>
# <u>TO THOMAS OSTROWSKI DEPOSITION</u>

13

# Thomas Ostrowski

## Review of Disability Benefits

| | | |
|---|---|---|
| Date of Birth: | ████████████ | |
| Date of Hire: | 11/27/1995 – Age 34 | Worked 6 years |
| Date of Disability: | 05/22/2003 | Disabled the last year or more and put on light duty |
| Current Age: | 54 | |
| Average Salary: (Best 3 Years)  Equals | | $ 3,047.67 |
| Benefit Calculation based on 25 Years of Service:  Equals 60% | | $ 1,828.61 |
| Plus $20: | | $      20.00 |
| Monthly Disability Payment: | | **$ 1,848.61** |
| Annual Salary used to calculate Disability: | | $36,592.00 |
| Annual Disability Payments: | | $22,183.32 |



Dilts

EXHIBIT
48

CONFIDENTIAL

DEF1 00591